UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONALD KRICK, Individually and on Behalf of the Estate of Oliver Krick; MARGARETA KRICK; CHRISTOPHER KRICK; DOUGLAS KEVORKIAN, Individually and on Behalf of the Estate of Ralph Kevorkian; LISA MICHELSON, Individually and on Behalf of the Estate of Yonatan Rojany; ERIC ROJANY; JODELLE GEARON, Individually and on Behalf of the Estate of Daniel Gaetke; TODD GAETKE; CRAIG GAETKE; WANDA KEMP, Individually and on Behalf of the Estates of O. Lamar Allen and Ashton Allen; CHRISTINE GROGAN; EILEEN ZAHARIOUDAKIS, Individually and Behalf of the Estate of Donald Gough; and MICHAEL DETERESA, | Judge:<br><br>Case No.  1:22-cv-11032<br><br><br>JURY TRIAL DEMANDED |
|      Plaintiffs | |
| v. | |
| RAYTHEON COMPANY; RAYTHEON TECHNOLOGIES CORPORATION; LOCKHEED MARTIN CORPORATION; UNITED STATES MISSILE DEFENSE AGENCY; UNITED STATES DEPARTMENT OF DEFENSE; UNITED STATES NAVY; and DOES 1 through, 20, inclusive, | |
|     Defendants. | |

<u>**COMPLAINT FOR DAMAGES**</u>

1

## I.      INTRODUCTION

1.      The crash of Trans World Airlines (TWA) Flight 800 ("TWA 800") was one of the deadliest aviation incidents in the history of the United States.  It also resulted in what could be considered one of the nation's biggest cover-ups.

2.      On July 17, 1996, a Boeing 747 headed for Paris took off from New York's John F. Kennedy International Airport at around 8:20 p.m.  Within twelve minutes of takeoff, the plane exploded and crashed into the Atlantic Ocean off the coast of Long Island, New York.  All 230 passengers and crew members perished.

3.      After the incident, the federal government released a false report contending that the explosion was the result of an electrical fire in the airplane's center fuel tank.

4.      Only recently, thanks to the work of physicist, Dr. Thomas Stalcup, through his Freedom of Information Act ("FOIA") litigation in Massachusetts federal court, has evidence emerged proving that TWA 800's explosion was not caused by any defect in the airplane, but instead by an errant United States missile fired at aerial target drones flying nearby.

5.      The evidence unearthed by Dr. Stalcup establishes that the United States Missile Defense Agency (formerly known as the Ballistic Missile Defense Organization), the United States Department of Defense, and the United States Navy (the "Government Defendants"), acting in concert and working side-by-side with Raytheon Company (now known as Raytheon Technologies Corporation) and Lockheed Martin Corporation (the "Contractor Defendants") and DOES 1 through 20, inclusive

2

(collectively the "Defendants') were testing the Aegis Weapons System and firing SM-2 missiles with live warheads from warship(s) at aerial missile targets off the coast of New York in close proximity to commercial airline flight paths. One such missile struck TWA flight 800, causing it to break apart and crash into the Atlantic Ocean, killing everyone aboard.

6.     Newly discovered evidence also shows that these Defendants engaged in a top-down cover-up to prevent the public from learning the truth about TWA 800. Proof of this cover-up, and of Defendants' underlying culpability for the crash, was only recently unearthed by Dr. Stalcup after more than a decade of FOIA litigation against the Government Defendants.

7.     Plaintiffs are the family members and estates of victims of the TWA 800 crash.  They bring this action to hold the Defendants liable for their reckless conduct and subsequent cover-up, and to vindicate the rights of those wrongly killed in the TWA 800 crash.

## II.     JURISDICTION AND VENUE

8.     This is a civil action for money damages against the United States Missile Defense Agency (formerly known as the Ballistic Missile Defense Organization), the United States Department of Defense, the United States Navy, Raytheon Company, Raytheon Technologies Corporation, Lockheed Martin Corporation, and DOES 1 through 20, inclusive, and their agents and employees.  It arises from reckless and grossly negligent conduct and wrongful acts and omissions resulting in the death of 230

individuals aboard TWA 800 over the Atlantic Ocean, including the decedents represented by Plaintiffs herein.

9.     Two of the Defendants named in this complaint are headquartered within the District of Massachusetts. Specifically, Defendant Raytheon Company and Defendant Raytheon Technologies Corporation both have their headquarters and principal places of business in Waltham, Massachusetts.

10.     In addition, a related case, *Thomas Stalcup v. Department of Defense*, Case No. 1:13-cv-11967-LTS, has been pending in United States District Court, District of Massachusetts, for several years.

11.     Plaintiffs assert their claims against the Government Defendants, United States Missile Defense Agency (formerly known as the Ballistic Missile Defense Organization), the United States Department of Defense, and the United States Navy, under the Federal Tort Claims Act ("FTCA") 28 U.S.C. § 2671 *et seq.*

12.     Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1331, 1332 and 28 U.S.C. § 1346(b).

13.     This Court may properly assert personal jurisdiction over all of the named Defendants because of their presence and activity in, and connections to, this forum.

14.     Venue is proper in this forum pursuant to 28 U.S.C. § 1402.

### III.   THE PARTIES

**a.   <u>The Plaintiffs</u>**

15.    Plaintiff Ronald Krick resides in Missouri.  He is the father of Oliver R. Krick and brings this action individually and as personal representative on behalf of the Estate of Oliver R. Krick, who died on TWA 800.

16.    Plaintiff Margareta Krick resides in Missouri.  She is the mother of Oliver R. Krick and brings this action individually.

17.    Plaintiff Christopher Krick resides in Missouri.  He is the brother of Oliver R. Krick and brings this action individually.

18.    Plaintiff Douglas Kevorkian resides in California.  He is the son of Ralph G. Kevorkian and brings this action individually and as personal representative on behalf of the Estate of Ralph G. Kevorkian, who died on TWA 800.

19.    Plaintiff Lisa Michelson resides in California.  She is the mother of Yonatan Rojany and brings this action individually and as personal representative on behalf of the Estate of Yonatan Rojany, who died on TWA 800.

20.    Plaintiff Eric Rojany resides in California.  He is the brother of Yonatan Rojany and brings this action individually.

21.    Plaintiff Jodelle Gearon resides in Kansas.  She is the sister of Daniel Gaetke and brings this action individually and as personal representative on behalf of the Estate of Daniel Gaetke, who died on TWA 800.

22.    Plaintiff Todd Gaetke resides in Kansas.  He is the brother of Daniel Gaetke and brings this action individually.

23.     Plaintiff Craig Gaetke resides in Georgia.  He is the brother of Daniel Gaetke and brings this action individually.

24.     Plaintiff Wanda Kemp resides in Georgia.  She is the sister of O. Lamar Allen and the aunt of Ashton Allen and brings this action individually and as personal representative on behalf of the Estates of O. Lamar Allen and Ashton Allen, both of whom died in the crash of TWA 800.

25.     Plaintiff Christine Grogan resides in California.  She is the daughter of O. Lamar Allen and brings this action individually.

26.     Plaintiff Eileen Zaharioudakis resides in California.  She is the sister of Donald E. Gough and brings this action individually and as personal representative on behalf of the Estate of Donald E. Gough, who died on TWA 800.

27.     Plaintiff Michael Deteresa resides in New Jersey.  He is the nephew of Donald E. Gough and brings this action individually.

**b.     The Defendants**

28.     Defendant Raytheon Company is a Delaware Corporation with its headquarters and principal place of business in Waltham, Massachusetts.

29.     Defendant Raytheon Technologies Corporation is a Delaware Corporation with its headquarters and principal place of business in Waltham, Massachusetts.

30.     Defendant Lockheed Martin Corporation is a Maryland corporation with its principal place of business in Bethesda, Maryland.  Defendant Lockheed Martin Corporation has significant contacts with, and conducts substantial business in, the Commonwealth of Massachusetts.  For example, Defendant Lockheed Martin

6

Corporation owns and operates several facilities in the Commonwealth of Massachusetts.

31.     The United States Defendants, including the United States Missile Defense Agency, the United States Department of Defense, and the United States Navy have significant contacts with, and conduct substantial business and operations in, the Commonwealth of Massachusetts.

32.     The Defendants identified herein as DOES 1 through 20, are the joint-venturers, agents, servants, employees, predecessor or subsequent companies or corporations, divisions, agencies, subsidiaries, and co-conspirators of the other Defendants.  They have been named using these fictious names because their true identities are currently unknown.  When their true identities become known, Plaintiffs will amend this complaint to substitute the true names for the fictitious names.

## IV.     FACTS COMMON TO ALL CAUSES OF ACTION

### a. Overview: The TWA 800 Disaster

33.     The Defendants tested missiles off the coast of the Eastern United States in 1996, which was a departure from prior practices.

34.     There are several flight paths in the vicinity of the area where the missile testing occurred, including flights taking off from, and landing at, major airports in New York and New Jersey, such as New York's John F. Kennedy International Airport, New York's LaGuardia Airport, and New Jersey's Newark International Airport.

35.     On July 17, 1996, TWA 800 took off from John F. Kennedy International Airport in New York at around 8:20 p.m.

36.    On that evening, numerous eyewitnesses described seeing a streak of light arcing from the surface of the ocean toward TWA 800 and then seeing an explosion and an object break apart and fall into the ocean.

37.    Twelve minutes after the plane took off, it broke apart and caught fire 13,800 feet over the Atlantic Ocean, precisely where the surface-originating streak observed by the eyewitnesses exploded.

38.    All two hundred and thirty passengers aboard TWA 800 died.

**b. The Government Investigation and Cover-Up**

39.    In the wake of the TWA 800 tragedy, the federal government purported to investigate its cause.

40.    However, instead of allowing the National Transportation Safety Board ("NTSB"), the agency tasked with investigating all domestic aviation incidents, to lead the investigation of the TWA 800 incident, the Federal Bureau of Investigation ("FBI") took charge.  The FBI also enlisted the assistance of the Central Intelligence Agency ("CIA").

41.    Indeed, the FBI essentially froze the NTSB out of the investigation. The FBI removed all copies (original and duplicates) of Navy radar tapes from the Navy, placing them out of the NTSB's reach, and refused to allow the NTSB to conduct eyewitness interviews or review the FBI's records that indicated the true cause of the TWA 800 crash.

42.     Eyewitnesses who were interviewed by the FBI recall being threatened by the organization.  For example, one eyewitness recalls being told to keep quiet about the "rocket" she saw in the sky or risk her citizenship application being denied.

43.     Despite this, eyewitnesses have consistently maintained that they saw something arcing toward TWA 800 before the plane erupted into flames and fell from the sky.

44.     For example, one eyewitness testified that she saw a "rocket go up" and explode, and then saw TWA 800's flaming wreckage fall from the sky.

45.     Two other eyewitnesses, Air National Guard pilots, Captain Christian Baur and Major Frederick "Fritz" Meyer, similarly stated that they witnessed events that indicated a missile struck TWA 800.

46.     On the day TWA 800 went down, Captain Baur and Major Meyer were flying in a Black Hawk helicopter near the area of the TWA 800 incident.  Captain Baur recalled seeing an object with a "rocket type motor . . . moving quick" toward TWA 800. After the crash, Captain Baur flew to the area and conducted a search and rescue.

47.     Captain Baur's co-pilot, Major Meyer, testified that he recognized a "flak" explosion at the site of the TWA 800 explosion, which is what military anti-air explosives create.

48.     Despite this evidence, the CIA concocted materials to discredit eyewitnesses who could confirm that TWA 800 had been downed by some kind of projectile.  These materials included a video and animation that was displayed during a nationally-televised FBI press conference that attempted to reconcile the eyewitness

testimony that the plane was struck by a projectile with the U.S. Government's official position that the crash was caused by a defect in the plane's center fuel tank.

49.     Although overwhelming eyewitness testimony indicated that TWA 800 was struck by a missile, the video and animation, which was subtitled "What Did The Eyewitnesses See?," contained a scene with large, capitalized, and underlined words, "NOT A MISSILE."  To ensure that audiences did not miss the point, a narrator read those words aloud.



50.     Despite outwardly proclaiming that the cause of the TWA 800 explosion was, in the CIA's words, "NOT A MISSILE," several internal government communications (that have only come to light in the recent FOIA litigation) indicated that a missile was involved.

51.     Following the FBI's press conference stating that TWA 800 was not brought down by a missile, the NTSB released a report stating that the likely cause of the crash was an explosion of flammable vapors in the plane's center fuel tank.  This became the publicly accepted view of what happened, and Plaintiffs relied upon this misinformation.

52.     The NTSB's report did not include and/or ignored crucial evidence that ran counter to its conclusion, and NTSB team leaders were ordered not to draft analysis reports, which ran contrary to the usual procedure for NTSB aviation crash reports.

53.     The NTSB also formed a new NTSB Office of Families, headed by a public relations expert, that successfully deceived the victims' families about the true cause of the crash. Through a series of misleading official communications, the Office of Families promoted a fuel tank scenario as the only possible explanation for the crash, and told the victims' families that the idea that TWA 800 was brought down by a missile was an implausible "conspiracy theory" without any basis in fact.  In reality however, the opposite is the case.

54.     This same misinformation was provided to the press, which widely reported it to the public.

55.     In short, for over 25 years, Plaintiffs and the public were led to believe—by their own government and the Defendants—that the victims of the TWA 800 crash were killed by a one-of-a-kind exploding fuel tank.  Recently, however, overwhelming evidence uncovered by physicist Dr. Thomas Stalcup shows that TWA 800 was struck by an errant missile fired by the Defendants.

11

c. **Defendants' Rush to Test the Aegis Missile System with Live Warheads**

56.     The missile program that resulted in the crash of TWA 800 became a high priority for the U.S. Government in 1996, when former Secretary of Defense William Perry sought a significant increase in funding for the Navy's Aegis Missile system from the U.S. Senate's Armed Services Committee.

57.     Defendant Department of Defense proposed that this missile system proceed "as quickly as possible to production and deployment" in order to increase defense capabilities against missiles from hostile countries.

58.     Indeed, in a news briefing from the Missile Defense Agency and the Department of Defense, Secretary Perry characterized the missile threat from rogue nations as "here and now."

59.     The Senate Committee approved the funding, and the Navy accelerated testing and development of the next-generation Aegis Missile System.

60.     The key to upgrading the Aegis System for missile defense lay in its radar system. To upgrade its capabilities as a missile defense system, the radar system needed significant improvements.  For example, the radar system needed to be able to track more enemy missiles at once and do so at further distances.

61.     The Aegis System's radar also needed improvement in its ability to operate close to shore and to properly integrate into existing systems.  As it stood, Aegis was confused by land and could not adequately "interoperate" with the other services' anti-missile systems.   These serious flaws could result in a missile striking an unintended target.

62.     To address these key deficiencies, the Department of Defense directed the Contractor Defendants to integrate a new radar and computer system into all new ship designs, known as the SPY-ID(V).

63.     The new computer system, known as Hiper-D, was developed by the Defense Advanced Projects Agency (DARPA) to run the SPY-1D(V) radar.

64.     When testing of the SPY-ID(V) began, there were no ships in the Naval fleet with the hardware or computing power to accommodate and operate the new radar system.

65.     Although the SPY-ID(V) would later become a key component aboard the next wave of Navy destroyer ships, in 1996 the only option with the hardware and computing power sufficient to operate the SPY-ID(V) was a New Jersey land-based testing site called the Combat Systems Engineering and Development Site ("CSEDS").

66.     Instead of waiting five years for ships to be properly constructed with the SPY-ID(V) so that testing could be conducted far from congested air corridors and at established test ranges, the SPY-ID(V) was tested on an expedited basis in and around the CSEDS in New Jersey, in a highly congested area.

67.     The integration of the SPY-ID(V) into the Aegis Missile System was a major technological leap forward, and it should have been conducted deliberately and carefully.   The system included new hardware, software, computer systems, and wireless networking to share data and coordinate with other services' missile defense systems.

68.     Despite this, the Defendants fast-tracked implementation of the system, and put it on an accelerated and unrealistic timetable.

69.     Despite the obvious risk posed by testing missiles in close proximity to people and commercial aircraft, Defendants certified the CSEDS for "operational testing" to ensure the upgraded Aegis System went online as soon as possible.

70.     In 1996, the Defendants began testing the SPY-ID(V) using "simulated and actual targets" in and around New Jersey.

71.     Recently unearthed evidence confirmed that in May 1996, Defendants conducted initial operational tests of the SPY-ID(V) radar upgrade with testing that involved firing at least one missile with a live warhead.

72.     That same month, a former member of the United States Coast Guard stated that he saw a missile rising over Long Island Sound as he drove to work.  Two months later, and five days before TWA 800 went down, he saw another missile on his morning commute.

73.     An electrician on the roof of a nearby Long Island hospital was filming the sunrise and captured the second missile witnessed by the Coastguardsman on his VHS camera.

74.     Five days later, as Navy missile targets flew nearby, dozens of witnesses saw a missile rise off the ocean apparently heading toward something well behind TWA 800, but only to take a sharp turn toward the jetliner seconds before exploding into it.

75.     Despite this tragic incident, the Defendants continued to test the radar and missile system in this same, highly populated area.

76.     In August that year, just six weeks after TWA 800 went down off Long Island, a rocket with classified Department of Defense sensors flew near and "startled" an American Airlines pilot near CSEDS' sister land-based site on Virginia's eastern seaboard.

77.     A month later and in the same area, two missiles were launched from Navy ships at aerial target drones flying nearby.

78.     Another two months later, on November 16, 1996, almost precisely where TWA 800 went down off Long Island, a Pakistani Airlines pilot reported to Air Traffic Control that a "rocket" rose in front of him and continued rising above his altitude. People on shore that evening were interviewed by the FBI and confirmed that a projectile rose between airliners off Long Island at the time.

79.     Six hours earlier that November day, a witness described seeing a missile-like object rise quickly over South New Jersey or Staten Island, NY.

80.     At 1:00 a.m. the next day, a witness reported to the FBI seeing a missile-like object from central Long Island.

81.     On March 17, 1997, many commercial airline pilots reported seeing a missile or missiles flying in the vicinity of New Jersey and Pennsylvania.

82.     On that same day (March 17, 1997), an Air Force cargo pilot reported to Air Traffic Control, and later to the FBI, that he had been seconds away from taking "evasive maneuvers" to avoid being hit by a missile fired over Burlington, Vermont.

After the missile arced away from his aircraft at the last minute, he flew by its "non-vapor" exhaust plume.

83.     Steve Habeger, the Executive Director of CSEDS's sister site in Virginia during this time, recently testified in Dr. Stalcup's FOIA in the United States District Court for the District of Massachusetts, *Thomas Stalcup v. Department of Defense*, Civil Action No. 1:13-cv-11967-DLC (the "FOIA Litigation"), that he was personally aware of at least a dozen Aegis missile tests off the East Coast of the United States around this same overall time period.

**d. Unearthed Evidence Discredits the Government's Exploding Fuel Tank Narrative**

84.     As part of the FOIA Litigation, Dr. Stalcup recently obtained crucial new evidence regarding what caused TWA 800 to explode on July 17, 1996.

85.     For example, Dr. Stalcup obtained several FBI records never released to the TWA 800 families or the public. One described an "original [Navy radar] tape" showing an object "heading straight for TWA 800." Another describes an object on radar "impact[ing]" TWA 800 and "spiral[ling] away," while also stating that witnesses described seeing a "flair (sic) going up. . . . , orbit/circle another object. Subsequently debris fell from the sky."

86.     These records were never made part of the NTSB investigation, and no eyewitnesses were permitted to testify at any NTSB hearing. As such, the Plaintiffs were never informed of this information.

87.     In addition, on around October 2, 2019, Dr. Stalcup privately consulted with a former high-level FBI official who informed him that aerial target drones were

flying in TWA 800's vicinity when TWA 800 went down—the very drones documented to have been used in East Coast missile tests of the Navy's Aegis System that summer of 1996. Those target drones ultimately parachuted to the ocean below, unscathed and abandoned.

88.     The FBI later ordered the Navy to retrieve these targets, which is contrary to the usual chain of command.

89.     In addition to the documentary evidence uncovered in the FOIA Litigation, Dr. Stalcup also deposed several government witnesses regarding the TWA 800 disaster.

90.     One of these witnesses, Steven Habeger, the Executive Director of an East Coast Navy land-based test site, testified that within minutes of the TWA 800 disaster, he was ordered to allow the FBI to remove all Navy radar tapes from his facility that might have recorded the TWA 800 incident.

91.     This event was corroborated by Mr. Habeger's commanding officer and by FBI custody records obtained during the FOIA Litigation.

92.     Dr. Stalcup also discovered that five days after the TWA 800 disaster, the Joint Terrorism Task Force directed the FBI to obtain another "original [Navy] radar tape" showing an object "heading straight for TWA 800" and to "prepare FD-302 re-procurement of this original tape."

93.     These radar tapes were confiscated by the FBI immediately after the crash of TWA 800.  According to records obtained in the FOIA Litigation, they show an object

"impact" TWA 800, which directly contradicts the FBI's, CIAs, and NTSB's public conclusions that what caused the incident was "NOT A MISSILE."

94.     In fact, the evidence reveals that TWA 800 was brought down by a missile and the government hid this truth from Plaintiffs and the public at large for over twenty-five years.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

95.     Under normal circumstances, the statute of limitations would have run on events that occurred in 1996.

96.     However, the discovery rule and fraudulent concealment doctrine toll the statute of limitations in this case.

97.     Specifically, key evidence confirming that a missile caused the crash of TWA 800 was hidden from the public and the victims' families for over 25 years. This evidence was only recently unearthed by Dr. Tom Stalcup in his hard-fought FOIA litigation, which has now been pending for over ten years.

98.     Plaintiffs only discovered the evidence Dr. Stalcup diligently compiled on April 15, 2021, when they attended a meeting hosted by Dr. Stalcup.  At that meeting, Dr. Stalcup informed the Plaintiffs about the key facts he learned in his FOIA lawsuit indicating that the TWA 800 crash was caused by a missile.

99.     Before April 15, 2021, the Plaintiffs were not aware of, or on notice of, the information that forms the basis of this complaint, nor have the Plaintiffs had any reasonable opportunity discover their injury, its cause, and the link between the two (prior to April 15, 2021).

100.    In addition, the statute of limitations was tolled because the Defendants, led by the United States government, took active steps to mislead the families and the public, as well as conceal that the TWA 800 crash was caused by a missile, including confiscating and concealing evidence from the United States Navy.

101.    Therefore, the discovery rule, the fraudulent concealment doctrine, the doctrine of equitable estoppel, and the doctrine of laches, toll the statute of limitations in this case.

## VI.    SATISFACTION OF FTCA JURISDICTIONAL REQUIREMENTS

102.    Presentation of an administrative claim to the appropriate agency is a jurisdictional prerequisite to Federal Tort Claims Act ("FTCA") claim. *See, e.g.*, *McNeil v. United States*, 508 U.S. 106 (1993).

103.    Here, Plaintiffs sent administrative claims to the United States Navy, the United States Missile Defense Agency, and the United States Department of Defense in October 2021.

104.    While the United States Missile Defense Agency and the United States Department of Defense did not respond to the claims, Defendant United States Navy denied Plaintiffs' claims in writing, and they noted that Plaintiffs only had six months to file lawsuits under the FTCA.

105.    Plaintiffs hereby bring these claims within six months of the mailing of those rejection letters from the United States Navy.

## VII.   CAUSES OF ACTION

### COUNT I
**Negligence and Gross Negligence**
**(Against All Defendants)**

105.   Plaintiffs hereby incorporate by reference all of the allegations set forth above, as so though fully set forth herein.

106.   Plaintiffs assert claims individually and on behalf of the Estates of the decedents against the Defendants for negligence and gross negligence.

107.   As a result of the negligent, grossly negligent, reckless, or intentional conduct of the Defendants, Plaintiffs' decedents died after a missile downed TWA 800.

108.   Specifically, the Defendants negligently, recklessly, or intentionally authorized and conducted the testing of missiles in commercial airspace.  As a result of these tests, a missile downed TWA 800 and killed Plaintiffs' decedents.

109.   Defendants owed decedents and Plaintiffs a duty not to negligently test missiles in commercial airspace.

110.   Defendants breached that duty by negligently testing missiles in commercial airspace.

111.   The systems and products discussed herein were still being tested in 1996 when the TWA crash occurred, are not state-of-the art 25 years later, and therefore do not involve matters of national security in 2022 or thereafter.

112.    Defendants RAYTHEON COMPANY, RAYTHEON TECHNOLOGIES CORPORATION, and DOES 1 through 20, inclusive, were negligent, grossly negligent, and breached their duties to Plaintiffs and decedents in the following ways:

a.  Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20, inclusive, worked closely with all of the other Defendants in conducting the missile testing that caused the crash of TWA 800;

b.  The SM-2 Missile (Standard Missile 2) was negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident;

c.  The CEC (Cooperative Engagement Capability) system, Aegis system, Navy Area Defense, Linebacker, and/or similar missile defense technologies, which were being integrated with the SPY-1 Radar System, were negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident;

d.  MK illuminators (which direct beams of radiation that "paints" targets so missiles can lock onto them) were negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants

Raytheon Company, Raytheon Technologies, and DOES 1 through 20 at the time of the subject incident;

e.  The IFF (Identify Friend or Foe) System within the CEC (Cooperative Engagement Capability) and similar systems such as the Navy's Aegis system, were negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident;

f.  The IFF (Identify Friend or Foe) System within the US Army's Patriot Missile System, as well other service's IFF systems were negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident;

g.  The Joint Tactical Information Distribution System (JTIDS) wireless network and similar joint and service networks were negligently and grossly negligently tested by, approved for use by, and overseen by, all of the Defendants at the time of the subject incident; and

h.  Defendant Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20, inclusive, were otherwise responsible for the decision to test missiles in the area where TWA 800 was downed.

113.     Defendants LOCKHEED MARTIN CORPORATION and DOES 1 through 20, inclusive, were negligent, grossly negligent, and breached their duties to Plaintiffs and decedents in the following ways:

a.   Defendant Lockheed Martin Corporation and DOES 1 through 20 worked closely with all of the other Defendants in conducting the missile testing that caused the crash of TWA 800;

b.   The Aegis SPY-1 Radar System was negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Lockheed Martin Corporation and DOES 1 through 20 at the time of the subject incident;

c.   The IFF (Identify Friend or Foe) System within the CEC (Cooperative Engagement Capability) and similar systems such as the Navy's Aegis system, was negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident;

d.   The IFF (Identify Friend or Foe) System within the US Army's Patriot Missile System, as well other service's IFF systems were negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident;

     e.   The Joint Tactical Information Distribution System (JTIDS) wireless network and similar joint and service networks were negligently and grossly negligently tested by, approved for use by, and overseen by, all of the Defendants at the time of the subject incident; and

     f.   Defendants Lockheed Martin Corporation and DOES 1 through 20 were otherwise responsible for the decision to test missiles in the area where TWA 800 was downed.

114.    Defendants UNITED STATES MISSILE DEFENSE AGENCY and DOES 1 through 20 were negligent, grossly negligent, and breached their duties to Plaintiffs and decedents in the following ways:

     a.   Defendant United States Missile Agency (formerly known as the Ballistic Missile Defense Organization) and DOES 1 through 20 worked closely with all of the other Defendants in conducting the missile testing that caused the crash of TWA 800; and

     b.   Defendant United States Missile Agency (formerly known as the Ballistic Missile Defense Organization) and DOES 1 through 20 were otherwise responsible for the decision to test missiles in the area where TWA 800 was downed.

115.    Defendant UNITED STATES DEPARTMENT OF DEFENSE and DOES 1 through 20 were negligent, grossly negligent, and breached their duties to Plaintiffs and decedents in the following ways:

    a.    Defendant United States Department of Defense and DOES 1 through 20 worked closely with all of the other Defendants in conducting the missile testing that caused the crash of TWA 800; and

    b.    Defendant United States Department of Defense and DOES 1 through 20 were otherwise responsible for the decision to test missiles in the area where TWA 800 was downed.

116.    Defendant UNITED STATES NAVY and DOES 1 through 20 were negligent, grossly negligent, and breached their duties to Plaintiffs and decedents in the following ways:

    a.    Defendant United States Navy and DOES 1 through 20 worked closely with all of the other Defendants in conducting the missile testing that caused the crash of TWA 800; and

    b.    Defendant United States Navy and DOES 1 through 20 were otherwise responsible for the decision to test missiles in the area where TWA 800 was downed.

117.    As a result of Defendants' breach of the applicable duties, decedents and Plaintiffs suffered damages.

118.    Plaintiffs are entitled to damages resulting from the actions and/or omissions of the Defendants.

119.    As a direct and proximate result of the negligent, grossly negligent, reckless, and/or intentional actions of the Defendants, decedents died, and Plaintiffs suffered damages and losses, including the following:

a.   Funeral and burial expenses;

b.   Loss of Financial Support and Income;

c.   The economic value of decedents' lives;

d.   Loss of Inheritance;

e.   Loss of consortium, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice;

f.   Grief and mental anguish of the Plaintiffs; and

g.   Decedents' pain and suffering.

120.   Plaintiffs demand judgment in their favor for the aforementioned damages, and below prayer for relief, against all Defendants.

**COUNT II**
**Wrongful Death and Survivorship**
**(Against All Defendants)**

121.   Plaintiffs hereby incorporate by reference all of the allegations above, as though set forth herein.

122.   Plaintiffs assert claims individually and on behalf of the Estates of the decedents against the Defendants for wrongful death and survivorship.

123.   As a result of the grossly negligent, reckless, or intentional conduct of Defendants, decedents died after a missile downed TWA 800.

124.   Defendants RAYTHEON COMPANY, RAYTHEON TECHNOLOGIES CORPORATION, and DOES 1 through 20, inclusive, were negligent, grossly negligent, and breached their duties to Plaintiffs and decedents in the following ways:

a.  Defendant Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20, inclusive, worked closely with all of the other Defendants in conducting the missile testing that caused the crash of TWA 800;

b.  The SM-2 Missile (Standard Missile 2) was negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident;

c.  The CEC (Cooperative Engagement Capability) system, Aegis system, Navy Area Defense, Linebacker, and/or similar missile defense technologies, which were being integrated with the SPY-1 Radar System, were negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident;

d.  MK illuminators (which direct beams of radiation that "paints" targets so missiles can lock onto them) was negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies, and DOES 1 through 20 at the time of the subject incident;

e.  The IFF (Identify Friend or Foe) System within the CEC (Cooperative Engagement Capability) and similar systems such as the Navy's Aegis

27

system, was negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident;

f.   The IFF (Identify Friend or Foe) System within the U.S. Army's Patriot Missile System, as well other services' IFF systems were negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident;

g.   The Joint Tactical Information Distribution System (JTIDS) wireless network and similar joint and service networks were negligently and grossly negligently tested by, approved for use by, and overseen by, all of the Defendants at the time of the subject incident; and

h.   Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20, inclusive, were otherwise responsible for the decision to test missiles in the area where TWA 800 was downed.

125.   Defendants LOCKHEED MARTIN CORPORATION and DOES 1 through 20, inclusive, were negligent, grossly negligent, and breached their duties to Plaintiffs and decedents in the following ways:

a.   Defendants Lockheed Martin Corporation and DOES 1 through 20, inclusive, worked closely with all of the other Defendants in conducting the missile testing that caused the crash of TWA 800;

b.  The Aegis SPY-1 Radar System was negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Lockheed Martin Corporation and DOES 1 through 20 at the time of the subject incident.

c.  The IFF (Identify Friend or Foe) System within the CEC (Cooperative Engagement Capability) and similar systems such as the Navy's Aegis system, was negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident;

d.  The Joint Tactical Information Distribution System (JTIDS) wireless network and similar joint and service networks were negligently and grossly negligently tested by, approved for use by, and overseen by, all of the Defendants at the time of the subject incident; and

e.  Defendants Lockheed Martin Corporation and DOES 1 through 20, inclusive, were otherwise responsible for the decision to test missiles in the area where TWA 800 was downed.

126.  Defendants UNITED STATES MISSILE DEFENSE AGENCY and DOES 1 through 20, inclusive, were negligent, grossly negligent, and breached their duties to Plaintiffs and decedents in the following ways:

a.  Defendant United States Missile Agency (formerly known as the Ballistic Missile Defense Organization) and DOES 1 through 20, inclusive, worked

29

closely with all of the other Defendants in conducting the missile testing that caused the crash of TWA 800; and

b. Defendant United States Missile Agency (formerly known as the Ballistic Missile Defense Organization) and DOES 1 through 20, inclusive, were otherwise responsible for the decision to test missiles in the area where TWA 800 was downed.

127.  Defendants UNITED STATES DEPARTMENT OF DEFENSE and DOES 1 through 20, inclusive, were negligent, grossly negligent, and breached their duties to Plaintiffs and decedents in the following ways:

a. Defendant United States Department of Defense and DOES 1 through 20, inclusive, worked closely with all of the other Defendants in conducting the missile testing that caused the crash of TWA 800; and

b. Defendant United States Department of Defense and DOES 1 through 20, inclusive, were otherwise responsible for the decision to test missiles in the area where TWA 800 was downed.

128.  Defendants UNITED STATES NAVY and DOES 1 through 20, inclusive, were negligent, grossly negligent, and breached their duties to Plaintiffs and decedents in the following ways:

a. Defendant United States Navy worked closely with all of the other Defendants in conducting the missile testing that caused the crash of TWA 800;

30

    b.   Defendant United States Navy was otherwise responsible for the decision to test missiles in the area where TWA 800 was downed.

129.    As a result of Defendants' actions, Plaintiffs and other distributees of decedents' estates suffered damages, including pecuniary damages.

130.    Personal representatives have been appointed for the decedents.

131.    Accordingly, Plaintiffs are entitled to recover:

    a.  Funeral and burial expenses;

    b.  Loss of financial support and income;

    c.  The economic value of decedents' lives;

    d.  Loss of inheritance;

    e.  Loss of consortium, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice;

    f.  Grief and mental anguish of the Plaintiffs; and

    g.  Decedents' pain and suffering.

131.    Plaintiffs demand judgment in their favor for the aforementioned damages, and below prayer for relief, against all Defendants.

**COUNT III**
**Product Liability: Failure to Warn and Manufacturing Defect**
**(Against Defendants RAYTHEON COMPANY, RAYTHEON TECHNOLOGIES**
**CORPORATION, LOCKHEED MARTIN CORPORATION, and DOES 1 through 20)**

132.    Plaintiffs hereby incorporate by reference all of the allegations above, as though set forth herein.

31

133.     Plaintiffs bring this claim against Defendants RAYTHEON COMPANY, RAYTHEON TECHNOLOGIES CORPORATION, LOCKHEED MARTIN CORPORATION,  and DOES 1 through 20, inclusive.

134.     Plaintiffs do not allege any design defects; rather, this claim alleges manufacturing defects and failure to warn.

135.     The systems and products discussed herein under test in 1996 when the TWA crash occurred, are not state-of-the art 26 years later, and therefore do not involve matters of national security in 2022 or thereafter.  Defendants' missile defense systems contained significant interoperability problems—defects that could result in the loss of life, equipment, or supplies. The vast majority of these problems were caused by system-specific software problems.

136.     Specific problems included: a) failure to accept changes in mislabeled data identifying a friendly aircraft as a hostile aircraft, with the potential to cause  the downing of a commercial airliner; b) excess messages overloading systems, causing system crashes and the loss of command and control resources during critical periods; c) improper track identification, creating the potential for either a hostile system to penetrate defenses or a friendly system such as a commercial aircraft to be inadvertently destroyed; and d) duplicate tracks distorting the joint tactical picture, denying vital information to battle managers and shooters.

137.     The contractor Defendants were aware of the aforementioned risks and concerns prior to the date of the subject TWA 800 incident.

138.    Defendants LOCKHEED MARTIN, GENERAL DYNAMICS, RAYTHEON COMPANY, RAYTHEON TECHNOLOGIES CORPORATION and DOES 1 through 20, inclusive, knew that the aforementioned products and systems were not ready to be used to fire live missiles in close proximity to human populations and commercial aircraft prior to the date of the subject TWA 800 incident.

139.    Defendants RAYTHEON COMPANY, RAYTHEON TECHNOLOGIES CORPORATION and DOES 1 through 20, inclusive, failed to warn Plaintiffs, decedents, and the United States of the following:

a.  The SM-2 Missile (Standard Missile 2) was not ready to be used with the Aegis Missile System in a highly congested area that included commercial aircraft;

b.  The CEC (Cooperative Engagement Capability) system, Aegis system, Navy Area Defense, Linebacker, and/or similar missile defense technologies, which were being integrated with the SPY-1 Radar System, were negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident;

c.  MK illuminators (which direct beams of radiation that "paints" targets so missiles can lock onto them) were negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants

Raytheon Company, Raytheon Technologies, and DOES 1 through 20 at the time of the subject incident;

d. The IFF (Identify Friend or Foe) System within the CEC (Cooperative Engagement Capability) and similar systems such as the Navy's Aegis system, was negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident;

e. The IFF (Identify Friend or Foe) System within the US Army's Patriot Missile System, as well other service's IFF systems were negligently and grossly negligently supplied by, tested by, approved for use by, and overseen by, Defendants Raytheon Company, Raytheon Technologies Corporation, and DOES 1 through 20 at the time of the subject incident; and

f. The Joint Tactical Information Distribution System (JTIDS) wireless network and similar joint and service networks were negligently and grossly negligently tested by, approved for use by, and overseen by, all of the Defendants at the time of the subject incident.

140. Defendants RAYTHEON COMPANY, RAYTHEON TECHNOLOGIES CORPORATION and DOES 1 through 20, inclusive, knew that the aforementioned products and systems were not ready to be used to fire live missiles in close proximity

34

to human populations and commercial aircraft prior to the date of the subject TWA 800 incident.

141.    Defendant LOCKHEED MARTIN CORPORATION and DOES 1 through 20, inclusive, failed to warn Plaintiffs, decedents, and the United States of the following:

a.  The Aegis SPY-1 Radar System was not ready to be used in a highly congested area that included commercial aircraft; and

b.  The IFF (Identify Friend or Foe) System within the Aegis System, which includes the SPY-1 Radar  System, was not ready to be used in a highly congested area that included commercial aircraft.

142.    Defendants LOCKHEED MARTIN CORPORATION and DOES 1 through 20, inclusive, knew that the aforementioned products and systems were not ready to be used to fire live missiles in close proximity to human populations and commercial aircraft prior to the date of the subject TWA 800 incident.

143.    Defendants RAYTHEON COMPANY, RAYTHEON TECHNOLOGIES CORPORATION, and DOES 1 through 20, inclusive, designed the following products pursuant to design plans and specifications: SM-2 Missile (Standard Missile 2); CEC (Cooperative Engagement Capability) System, which was being integrated with the SPY-1 Radar System; the MK illuminators (a directed beam of radiation that "paints" targets so missiles can lock onto them); the IFF (Identify Friend or Foe) System within the CEC (Cooperative Engagement Capability) System; the IFF (Identify Friend or Foe) System within the United States' Patriot Missile System; and other associated products and systems used on the day of the subject incident.

35

144. The following products were flawed due to manufacturing defects, and did not conform to their specifications: SM-2 Missile (Standard Missile 2), CEC (Cooperative Engagement Capability) System, which was being integrated with the SPY-1 Radar System; the MK illuminator System (a directed beam of radiation that "paints" targets so missiles can lock onto them); the IFF (Identify Friend or Foe) System within the CEC (Cooperative Engagement Capability) System; the IFF (Identify Friend or Foe) System within the United States' Patriot Missile System; and other associated products and systems used on the day of the subject incident.

145. Defendant LOCKHEED MARTIN CORPORATION and DOES 1 through 20, inclusive, designed the following products pursuant to design plans and specifications: the Aegis SPY-1 Radar System; the IFF (Identify Friend or Foe) System within the Aegis System, which includes the SPY-1 Radar System; and other associated products and systems used on the day of the subject incident.

146. The following products were flawed due to manufacturing defects, and did not conform to their specifications: the Aegis SPY-1 Radar System; the IFF (Identify Friend or Foe) System within the Aegis System, which includes the SPY-1 Radar System; and other associated products and systems used on the day of the subject incident.

147. As a result of the aforementioned manufacturing defects, and Defendants RAYTHEON COMPANY, RAYTHEON TECHNOLOGIES CORPORATION, LOCKHEED MARTIN CORPORATION, and DOES 1 through 20's failure to warn

Plaintiffs, decedents, and the United States, a missile struck TWA 800 and caused the deaths of decedents, and Plaintiffs' damages.

148.    Plaintiffs demand judgment in their favor for the aforementioned damages, and below prayer for relief, against these Defendants.

## VIII.   PRAYER FOR RELIEF

Plaintiffs pray that the Court grant judgment in their favor against the Defendants and grant to Plaintiffs:

a.   Compensatory damages;

b.   Punitive damages;

c.   Interest from date of judicial demand;

d.   Costs and expenses;

e.   Attorney's fees; and

f.   Such other and further relief as this Honorable Court may determine to be just and appropriate under the circumstances.

Respectfully submitted,

Dated: June 28, 2022                          BAILEY & GLASSER LLP

By:  _/s/ John Roddy_

John Roddy (BBO. No. 424240)
_jroddy@baileyglasser.com_
**Bailey & Glasser LLP**
176 Federal Street, 5th Floor
Boston, MA 02110
Telephone: (617) 439-6730
Facsimile: (617) 951-3954

Todd A. Walburg (*Pro Hac Vice Anticipated*)
*twalburg@baileyglasser.com*
Leslie A. Brueckner (*Pro Hac Vice Anticipated*)
*lbrueckner@baileyglasser.com*
**Bailey & Glasser LLP**
1999 Harrison Street, Suite 660
Oakland, CA 94612
Telephone: (510) 272-8000

Benjamin L. Bailey (*Pro Hac Vice Anticipated*)
*bbailey@baileyglasser.com*
Eric B. Snyder *Pro Hac Vice Anticipated*)
*esnyder@baileyglasser.com*
Christopher D. Smith (*Pro Hac Vice Anticipated*)
*csmith@baileyglasser.com*
**Bailey & Glasser LLP**
209 Capitol Street
Charleston, West Virginia 25301
Telephone: (304) 345-6555

***Attorneys for the Plaintiffs***