UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

RONALD KRICK, et al.,

       Plaintiffs,

              v.

RAYTHEON COMPANY, et al.;

       Defendants.

-----------------------------------------------------x

Civil Action No.
1:23-cv-8093-AMD-JAM

(Donnelly, D.J)
(Marutollo, M.J)

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES'**
**MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

i

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................................... 2

I.	THE GOVERNMENT INVESTIGATION ......................................................................... 2

II.	UNOFFICIAL INVESTIGATIONS AND EARLY FREEDOM OF INFORMATION
ACT CASES ALLEGED A MILITARY MISSILE DOWNED TWA FLIGHT 800 AND THE
GOVERNMENT COVERED IT UP. .................................................................................................. 4

III.	AS A FOIA PLAINTIFF IN HIS OWN RIGHT, DR. STALCUP ALSO ALLEGED THE
GOVERNMENT COVERED UP A MISSILE STRIKE. ............................................................. 7

IV.	PRIOR MULTI-DISTRICT TORT LITIGATION ............................................................. 9

V.	PRIOR SETTLEMENT RELEASES ............................................................................... 12

VI.	PROCEDURAL POSTURE OF THIS CASE ................................................................... 14

ARGUMENT ................................................................................................................................ 14

I.	THE FTCA DOES NOT WAIVE SOVEREIGN IMMUNITY FOR PLAINTIFFS'
CLAIMS BECAUSE A SIMILARLY SITUATED PRIVATE PARTY THAT WAS
RELEASED CANNOT BE LIABLE UNDER LIKE CIRCUMSTANCES. ............................... 14

II.	PLAINTIFFS LACK STANDING TO BRING THESE CLAIMS. ................................... 18

  A.	NO ESTATES WERE REOPENED, AND NO PERSONAL REPRESENTATIVES
  WERE APPOINTED. ...................................................................................................... 18

  B.	THE REMAINING INDIVIDUAL PLAINTIFFS LACK STANDING TO BRING
  THEIR OWN ACTION. .................................................................................................. 20

III.	CHRISTOPHER KRICK FAILED TO EXHAUST HIS ADMINISTRATIVE
REMEDIES AND HIS CLAIM MUST BE DISMISSED. ........................................................ 21

IV.     THE STATUTE OF LIMITATIONS HAS LONG SINCE RUN ON PLAINTIFFS' ALLEGATIONS AGAINST THE UNITED STATES. ................................................................ 22

    A.   STANDARD OF REVIEW ...................................................................................... 22

    B.   PLAINTIFFS' CLAIMS ACCRUED AT, OR NEAR, THE TIME OF THE CRASH. ... 23

        1.   Distinction between the Discovery Rule and Tolling. .................................................. 23

        2.   Plaintiffs' Claims Accrued Long Before October 2019. .............................................. 25

    C.   PLAINTIFFS' ALLEGATIONS DO NOT SUPPORT APPLICATION OF THE FRAUDULENT CONCEALMENT DOCTRINE. .................................................... 32

    D.   PLAINTIFFS' ALLEGATIONS DO NOT SUPPORT APPLICATION OF EQUITABLE ESTOPPEL OR LACHES. .................................................................................... 34

V.     PLAINTIFFS' COMPLAINT PLEADS AN ADMIRALTY CAUSE OF ACTION; THEREFORE, THIS ACTION BROUGHT UNDER THE FTCA MUST BE DISMISSED. ..... 36

CONCLUSION ................................................................................................................ 39

## TABLE OF AUTHORITIES

**Cases**

*A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135 (2d Cir. 2011)......................... 24, 25, 27, 32

*Accuracy in Media, Inc. v. Nat'l Transp. Safety Bd.*, No. Civ. A.03-00024 (CKK), 2006 WL 826070 (D.D.C. Mar. 29, 2006)........................................................................................ 6

*All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82 (2d Cir. 2006).................. 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 23, 26

*Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635 (2d Cir. 2005) ............................... 15

*Barrett v. United States*, 689 F.2d 324 (2d Cir. 1982)........................................... 24, 30, 31

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................... 23

*Benedek v. PLC Santa Monica, LLC*, 129 Cal. Rptr. 2d 197 (Cal. Ct. App. 2002)...................... 16

*Blanco v. United States*, 775 F.2d 53 (2d Cir. 1985) ........................................................ 36

*Brass v. Am. Firm Tech., Inc.*, 987 F.2d 142 (2d Cir. 1993) .............................................. 23

*Brownback v. King*, 592 U.S. 209 (2021) ................................................................... 15

*Buttry v. Gen. Signal Corp.*, 68 F.3d 1488 (2d Cir. 1995)................................................. 35

*Cangemi v. United States*, 13 F.4th 115 (2d Cir. 2021)..................................................... 15

*Carter v. HealthPort Techs., LLC*, 822 F.3d 47 (2d Cir. 2016).......................................... 15, 18

*Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76 (2d Cir. 2005) .................. 21

*Cooke v. United States*, 918 F.3d 77 (2d Cir. 2019) ........................................................ 22

*Crawford v. Electric Boat Corp.*, 515 F. Supp. 2d 282 (D. Conn. 2007) ............................... 36, 37

*Dept. of Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999)..................................................... 36

*Ellul v. Congregation of Christian Bros.*, 774 F.3d 791 (2d Cir. 2014) ................... 23, 24, 33, 35

*Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972)........................................ 38

*FDIC v. Meyer*, 510 U.S. 471 (1994) ................................................................................. 15

*Foremost Ins. Co. v. Richardson*, 457 U.S. 668 (1982) .................................................... 37

*Frometa v. Mar-Can Transp. Co.*, 148 N.Y.S.3d 613 (N.Y. App. Div. 2021) ............................ 21

*Frontera v. United States*, No. 05-CV-0423S, 2009 WL 909700 (W.D.N.Y. Mar. 31, 2009) ..... 23

*Gabriel v. Cnty. of Herkimer*, 889 F. Supp. 2d 374 (N.D.N.Y. 2012) ........................................ 21

*Garmon v. Cnty. of Rockland*, No. 10-cv-7724, 2013 WL 541380 (S.D.N.Y. Feb. 11, 2013) ..... 20

*General Motors Corp. v. Super. Ct.*, 15 Cal. Rptr. 2d 622 (Cal. Ct. App. 1993) ......................... 17

*Global Minerals and Metals Corp. v. Holme*, 824 N.Y.S.2d 210 (N.Y. App. Div. 2006) ........... 17

*Gonzalez v. N.Y. City Housing Auth.*, 572 N.E.2d 598 (N.Y. 1991) ........................................... 19

*Grancio v. De Vecchio*, 572 F. Supp. 2d 299 (E.D.N.Y. 2008) ............................................ 22, 29

*Haekal v. Refco, Inc.*, 198 F.3d 37 (2d Cir. 1999) ..................................................................... 33

*Harper v. Ercole*, 648 F.3d 132 (2d Cir. 2011) ........................................................................ 33

*Hernandez v. New York City Health & Hosps. Corp.*, 585 N.E.2d 822 (N.Y. 1991) ............. 19, 21

*Hertz v. United States*, 560 F.3d 616 (6th Cir. 2009) ....................................................... 26, 27, 28

*Heslin v. Cnty. of Greene*, 923 N.E.2d 1111 (N.Y. 2010) ......................................................... 21

*In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001*, No. MDL 1448 (RWS), 2006 WL
1288298 (S.D.N.Y. May 9, 2006) ....................................................................................... 38

*In re Air Crash Into Java Sea on Jan. 9, 2021*, No. 1:23-MD-3072, 2023 WL 5597824 (E.D. Va.
Aug. 25, 2023) ................................................................................................................... 37

*In re Air Crash Off Long Island, N.Y., on July 17, 1996*, 209 F.3d 200 (2d Cir. 2000) ... 12, 37, 38

*In re Air Crash Off Point Mugu, Cal., on Jan. 30, 2000*, 145 F. Supp. 2d 1156 (N.D. Cal. 2001)
............................................................................................................................................. 38

*In re September 11 Litig.*, 760 F. Supp. 2d 433 (S.D.N.Y. 2011) .............................................. 19

*In Re: Air Crash*, 965 F. Supp. 5 (S.D.N.Y. 1997) ........................................................................ 10

*In Re: Air Crash*, No. 96-7986, 1998 WL 292333 (S.D.N.Y. June 2, 1998) .......................... 9, 12

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).................... 37

*Joachim v. United States*, No. 22-cv-5719, 2023 WL 6292542 (E.D.N.Y. Sept. 27, 2023) ........ 19

*Keene Corp. v. United States*, 700 F.2d 836 (2d Cir. 1983) ......................................................... 25

*Koch v. Christie's Int'l PLC*, 699 F.3d 141 (2d Cir. 2012) ........................................................... 33

*Koufakis v. Siglag*, 925 N.Y.S.2d 204 (N.Y. App. Div. 2011) ..................................................... 17

*Krick v. Raytheon Co.,* 695 F. Supp. 3d 202 (D. Mass. 2023).................................................... 26

*Lahr v. Nat'l Safety Trans. Bd.*, No. CV. 03-8023 AHM (AJWx), 2006 WL 2854314 (C.D. Cal.

  Oct. 4, 2006) ................................................................................................................................ 6

*Lahr v. Nat'l Trans. Safety Bd.*, 569 F.3d 964 (9th Cir. 2009) ................................................. 3, 4

*Lahr v. Nat'l Transp. Safety Bd.*, 453 F. Supp. 2d 1153 (C.D. Cal. 2006), *aff'd in part, rev'd in*

  *part and remanded*, 569 F.3d 964 (9th Cir. 2009)...................................................... 3, 4, 5, 6, 7

*Long Island Care Ctr., Inc. v. Goodman*, 26 N.Y.S.3d 595 (N.Y. App. Div. 2016) .................... 21

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................. 18

*Machado v. Gulf Oil, L.P.*, 146 N.Y.S.3d 66 (N.Y. App. Div. 2021) ........................................... 21

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000)...................................................... 18, 36

*Malik v. Meissner*, 82 F.3d 560 (2d Cir. 1996)............................................................................ 36

*Matthias v. United States*, 475 F. Supp. 3d 125 (E.D.N.Y. 2020).................................... 15, 19, 20

*Mayes v. United States*, 790 F. App'x 338 (2d Cir. 2020)........................................................... 22

*Mingo v. United States*, 274 F. Supp. 2d 336 (E.D.N.Y. 2003).................................................... 27

*Paige v. Police Dept. of Schenectady*, 264 F.3d 197 (2d Cir.2001) ........................................... 32

*Pearl v. City of Long Beach*, 296 F.3d 76 (2d Cir. 2002)............................................... 24, 30, 32

vi

*Picarella v. United States*, No. 22-cv-4983, 2024 WL 1435744 (E.D.N.Y. Apr. 3, 2024).......... 29

*Pipitone v. City of New York*, 57 F. Supp. 3d 173 (E.D.N.Y. 2014)............................................... 25

*Rademacher v. United States*, 3:19-cv-00157 (N.D. Miss. Mar. 19, 2020)............................ 28, 29

*Ressler v. United States*, No. 11-cv-02253, 2012 WL 4328662 (D. Colo. Sept. 20, 2012).......... 28

*Richards v. United States*, 369 U.S. 1 (1962) ............................................................................. 19

*Roque v. United States*, 676 F. Supp. 2d 36 (D. Conn. 2009) ...................................................... 24

*Ruotolo v. City of New York*, 514 F.3d 184 (2d Cir. 2008)............................................................ 23

*Russo v. City of Hartford*, 184 F. Supp. 2d 169 (D. Conn. 2002)................................................. 15

*S.E.C. v. Wyly*, 788 F. Supp. 2d 92 (S.D.N.Y. 2011)........................................................ 23, 30, 33

*SCA Hygiene Prod. Aktibolag v. First Quality Baby Prod., LLC*, 580 U.S. 328 (2017).............. 35

*Sephton v. FBI*, 365 F. Supp. 2d 91 (D. Mass. 2005), *aff'd*, 442 F.3d 27 (1st Cir. 2006).............. 5

*Shelley v. S. Shore Healthcare*, 999 N.Y.S.2d 103 (N.Y. App. Div. 2014)................................... 21

*Siswanto v. Airbus Americas, Inc.*, No. 15-CV-5486, 2016 WL 7178458 (N.D. Ill. Dec. 9, 2016)

.................................................................................................................................................. 37

*Smith v. McGinnis*, 208 F.3d 13 (2d Cir. 2000)........................................................................... 32

*Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406 (2d Cir. 2008) ...................................... 23

*Stalcup v. CIA*, 768 F.3d 65 (1st Cir. 2014)............................................................................... 7, 8

*Stalcup v. CIA*, No. CIV. 11-11250-FDS, 2013 WL 4784249 (D. Mass. Sept. 5, 2013), *aff'd*, 768

F.3d 64 (1st Cir. 2014)......................................................................................................... 3, 4, 7

*Stalcup v. Dep't of Def.*, No. 13-11967-LTS, 2015 WL 5545059 (D. Mass. Sept. 18, 2015).... 7, 8

*Stone v. National Bank and Trust Co.*, 591 N.Y.S.2d 609 (N.Y. App. Div. 1992) ...................... 16

*Taghadomi v. United States*, 401 F.3d 1080 (9th Cir. 2005)........................................................ 37

*Tamayo v. Ford Motor Titling Tr.*, 726 N.Y.S.2d 709 (N.Y. App. Div. 2001) ............................ 17

*Torres v. United States*, 612 F. App'x 37 (2d Cir. 2015) ........................................................... 32

*United States v. Ibarra*, 502 U.S. 1 (1991) ................................................................................. 33

*United States v. Kubrick,* 444 U.S. 111 (1979).......................................................................... 26

*United States v. Kwai Fun Wong*, 575 U.S. 402 (2015) ............................................................ 22

*United States v. Mitchell*, 445 U.S. 535 (1980) ........................................................................ 14

*United States v. Sanders*, 17 F. Supp. 2d 141 (E.D.N.Y. 1998) ................................................. 5

*United States v. Strock*, 982 F.3d 51 (2d Cir. 2020) ................................................................. 23

*Valdez ex rel. Donely v. United States*, 518 F.3d 173 (2d Cir. 2008).............................. 24, 27, 32

*Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318 (2d Cir. 2004) ..................................... 32

*Vidro v. United States*, 720 F.3d 148 (2d Cir. 2013) ................................................................. 18

*Walters v. Fischer Skis U.S., LLC*, No. 6:21-CV-1115, 2022 WL 3226352 (N.D.N.Y. Aug. 10, 2022) ............................................................................................................................ 19

*Wells v. Shearson Lehman/Am. Exp., Inc.*, 526 N.E.2d 8 (N.Y. 1988)........................................ 17

*West v. United States*, No. 00-cv-9433, 2003 WL 164278 (S.D.N.Y. Jan. 20, 2003) ................. 18

*Williams v. United States*, 711 F.2d 893 (9th Cir. 1983)............................................................ 39

**Statutes**

28 U.S.C. § 1346(b) .................................................................................................................. 15

28 U.S.C. § 1346(b)(1) .............................................................................................................. 19

28 U.S.C. § 2401(b) .............................................................................................................. 22, 25

28 U.S.C. § 2674....................................................................................................................... 15, 36

28 U.S.C. § 2675(a) ................................................................................................................. 21

28 U.S.C. § 2680(d) .............................................................................................................. 36, 37

46 U.S.C. § 30905....................................................................................................................... 2

46 U.S.C. § 31104 ................................................................................................ 36

46 U.S.C. §§ 30301–30308 .................................................................................. 11

46 U.S.C. §§ 30901–30918 .................................................................................. 36

46 U.S.C. §§ 31101–30013 .................................................................................. 36

Cal. Civ. Proc. Code § 877(a) .............................................................................. 17

N.Y. Est. Powers & Trusts § 1–2.13 ................................................................... 19

N.Y. Est. Powers & Trusts § 5–4.1 ................................................................ 19, 20

N.Y. Est. Powers & Trusts § 5–4.4 ...................................................................... 20

N.Y. Gen. Obligations Law § 15-108 ................................................................... 16

## Rules

Fed. R. Civ. P. 12(b)(1) ........................................................................................ 36

Fed. R. Civ. P. 12(h)(3) ........................................................................................ 36

Fed. R. Civ. P. 8(c)(1) .......................................................................................... 35

## Treatises

28A N.Y. Prac., Contract Law § 26:8 .................................................................. 17

## Constitutional Provisions

U.S. Const. art. I, § 8 ........................................................................................... 38

## Other Authorities

The Federalist No. 11 ............................................................................................ 38

The Federalist No. 24 ............................................................................................ 38

## TABLE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Minute entry granting plaintiff's motion for attorneys' fees in *Lahr v. Nat'l Transp. Safety Bd.*, No. CV 03-8023 AHM (RZx) (C.D. Cal. Mar. 19, 2007) |
| 2 | Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment in *Stalcup v. CIA*, No. 1:11-cv-11250 (D. Mass. Jun. 12, 2013) |
| 3 | *In re: Air Crash off Long Island, N.Y., on July 17, 1996*, MDL No. 1161, Transfer Order (J.P.M.L. Feb. 19, 1997) |
| 4 | Combined MDL Docket Entries, *In re: Air Crash TWA et al.*, No. 96-cv-7986 (S.D.N.Y. filed Oct. 24, 1996), excerpted |
| 5 | *In re: Estates of Donald E. Gough*, No. CV96-05099, Order Settling Final Account and for Final Distribution of Estate of Donald E. Gough (2d Judicial Dist. Ct. for the State of Nevada in and for the County of Washoe, Aug. 26, 1999) |
| 6 | *In re: Oliver Krick, Deceased*, No. CV196-513P, Probate Excerpts for Estate of Oliver Krick (Cir. Ct. of St. Charles County, Mo., Probate Division filed Oct. 1, 1996) |
| 7 | *In re: Estate of Ralph G. Kevorkian*, No. A184515, Probate Excerpts for Estate of Ralph G. Kevorkian (Superior Ct. of Cal., Orange County, filed Sept. 25, 1996) |
| 8 | *In re: O. Lamar Allen, Deceased*, No. 96/1072/01, Probate Excerpts for Estates of O. Lamar Allen and Ashton Allen (Probate Ct. of Cobb County Ga. filed Aug. 7, 1996) |
| 9 | Combined Releases of All Claims Arising out of the Loss of TWA Flight 800 |
| 10 | Cover Letter Enclosing FTCA Administrative Claims on Behalf of TWA 800 Families and Claim Excerpts (received October 4, 2021) |
| 11 | Declaration of Hal H. Dronberger executed March 13, 2025 |
| 12 | *Krick v. Raytheon Co.*, No. 22-cv-11032, Motion Hearing Transcript (D. Mass. Aug. 30, 2023) |
| 13 | *Rademacher v. United States*, No. 3:19-cv-00157, slip op. (N.D. Miss. Mar. 19, 2020) |

## INTRODUCTION

This wrongful death action brought under the Federal Tort Claims Act (FTCA) arises from the crash of Trans World Airlines Flight 800 (TWA Flight 800) on July 17, 1996. This case constitutes the second time a tort lawsuit was brought on behalf of individuals who died on board that tragic flight. The first case was filed in 1996 and consolidated for pretrial purposes in multi-district litigation (MDL) before Judge Robert W. Sweet in the Southern District of New York (SDNY). *See In re Air Crash off Long Island*, No. 96-cv-7986, MDL 1161. All claims brought in the MDL, including the claims of the estates in this case, settled. In settling, the personal representatives, decedents' family members, and their counsel signed general releases accepting money in exchange for releasing all causes of action, past, present, or future, against all entities who may be liable for the loss of TWA Flight 800, whether known or unknown, and waiving their rights to bring a future lawsuit even if subsequent facts were discovered. The releases bar the present action.

Any analysis can stop with the releases; however, the Court also lacks jurisdiction to hear this case because the purported personal representatives of the decedents' estates lack standing. Plaintiffs allege in their Complaint that Wanda Kemp, Douglas Kevorkian, Eileen Zahrioudakis, and Ronald Krick are the court-appointed personal representatives of open estates.[1] Such allegations are inaccurate. Ms. Kemp, Mr. Kevorkian and Ms. Zahrioudakis were never appointed by any court to act as personal representatives. Only Mr. Krick was appointed to act in such a capacity, but that estate was closed in 2001, and with the closure and the settlement with Boeing, his appointment ended. Prior to filing this action, the estate of Oliver Krick was not reopened and no one was appointed as a personal representative. In addition, Christopher Krick

---

[1] For brevity, the Second Amended Complaint will be referred to as the Complaint throughout the brief since there were no amendments material to this motion.

1

never submitted an administrative claim prior to filing this lawsuit, so his failure to exhaust administrative remedies divests the Court of subject matter jurisdiction over his FTCA claim.

Assuming the Court has subject matter jurisdiction, which the United States denies, the claims are untimely because the two-year period to file an administrative claim expired a long time ago. At the latest, Plaintiffs' claims accrued by the end of 1996 when the missile theory, a.k.a. "errant missile test" or "friendly fire" theories, with its potential connection to the Navy, was a very public subject in the media. The errant missile test theory was a subject of the MDL and the impetus behind numerous Freedom of Information Act (FOIA) lawsuits and a related criminal case. It has also been the subject of reams of media reports, and was analyzed in depth in government reports. Despite the very public discussion of the errant missile test decades ago, Plaintiffs waited to file administrative claims until October 4, 2021, 26 years after the accident. Plaintiffs plead no facts that justify the delay in accrual of the cause of action or provide a basis for tolling the statute of limitations.

Lastly, the FTCA does not waive the United States' sovereign immunity for admiralty actions like this one. The facts pleaded in the Complaint arise exclusively under the Court's admiralty jurisdiction making the FTCA inapplicable. Absent the assertion of an applicable waiver of sovereign immunity, the Complaint must be dismissed. Even if Plaintiffs attempted to refile this action under the Suits in Admiralty Act or the Public Vessels Act, their suit would be barred by 46 U.S.C. § 30905, because the cause of action accrued more than two years before they filed suit on June 28, 2022. Any refiling would thus be futile.

## FACTUAL BACKGROUND

### I.    THE GOVERNMENT INVESTIGATION

On July 17, 1996, a Boeing 747 operated as TWA Flight 800 exploded shortly after takeoff from New York's John F. Kennedy International Airport. ECF No. 33 ¶¶ 2, 34, 36-37.

2

On board were 230 passengers and crew en route to Paris, France, all of whom died. *See id.* ¶ 2; *see also Lahr v. Nat'l Trans. Safety Bd.*, 569 F.3d 964, 969 (9th Cir. 2009). The National Transportation Safety Board (NTSB) and the Federal Bureau of Investigation (FBI) immediately launched an inquiry. ECF 33 ¶¶ 38-39; *see also Stalcup v. CIA*, No. CIV. 11-11250-FDS, 2013 WL 4784249, at *1 (D. Mass. Sept. 5, 2013), *aff'd*, 768 F.3d 64 (1st Cir. 2014). The NTSB's initial investigation focused on three possible causes: bomb, *missile*, or mechanical failure; the FBI was involved because of potential criminal activity. *Stalcup*, 2013 WL 4784249, at *1; *see also Lahr*, 569 F.3d at 969.

As part of the investigation, the FBI spoke with 244 eyewitnesses. *Stalcup*, 2013 WL 4784249, at *1. These interviews were documented, *id.*, and eventually published on the NTSB's public docket on September 1, 2000.[2] Some eyewitnesses reported seeing a "streak of light" rising up to the plane prior to the explosion, which led to the theory that a missile shot it down. *Id.*; *see also* ECF 33 ¶¶ 41-43. Because of these reports, the FBI requested the assistance of the Central Intelligence Agency (CIA) to determine whether the observations supported a theory that a missile caused the crash. *Stalcup*, 2013 WL 4784249, at *1.

The CIA investigated and prepared an animation explaining its conclusions, which aired, in its entirety, on CNN on November 17, 1997. *Lahr v. Nat'l Transp. Safety Bd.*, 453 F. Supp. 2d 1153, 1163 n.5 (C.D. Cal. 2006), *aff'd in part, rev'd in part and remanded*, 569 F.3d 964 (9th Cir. 2009); *see also* ECF 33 ¶¶ 47-49. The CIA concluded that what eyewitnesses perceived as a flare or streak of light was actually the aircraft in the process of crippled flight following an initial internal explosion. *Lahr*, 569 F.3d at 970. The CIA concluded that the explosion caused

---

[2] Nat'l Transp. Safety Bd., Public Docket for DCA96MA070, https://data.ntsb.gov/Docket/?NTSBNumber=DCA96MA070

the front portion to separate from the aft majority of the plane. *Id.* The loss of mass lightened the weight on the engines, and propelled the already burning aircraft upwards. *Id*. The plane later erupted into a "fuel-fed fireball." *Id.*; *see also Stalcup*, 2013 WL 4784249, at *1. The CIA animation explicitly stated that what the eyewitnesses saw was "*Not A Missile.*" ECF 33 ¶ 49.

The government investigation continued through NTSB public hearings in December 1997 and August 2000. *Lahr*, 453 F. Supp. 2d at 1162. The latter coincided with the NTSB's release of its final report. ECF 45-1. The NTSB concluded that the explosion was caused by the ignition of flammable vapors within the plane's center fuel tank. ECF 33 ¶ 50. The "Factual Information" section of the report makes 97 references to the word "missile" or "missiles." ECF 45-1 at 1–255. The report, and the almost 3,000 documents from the investigation are, and have been, publicly available, most since at least September 1, 2000.[3] *Lahr*, 569 F.3d at 971. This set of publicly-available evidence includes FBI summaries from eyewitness accounts. *Id*. The NTSB report includes multiple sections dedicated to recording and evaluating eyewitness statements, along with missile related information, and a missile visibility study. ECF 45-1 at 118-19, 237-54. Some of the witnesses whose statements were included have publicly discussed how the CIA and NTSB conclusions do not accord with their memories. *Lahr*, 569 F.3d at 976.

**II.   UNOFFICIAL INVESTIGATIONS AND EARLY FREEDOM OF INFORMATION ACT CASES ALLEGED A MILITARY MISSILE DOWNED TWA FLIGHT 800 AND THE GOVERNMENT COVERED IT UP.**

The Ninth Circuit, in an opinion from an early FOIA case, stated that the explosion sparked national and international media attention commensurate with such a dramatic and tragic event. *Lahr*, 569 F.3d at 976-77. The district court that heard the FOIA case mused, "Of course

---

[3] Nat'l Transp. Safety Bd., Public Docket for DCA96MA070, https://data.ntsb.gov/Docket/?NTSBNumber=DCA96MA070

there was an official investigation. And of course there was an official explanation. And of course there was an ensuing torrent of critics and skeptics who challenged the *bona fides* of the investigation and rejected the explanation." *Lahr*, 453 F. Supp. 2d at 1161. Along with the media coverage was an ever-increasing body of lawsuits and opinions, publicly discussing theories about the explosion.

The first reported opinion discussing the activities of individuals outside of the government attempting to "learn the truth" about the cause of the explosion stems from a criminal case in the Eastern District of New York. *See United States v. Sanders*, 17 F. Supp. 2d 141 (E.D.N.Y. 1998). In that case two "journalists" were indicted for conspiring to remove parts of TWA Flight 800 from an evidence hangar during the government investigation. *Id*. at 143. From October 1996 through July 1997 the criminal defendants sought to obtain samples of a reddish-brown material from seat cushions which they believed would prove that "the *government was covering up* the fact that *the flight was downed by a Navy missile*." *Id*. at 147 (emphasis added). Those assertions were published in April 1997 in a book by James Sanders, one of the criminal defendants, called *The Downing of TWA Flight 800. Id*.

In September 1998, Graeme Sephton, an independent investigator, sent a FOIA request to the FBI for information related to foreign objects removed from the victim's bodies. *Sephton v. FBI*, 365 F. Supp. 2d 91, 93 (D. Mass. 2005), *aff'd*, 442 F.3d 27 (1st Cir. 2006). Sephton was part of a group called the Flight 800 Independent Research Organization whose purpose was to conduct an "independent investigation into the crash." *Id*. at 92. Specifically, he was looking for information related to foreign bodies found in the victims that were of an "unknown origin," *i.e*., missile fragments. *Id*.

In May 2002, Accuracy in Media submitted FOIA requests to the NTSB in an attempt to find bad faith on the government's part in the investigation. *Accuracy in Media, Inc. v. Nat'l Transp. Safety Bd.*, No. Civ. A.03-00024 (CKK), 2006 WL 826070, at *6 (D.D.C. Mar. 29, 2006). In court filings, the FOIA plaintiff was supported by a series of affiants, some of whom were individuals associated with the government's investigation, along with eyewitnesses, who expressed the "collective opinion that there was an attempt to cover up the causes of the accident." *Id*. at *10.

In October 2003, Ray Lahr, a former airline pilot, filed over one hundred FOIA requests with the NTSB and CIA searching for information related to the animations aired on CNN in 1997. *Lahr*, 453 F. Supp. 2d at 1163. Lahr's filings expressed his belief that TWA Flight 800 was shot down by "an errant missile launched by the United States military." *Id*. at 1164; *see* ECF 33 ¶¶ 4, 54 (referencing an "errant missile"). Further, Lahr contended that the investigation that followed was a "massive cover-up." *Lahr v. Nat'l Safety Trans. Bd.*, No. CV. 03-8023 AHM (AJWx), 2006 WL 2854314, at *2 (C.D. Cal. Oct. 4, 2006). The district court's minute entry on Lahr's fee petition noted that, by March 2007, TWA Flight 800 had been the subject of nine books and over 2,000 newspaper articles. Ex. 1, *Lahr v. Nat'l Transp. Safety Bd.*, No. CV 03-8023 AHM (RZx) (C.D. Cal. Mar. 19, 2007), slip op. at 3. The court further noted that a Google search yielded over 147,000 webpage hits, and that Lahr intended on publishing the documents from his "investigation" on public websites. *Id*.

Lahr's lawsuit contains an itemization of the evidence he believed supported the missile and government cover-up theories: 1) evidence was withheld from the government probe; 2) the government altered evidence; 3) evidence was removed from the storage facility; 4) the government misrepresented radar data; 5) radar data and the flight recorder are missing; 6)

underwater video of the evidence recovery has been altered; 7) the government concealed missile debris; 8) the NTSB did not permit eyewitness testimony at the public hearing; 9) eyewitnesses disagree with the CIA animation, and; 10) the FBI took over the investigation from the NTSB which should have been the proper lead agency. *Compare Lahr*, 453 F. Supp. 2d at 1164-66, *with* ECF 33 ¶¶ 39-40 (FBI took over the investigation from NTSB), ¶ 42 (eyewitnesses say they saw something arcing towards aircraft), ¶ 47 (eyewitnesses disagree with CIA animation), ¶¶ 84-85 (government radar data shows something else), ¶¶ 91-92 (radar data confiscated by FBI). Dr. Stalcup, whom the Complaint extensively cites as the source of new evidence justifying this untimely lawsuit, submitted an affidavit in support of Lahr's litigation. *Lahr*, 453 F. Supp. 2d at 1164 n.6, 1166 n.11.

**III.    AS A FOIA PLAINTIFF IN HIS OWN RIGHT, DR. STALCUP ALSO ALLEGED THE GOVERNMENT COVERED UP A MISSILE STRIKE.**

In March 2010, Dr. Stalcup submitted a series of FOIA requests to the CIA, the Department of Defense (DoD), the Office of the Secretary of Defense, and the Missile Defense Agency. *Stalcup*, 2013 WL 4784249, at *2; *Stalcup v. Dep't of Def.*, No. 13-11967-LTS, 2015 WL 5545059, at *1-2 (D. Mass. Sept. 18, 2015). In the FOIA cases that resulted, Dr. Stalcup, like Plaintiffs here, argued that the government, and specifically the CIA, NTSB, and FBI, were engaged in a cover-up and perpetrating a fraud on the public. *Compare Stalcup*, 2013 WL 4784249, at *5, *with* ECF 33 ¶¶ 39, 47, 51.

The First Circuit, in the appeal of the CIA case, noted that Dr. Stalcup's arguments were "nearly identical" to the ones asserted by Lahr in the Ninth Circuit years earlier. *Stalcup v. CIA*, 768 F.3d 65, 69 (1st Cir. 2014). The First Circuit also noted that Dr. Stalcup was silent on how the documents requested "would shed any new light" on the alleged cover-up and—like

Plaintiffs here—referenced an eyewitness who felt intimidated by investigators. *Id.* at 73; *see also* ECF 33 ¶ 41 (witness allegedly threatened by FBI).

Dr. Stalcup's 2013 opposition to the CIA's motion for summary judgment demonstrates his long-held conviction—on which Plaintiffs now rely—that the government covered up evidence of a missile strike. Ex. 2 [Pl.'s Opp'n Mot. Summ. J., Civ. No. 1:11-cv-11250]. Dr. Stalcup claimed that he was already in the possession of enough information to produce a documentary concerning the explosion and the federal investigation that followed. *Id*. ¶ 1. Then he proceeded to lay out the breadth of his investigation which included reviewing the FBI interview summaries from the NTSB docket. *Id*. ¶ 5. His opposition continued with a lengthy explanation of the alleged conspiracy between the FBI and CIA in creating the animation that aired in 1997. *Id*. ¶¶ 7-12. It repeated statements and affidavits from eyewitnesses, including several with military backgrounds, regarding their observations of something rising up to meet TWA Flight 800. *Id*. ¶¶ 19, 23-27, 29-30, 32-35. These eyewitnesses included Captain Chris Baur and Major Frederick Meyer, both of whom Plaintiffs' Complaint explicitly references. *See id.* ¶¶ 19, 35. In the later DoD case, Dr. Stalcup asserted that he had evidence regarding missile tests occurring off the East Coast. *Stalcup*, 2015 WL 5545059, at *4; *see* ECF 33 ¶ 32.

In their Complaint, Plaintiffs allege the following recently discovered evidence justifies their failure to timely file their administrative claim within two years of the accident in 1996: 1) operational testing of a radar system was conducted in May 1996 which included firing a missile with a live warhead; 2) that a dozen missile tests were conducted off the East Coast in an unidentified location, during a poorly defined time period which appears to include the late 1990s; 3) FBI records discussing an original Navy radar tape existed; 4) a conversation with an unidentified alleged FBI official about aerial target drones operating in an unidentified area near

8

TWA Flight 800; 5) the FBI took custody of radar tapes from the Navy; and 6) the purported existence of another radar tape that showed details of the explosion. ECF 33 ¶¶ 70, 82, 84, 86, 87, 89-92. As the above-stated facts demonstrate, and the below argument will support, none of this is actually "newly discovered" evidence; but rather additional refinement of a theory that already existed in 1996 and that Dr. Stalcup and others advanced in FOIA cases starting as early as the late 1990s and continuing through to the present.

## IV.    PRIOR MULTI-DISTRICT TORT LITIGATION

Multiple plaintiffs filed lawsuits in numerous federal district and state courts shortly after TWA Flight 800 crashed. Each of the remaining estates in the present litigation filed its lawsuit by the two-year anniversary of the explosion. The defendants in those cases removed all state court actions to federal court, after which Boeing asked the Judicial Panel for Multidistrict Litigation to centralize the litigation in a common forum. The MDL Panel ultimately assigned all cases arising out of the crash to the Southern District of New York before Judge Robert W. Sweet. Ex. 3, Transfer Order, MDL 1161, No. 15, Feb. 19, 1997. As of June 2, 1998, 145 cases were consolidated in the MDL. *In Re: Air Crash*, No. 96-7986, 1998 WL 292333, at *1 (S.D.N.Y. June 2, 1998). With respect to the claims of the estates in the present action, the MDL Panel transferred the cases of four of the remaining estates from other districts to SDNY.[4] Donald Gough's estate initially filed its action in SDNY, so it did not need to be transferred.[5]

---

[4] The remaining Plaintiffs in the present action bring claims on behalf of five decedents: Ashton Allen, O. Lamar Allen, Donald Gough, Ralph Kevorkian, and Oliver Krick. Transferred cases on the MDL docket were Doc. 48 (transferring Allen action from N.D. Ga., July 15, 1997); Doc. 62 (transferring Kevorkian action from C.D. Cal., Nov. 3, 1997); Doc. 86 (transferring Allen/Grogan action from N.D. Ga., Aug. 12, 1998); Doc. 91 (transferring Krick action from E.D. Mo., Sept. 15, 1998); see Ex. 4, MDL Docket, for docket entries.

[5] The SDNY case was No. 98-cv-1524 (Gough).

9

Before filing the actions that were consolidated before Judge Sweet, the decedents' representatives opened estates in their relevant local jurisdictions, which included:

- Washoe County, Nevada, for the estate of Donald Gough;
- St. Charles County, Missouri, for the estate of Oliver Krick;
- Orange County, California, for the estate of Ralph Kevorkian; and
- Cobb County, Georgia, for the estates of Otis Lamar Allen and Ashton Lamar Allen.

Ex. 5-8 [Estate Documents]. The probate courts in the various states appointed the following personal representatives to administer the estates:

- Erik Gough for the estate of Donald Gough;
- Ronald and Margaret Krick for the estate of Oliver Krick;
- Christine Enlow for the estate of Ralph Kevorkian; and
- Betty Anne Allen for the estates of Otis Lamar Allen and Ashton Lamar Allen.

The plaintiffs sued multiple defendants in the centralized MDL action, including Boeing and TWA. On May 7, 1997, Judge Sweet entered an order setting up the master file, appointing the plaintiffs' steering committee, and otherwise establishing the rules for the litigation. Ex. 4, Pretrial Order # 1, *In Re: Air Crash*, No. 96-7986, MDL No. 1161 (S.D.N.Y. May 7, 1997); *see also In Re: Air Crash*, 965 F. Supp. 5 (S.D.N.Y. 1997) (describing proceedings). The court ordered both liability and damages discovery to commence. 965 F. Supp. at 8.

The plaintiffs, via well-known aviation counsel Lee Kreindler, chair of the plaintiffs' committee, told Judge Sweet on May 21, 1997, that they had a schedule for defendants' document production. Ex. 4 [Tr., May 21, 1997] at 8. And by September 11, 1997, the plaintiffs had received 15 boxes of documents from Boeing and 5,000 pages from TWA. Ex. 4 [Tr., Sept. 11, 1997] at 4. The plaintiffs were well aware of the "missile theory" at this time and served discovery on defendants relating to the missile theory. *E.g.*, Ex. 4, MDL Doc. 64.

By June 1999, the plaintiffs had taken numerous depositions, received over 130,000 pages of documents from defendants, and consulted with experts. Ex. 4, MDL Doc. 247. The

10

plaintiffs' counsel informed the court they had "uncovered evidence to establish that Boeing's conduct was reckless and may provide a basis for punitive damages." *Id*. ¶ 2. The plaintiffs were not relying solely on any investigation by federal agencies; rather "Plaintiffs' Committee has also conducted its own investigation by, among other things, consulting with experts and speaking to numerous witnesses." *Id*. ¶ 8. The plaintiffs' counsel submitted a lengthy explanation of their findings that an explosion in the center fuel tank caused the accident, and that Boeing's design was flawed. *Id*. ¶ 9.

As of December 9, 1999, the parties continued to discuss the missile theory, because Boeing's counsel thought a hole in the wall of the center fuel tank suggested that something had pierced the tank going from outside in. Ex. 4 [Tr., Dec. 9, 1999] at 6, 9. The plaintiffs had received over 200,000 pages of documents at that time and had taken many depositions. *Id*. at 7-8. Plaintiffs sought the deposition of Boeing's CEO about public comments he made about the missile theory. *Id*. at 10. The plaintiffs' counsel, whom the judge called "the cream of the collision bar," *id*. at 3, spoke about the expense of conducting discovery into the missile theory. *Id*. at 11. Judge Sweet and the plaintiffs' attorneys stated that whether an "external cause" existed for the crash was the central issue of discovery. *Id*. at 26, 28, 30. Judge Sweet referenced Pierre Salinger at a hearing in a discussion about expert testimony. *Id*. at 31. (Pierre Salinger, former Kennedy Administration Press Secretary, famously claimed, in 1996, to have proof that the U.S. Navy shot down TWA Flight 800 with a missile). *Id*. at 31.

One issue central to the case was whether the Death on the High Seas Act (DOHSA), 46 U.S.C. §§ 30301–30308, applied to limit the scope of beneficiaries who may recover for the decedents' deaths, and the type of damages available. The parties briefed the issue before Judge Sweet, who ruled that DOHSA did not apply to the crash, *In re Air Crash Off Long Island, N.Y.,*

11

*on July 17, 1996*, Nos. 96-cv-7986, MDL 1161, 1998 WL 292333 (S.D.N.Y. June 2, 1998). On

March 29, 2000, the Second Circuit affirmed the district court's holding in a 2-1 decision. *In re*

*Air Crash Off Long Island, N.Y., on July 17, 1996*, 209 F.3d 200 (2d Cir. 2000). About a dozen

cases settled before the Second Circuit affirmed this ruling. After the circuit court's ruling, the

remaining cases settled. The last docket entry in the MDL was on March 30, 2005.

## V.    PRIOR SETTLEMENT RELEASES

With regard to this case, the remaining decedents' families, represented by counsel,

settled their wrongful death actions between April 29, 2000 and October 17, 2001. All the

settlements were filed in the MDL.[6] Six of the nine individual Plaintiffs still in this case,

represented by counsel at that time, also signed general releases. *See* Ex. 9 [Releases]. The only

individual Plaintiffs in this case that did not sign a release twenty-five years ago were Wanda

Kemp, Michael Deteresa, and Craig Gaetke. Other family members signed the releases for the

decedents on whose behalf Kemp and Deteresa now bring suit. In the case of Mr. Gaetke, his

attorney signed a release in the attorney's representative capacity. *See* Ex. 9 at BOE0016.

In signing the releases,[7] Plaintiffs explicitly acknowledged:

> 8. *Releasors enter into this Release contemplating the possibility that facts may be subsequently discovered that could support claims as yet unasserted against Releasees* for compensatory, consequential and/or punitive damages. . . . Releasors intend to discharge Releasees from all liability for all losses, injuries or damages arising out of the injury to or death of Decedent, both those now known and those that may be subsequently discovered. *This Release shall not be subject to any claim of mistake of fact or law by Releasors.* Releasors also fully

---

[6] MDL Docket Stipulations and Orders of dismissal after settlements: ECF 418, 420, 421, Allen (Jan. 29, 2002); ECF 290, Gaetke (Nov. 30, 2000); ECF 315, Gough (Feb. 2, 2001); ECF 261, Kevorkian (May 25, 2000); ECF 345, Krick (May 11, 2001); see Ex. 4, MDL docket for docket entries.

[7] The substantive language in the releases is nearly identical. For purposes of this motion, the United States will cite the language in the Ashton Lamar Allen Release, Ex. 9 at BOE0059-66. However, to the extent that any language is different in other releases, that language will be specifically quoted.

understand and acknowledge that facts concerning their claims may be found hereafter to be other than or different from the facts they now believe to be true. *Releasors expressly accept and assume the risk of any such possible differences in facts and agree that this Release shall remain in full effect notwithstanding any such difference in facts.* (emphasis added).

Ex. 9 at BOE0061-62.

The releases define the term "Releasees" in two locations within the five-page agreement in the broadest possible sense to include, first: "all other persons and entities not specifically identified who are or may be liable to Releasors in whole or in part for any and/or all damages and losses to Releasors, whether known or unknown, arising out of or in any way related to or resulting from the loss of TWA Flight 800." *Id*. at BOE0059. Secondly:

> 5. Releasors intend this Release to constitute a full release and discharge of any and all claims that they may have arising out of the injury to and death of Decedent. *Releasors state that they intend to release fully all individuals, entities or corporations, whether specifically named or not, that might be liable for damages arising out of the injury to or death of Decedent*. Releasors agree that they will not, directly or indirectly, make or cause to be made any further action against any person (including any individual, corporation or other entity) for losses, damages or injuries arising out of the injury to or death of Decedent. (emphasis added).

*Id*. at BOE0050 ¶ 5. In the case of the estate of Ralph Kevorkian, the release specifically defines releasees to include "any and all agencies, departments, and subdivisions of the GOVERNMENT OF THE UNITED STATES OF AMERICA (including the Federal Aviation Administration and the Department of Defense)." Ex. 9 at BOE0001.

The claims released include all potential causes of action arising from the crash of TWA Flight 800, and not just those advanced by the MDL plaintiffs:

> 3. *[R]eleasors release and forever discharge any and all actions . . .* in law, admiralty or equity, which against Releasees *the Releasors ever had, now have or hereafter can, shall or may have, for, upon, by reason of, arising out of, or in any way related to the Event . . . .* This Release also expressly extends to and includes, but is not limited to, each and every claim or cause of action that could have been asserted for all past and future economic damages, noneconomic damages and

13

awards recoverable or potentially recoverable from any person . . . . (emphasis added).

Ex. 9 at BOE0060 ¶ 3.

Except for Ralph Kevorkian, each release also includes a choice of law provision selecting New York law. *Id*. at BOE0063 ¶ 16. Kevorkian's release is governed by California law. *Id.* at BOE0005 ¶ 16. The releases were executed by the personal representatives and decedent's beneficiaries, before notaries, and signed by counsel. *See* Ex. 9 at BOE0065-66. Releasors "expressly confirm that they have consulted with their attorneys concerning this release and have been fully advised with respect to their rights and obligations hereunder." *Id*. at BOE0063-64 ¶ 18.

## VI.    PROCEDURAL POSTURE OF THIS CASE

Before filing their lawsuit against the United States, all but one Plaintiff submitted administrative claims to the Navy on October 4, 2021. Ex. 10 [Admin. Claims]. The administrative claims were signed (illegibly) by the same person. *Id.* The phone number associated with the signature is the same as the phone number in the signature block for Plaintiffs' former counsel Todd Walburg. *See* ECF 33 at 38. Every administrative claim lists the person on whose behalf it is filed as both an individual and on behalf of an estate. *Id*. No administrative claim was filed on behalf of Christopher Krick prior to initiating this lawsuit. *See* Ex. 11 [Navy Decl.] ¶ 4.

## **ARGUMENT**

## I.    THE FTCA DOES NOT WAIVE SOVEREIGN IMMUNITY FOR PLAINTIFFS' CLAIMS BECAUSE A SIMILARLY SITUATED PRIVATE PARTY THAT WAS RELEASED CANNOT BE LIABLE UNDER LIKE CIRCUMSTANCES.

The United States, as sovereign, is immune from suit unless it explicitly consents. *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *see also Cangemi v. United States*, 13 F.4th 115,

14

130 (2d Cir. 2021). Under the FTCA the United States has waived its sovereign immunity only to the extent that a similarly-situated private person could be liable under local law. 28 U.S.C. §§ 1346(b), 2674; *FDIC v. Meyer*, 510 U.S. 471, 477 (1994) (courts have jurisdiction only if claims are actionable under § 1346(b)). A claim is actionable if it alleges six elements: 1) it is against the United States, 2) for money damages, 3) for personal injury or death, 4) caused by the negligent act of a government employee, 5) acting within the scope of employment, and 6) under circumstances where a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b); *Brownback v. King*, 592 U.S. 209, 212 (2021). The elements are jurisdictional, and a plaintiff's failure to establish them deprives a court of subject-matter jurisdiction. *Brownback*, 592 U.S. at 217.

It is well established that a plaintiff bears the burden of demonstrating that a court has subject matter jurisdiction and must do so by a preponderance of the evidence. *Matthias v. United States*, 475 F. Supp. 3d 125, 133 (E.D.N.Y. 2020) (citing *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)). A defendant may challenge subject matter jurisdiction under Rule 12(b)(1) with either a facial or factual attack. *Russo v. City of Hartford*, 184 F. Supp. 2d 169, 178 (D. Conn. 2002). A facial attack merely challenges the sufficiency of the pleadings, *id.*, meaning that a court's review is limited to the complaint and exhibits attached thereto. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). In a factual attack, such as is raised in this motion, a defendant is permitted to include extrinsic evidence beyond the pleadings. *Id.* at 57. In that circumstance, no presumptive truthfulness applies to a plaintiff's allegations and the court must weigh all controverted facts. *Id.*

Plaintiffs have failed to plausibly allege or otherwise establish that a private person would be liable to them in accordance with the law of the place where the act or omission

15

occurred because the representatives for these same decedents, and in certain cases the Plaintiffs themselves, signed releases waiving their rights to bring any future lawsuit against any potential defendant. *See* Ex. 9. One release specifically named the United States as a releasee, *see* Ex. 9 at BOE0001, and the others define releasee in the broadest terms possible as:

> "all other persons or entities not specifically identified who are or may be liable to Releasors . . . for any and/or all damages and losses to Releasors, whether known or unknown, arising out of or in any way related to or resulting from the loss of TWA Flight 800."

Ex. 9 at BOE0059.

In these agreements, the representatives accepted a monetary payment in exchange for, *inter alia*, agreeing not to bring future lawsuits against any other entity. All parties were represented by counsel, and the settlements were approved by Judge Sweet. In the agreements, Plaintiffs specifically contemplated that information might later come to light that changed their understanding of the facts, and agreed that the settlement would be binding nonetheless and would release any and all future claims. Ex. 9 at BOE0061 ¶ 8. Given the centrality of the errant missile test theory in the lengthy MDL proceedings, this agreement to forgo a cause of action in the future carries particular weight.

The releases are contracts and thus constitute binding agreements to relinquish existing and future claims. *See Stone v. National Bank and Trust Co.*, 591 N.Y.S.2d 609, 611 (N.Y. App. Div. 1992); *Benedek v. PLC Santa Monica, LLC*, 129 Cal. Rptr. 2d 197 (Cal. Ct. App. 2002). Five of the releases include a New York choice of law provision; *see* Ex. 9 at BOE0063 ¶ 16, one (Kevorkian) includes a California choice of law provision, *see* Ex. 9 at BOE0005 ¶ 16. Under New York law, a settling party can execute a "limited release" to release some but not all tortfeasors, N.Y. Gen. Obligations Law § 15-108, however, that is not what was done here. The New York statute does not require that an entity be specifically named or identified in the release

16

to be discharged. *Wells v. Shearson Lehman/Am. Exp., Inc*., 526 N.E.2d 8, 12 (N.Y. 1988); *Tamayo v. Ford Motor Titling Tr*., 726 N.Y.S.2d 709, 710–11 (N.Y. App. Div. 2001). If the release expressly extends to joint tortfeasors not named in the settlement, as is the case here, the release is enforceable to bar future actions. *Koufakis v. Siglag*, 925 N.Y.S.2d 204, 206 (N.Y. App. Div. 2011). This is especially true when the release is executed incident to a court-approved settlement. *Id*.

Where both parties are represented by counsel, and have roughly equivalent bargaining position, the general rule is that if the language of the release is clear, the parties' intent is expressed by that language. 28A N.Y. Prac., Contract Law § 26:8. In such circumstances, the release may be construed against the Releasor. *Id*. A court may only look to extrinsic evidence to determine the parties' intent where the release language is ambiguous. *Id*. There is no need to do so here as the intent of the parties is clear on the face of the agreement. New York courts have made clear that "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Global Minerals and Metals Corp. v. Holme*, 824 N.Y.S.2d 210, 214 (N.Y. App. Div. 2006).

As to the Kevorkian agreement under California law, a written general release "given in good faith to a tortfeasor" will discharge a third-party beneficiary from liability if its terms so provide. Cal. Civ. Proc. Code § 877(a). While a third-party beneficiary need not be specifically named to be discharged, *see, e.g*., *General Motors Corp. v. Super. Ct*., 15 Cal. Rptr. 2d 622, 624 (Cal. Ct. App. 1993), the United States *was a named releasee* in the California release. *See* Ex. 9 at BOE0001 ("and any and all agencies, department, and subdivisions of the GOVERNMENT OF THE UNITED STATES OF AMERICA . . . ."). Additionally, Kevorkian specifically waived

any rights or benefits with respect to unknown or unsuspected claims under California Civil Code § 1542 ("General Release; Extent") (as did other Releasors).

Nothing in the releases indicates ambiguity or an intent to limit the release. The releases expressly bar future action against unnamed potential joint tortfeasors, which is valid under both New York and California law. The signatures of multiple prominent plaintiffs' law firms show the language was no drafting mistake; to the contrary, Plaintiffs had full access to the district court, years of discovery, and a successful appeal to the Second Circuit. Far from being unsophisticated persons misled by accident investigators, the MDL litigation reveals Plaintiffs' educated and voluntary decisions to enter a covenant not to bring further lawsuits. Indeed, it is hard to imagine Boeing would have settled the wrongful death suits in the MDL, without releasing all potential tortfeasors, known and unknown, to avoid inviting re-litigation of the accident. Accordingly, the action should be dismissed.[8]

## II.    PLAINTIFFS LACK STANDING TO BRING THESE CLAIMS.

### A.    NO ESTATES WERE REOPENED, AND NO PERSONAL REPRESENTATIVES WERE APPOINTED.

A party invoking the court's jurisdiction bears the burden of proving that it has Article III standing subject to the Constitution's Case and Controversy Clause. *Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Such standing is determined at the time the lawsuit is commenced. *Carter*, 822 F.3d at 56. Any challenge to standing is determined under Rule 12(b)(1) as it is a threshold jurisdictional

---

[8] *See generally Vidro v. United States*, 720 F.3d 148, 150-51 (2d Cir. 2013) (action dismissed because United States is entitled to assert state law defenses available to private parties); *Makarova v. United States*, 201 F.3d 110, 116 (2d Cir. 2000) (dismissing action where it could not be brought against a private party); *West v. United States*, No. 00-cv-9433, 2003 WL 164278 at *5 (S.D.N.Y. Jan. 20, 2003) (dismissing action when private party would be immune from suit).

issue that must be decided before looking to the merits. *Walters v. Fischer Skis U.S., LLC*, No. 6:21-CV-1115, 2022 WL 3226352, at *2 (N.D.N.Y. Aug. 10, 2022) (citing *All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006)).

In an FTCA case, courts apply the law of the place where the alleged act or omission occurred, 28 U.S.C. § 1346(b)(1); *Richards v. United States*, 369 U.S. 1, 11 (1962) (in airplane crash case, holding that the FTCA requires application of the whole law of the state where the act or omission occurred). This includes determining who has the capacity to sue in a wrongful death case. *Matthias v. United States*, 475 F. Supp. 3d 125, 135 (E.D.N.Y. 2020); *see also Joachim v. United States*, No. 22-cv-5719, 2023 WL 6292542, at *2 (E.D.N.Y. Sept. 27, 2023). Here, Plaintiffs allege negligent missile testing off the coast of New York. ECF 33 ¶¶ 5, 32, ECF 95 at 23, ECF 96. Accordingly, New York law applies to Plaintiffs' FTCA claims.

In New York, a wrongful death action is entirely the product of statute, and no common law cause of action existed prior to its enactment. *Hernandez v. New York City Health & Hosps. Corp.*, 585 N.E.2d 822, 825 (N.Y. 1991). As a statutory creation, the Court of Appeals has instructed that this law must be construed strictly. *In re September 11 Litig.*, 760 F. Supp. 2d 433, 443 (S.D.N.Y. 2011) (citing *Gonzalez v. N.Y. City Housing Auth.*, 572 N.E.2d 598 (N.Y. 1991)).

Under New York's wrongful death statute, in order to demonstrate standing, a plaintiff is required to prove the appointment of a personal representative. *Matthias*, 475 F. Supp. 3d at 143; *see* N.Y. Est. Powers & Trusts § 5–4.1; *id.* at § 1–2.13. A "personal representative" is defined as "a person who has received letters to administer the estate of a decedent." *Hernandez*, 585 N.E.2d at 825 (citing N.Y. Est. Powers & Trusts § 1–2.13). Therefore, only a court-appointed personal representative may bring a wrongful death or survival action on behalf of an estate.

19

*Matthias*, 475 F. Supp. 3d at 135. The relevant time period for determining whether an individual has standing is whether they were appointed as a personal representative at the time the action is commenced in federal court. *Id*. at 136. A plaintiff who attempts to bring a claim on behalf of an estate, who has not been appointed as an administrator or personal representative, lacks standing because they are asserting someone else's rights. *Garmon v. Cnty. of Rockland*, No. 10-cv-7724, 2013 WL 541380, at *2 (S.D.N.Y. Feb. 11, 2013).

The Complaint alleges that personal representatives were appointed for the five estates that remain Plaintiffs in this case. *See* ECF 34 ¶¶ 15, 18, 24, 26, 130. This allegation is false. As demonstrated by the documents from the various courts in which these estates were probated, while personal representatives were appointed in the 1990s, those estates were all closed after the end of the MDL. *See* Ex. 5-8 [Estate Documents]. In addition, the individuals appointed as personal representatives by the probate courts, except for Ronald Krick, are different than the parties claiming to be the personal representatives in this case. *See* Ex. 5-8. Further, there is no evidence that the estates were ever reopened with additional or different individuals appointed as personal representatives. Therefore, the individuals claiming to act on behalf of the estates lack standing and the causes of action brought on behalf of those estates should be dismissed.

B.    THE REMAINING INDIVIDUAL PLAINTIFFS LACK STANDING TO
      BRING THEIR OWN ACTION.

In addition to the decedents' estates, Plaintiffs include nine remaining individuals. *See* ECF No. 34 ¶¶ 117-19, 131. As to the United States, Plaintiffs' Complaint asserts negligence in count I and wrongful death and survivorship in count II. The Complaint does not explicitly attribute specific elements of damages to the individuals as compared to the estates.

A wrongful death claim is brought exclusively by the personal representative of the estate for the benefit of statutory distributees. N.Y. Est. Powers & Trusts §§ 5-4.1, 5-4.4; *Heslin v.*

*Cnty. of Greene*, 923 N.E.2d 1111, 1116 (N.Y. 2010); *see also Hernandez*, 585 N.E.2d at 825 (wrongful death action must be brought by personal representative). The damages recoverable are exclusively for the pecuniary loss suffered by the individual distributees as a result of the decedent's death. *Hernandez*, 585 N.E.2d at 825; *see also Gabriel v. Cnty. of Herkimer*, 889 F. Supp. 2d 374, 405 (N.D.N.Y. 2012). A personal injury claim that survives the decedent's death (a.k.a. a survival claim) belongs to, and can only be brought by, an estate. *Heslin*, 923 N.E.2d at 1116. This means any recovery for a survival action is subject to the costs owed by the estate to creditors, or for any liens, debts, or other obligations. *Id*.

Under either theory of recovery, *i.e.*, wrongful death or survival, the right to bring an action seeking compensation falls exclusively on the personal representative of the estate. *Frometa v. Mar-Can Transp. Co.*, 148 N.Y.S.3d 613, 623 (N.Y. App. Div. 2021) (citing *Machado v. Gulf Oil, L.P.*, 146 N.Y.S.3d 66 (N.Y. App. Div. 2021)). Hence individuals, such as parents, children, an aunt, siblings, or a nephew, in their individual capacities, lack standing to assert claims on their own behalf. *Id.* (citing *Long Island Care Ctr., Inc. v. Goodman*, 26 N.Y.S.3d 595 (N.Y. App. Div. 2016); *see also Shelley v. S. Shore Healthcare*, 999 N.Y.S.2d 103, 104 (N.Y. App. Div. 2014) (personal representative is the only person capable of seeking recovery). Therefore, the remaining individual Plaintiffs lack standing to bring their claims against the United States.

### III. CHRISTOPHER KRICK FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES AND HIS CLAIM MUST BE DISMISSED.

Plaintiffs bring this action pursuant to the FTCA, which requires claimants to exhaust all administrative remedies before filing a complaint in federal court. 28 U.S.C. § 2675(a); *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005). This requirement is jurisdictional and cannot be waived. *Id*. The plaintiff bears the burden of proving that he filed the

21

requisite administrative claim before filing suit. *Cooke v. United States*, 918 F.3d 77, 80 (2d Cir. 2019). Failure to file a claim deprives a court of subject matter jurisdiction, and requires the dismissal of the complaint. *Mayes v. United States*, 790 F. App'x 338, 340 (2d Cir. 2020).

Christopher Krick did not file an administrative claim with the Navy prior to filing this lawsuit. *See* Ex. 11 ¶ 4 [Navy Decl.]. His failure to do so means he did not comply with the FTCA's requirement to exhaust his administrative remedies. Therefore the Court lacks jurisdiction over his claims and they must be dismissed. *See Mayes*, 790 F. App'x at 340.

IV.    **THE STATUTE OF LIMITATIONS HAS LONG SINCE RUN ON PLAINTIFFS' ALLEGATIONS AGAINST THE UNITED STATES.**

A.    STANDARD OF REVIEW

Plaintiffs plead the FTCA as their sole potential waiver of sovereign immunity. *See* ECF 33 ¶ 11. The FTCA requires that "a tort claim against the United States *shall be forever barred* unless it is presented in writing to the appropriate Federal agency *within two years after such claim accrues . . . .*" 28 U.S.C. § 2401(b) (emphasis added); *see also Grancio v. De Vecchio*, 572 F. Supp. 2d 299, 307 (E.D.N.Y. 2008). The Plaintiffs failed to do so; therefore, their Complaint must be dismissed.

Prior to 2015, the Second Circuit viewed a motion to dismiss such as this one as an attack upon a court's subject matter jurisdiction under Rule 12(b)(1). In *United States v. Kwai Fun Wong*, however, the Supreme Court ruled that the FTCA's statute of limitations was procedural rather than jurisdictional; therefore, the time bar is an affirmative defense. 575 U.S. 402, 420 (2015). While motions based on affirmative defenses are typically made as ones for summary judgment; they may be brought as motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) if the defense is apparent on the face of the complaint. *Ellul v. Congregation of*

22

*Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014) (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).

In considering a motion to dismiss for failure to state a claim a party is limited to 1) the complaint; 2) documents attached to, or incorporated by refence to, the complaint; 3) matters of which a court may take judicial notice; and 4) documents either in the plaintiffs' possession or which plaintiffs had knowledge of and relied upon in bringing their suit. *Frontera v. United States*, No. 05-CV-0423S, 2009 WL 909700, at *18 (W.D.N.Y. Mar. 31, 2009) (citing *Brass v. Am. Firm Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *see also United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020). The Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), mandate that, to survive a Rule 12(b)(6) motion, a complaint must state a "plausible" claim for relief. *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008).

On a Rule 12(b)(6) motion, a court must accept as true all *factual allegations* contained in the complaint and draw all reasonable inferences in a plaintiff's favor. *S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 101 (S.D.N.Y. 2011). A court need not accord a presumption of truthfulness to any legal conclusions, deductions, or opinions couched as facts. *Id*. The claim must be plausible, meaning a plaintiff must plead sufficient *facts* so that a court may draw reasonable inferences that a defendant is liable for the alleged misconduct. *Id*. As will be seen, while Plaintiffs' Complaint contains many salacious allegations and legal conclusions, it is bereft of facts upon which the Court may find this action to be timely.

B.     PLAINTIFFS' CLAIMS ACCRUED AT, OR NEAR, THE TIME OF THE CRASH.

1.     Distinction between the Discovery Rule and Tolling.

The questions of accrual and tolling, while interrelated, are legally distinct. Second

23

Circuit case law nonetheless uses similar language to describe different tools for delaying the running of a limitations period. *Ellul*, 774 F.3d at 801. Regardless of whether Plaintiffs are attempting to delay the accrual of their claim or to toll a statute of limitations that has already accrued, they face a similar outcome—the two-year time period to bring a claim has long expired. Plaintiffs' administrative claims were received by the Navy on October 4, 2021, meaning that, to be timely, the underlying action must not have accrued prior to October 4, 2019. If the claim accrued prior to then, it is either untimely, or Plaintiffs must demonstrate that they are entitled to tolling. Plaintiffs' Complaint primarily focuses on two means of avoiding the time bar: 1) the discovery rule; and 2) tolling via fraudulent concealment.[9]

"Accrual is the date on which the statute of limitations begins to run." *Roque v. United States*, 676 F. Supp. 2d 36, 40 (D. Conn. 2009) (quoting *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 177 (2d Cir. 2008)). Federal law determines that date under the FTCA. *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135 (2d Cir. 2011). In general terms, the discovery rule acts to delay the time of accrual until a plaintiff knows or should know that she was injured and the cause; whereas tolling applies to stop the limitations period from running for a specified reason after it has accrued. *Ellul*, 774 F.3d at 801. In Second Circuit case law, fraudulent concealment, or as referred to by Plaintiffs here as "government cover-up," could apply to delay accrual or toll the statute of limitations. *See Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002).

Both concepts are exceptions to the general rule that a claim accrues at the time of injury. *Barrett v. United States*, 689 F.2d 324, 327 (2d Cir. 1982). A mechanical application of the

---

[9] Plaintiffs also claim equitable estoppel and laches apply; however, Plaintiffs only briefly mentioned them. *See* ECF 33 ¶¶ 94-95, 100. It appears from their Complaint, and prior briefing, that those arguments are not meritorious. Regardless they are addressed in summary *infra*.

statute of limitations benefits the very real public policy goal of compelling plaintiffs to bring timely claims, while evidence and memories are fresh, and thus avoids prejudicing defendants by unpredictably lengthening a limitations period. *A.Q.C. ex rel. Castillo*, 656 F.3d at 1142; *see also Keene Corp. v. United States*, 700 F.2d 836, 842 (2d Cir. 1983) (two-year rule is not arbitrary litigation cutoff but important tool "to provide a procedure under which the government may investigate, evaluate and consider settlement of a claim"); *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 188 (E.D.N.Y. 2014) ("Statutes of limitations, of course, also guard against 'the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'"). Such is the case here where twenty-nine years, a criminal case, multiple FOIA litigations, and an MDL were allowed to pass between the very public injury and this lawsuit.

2.    Plaintiffs' Claims Accrued Long Before October 2019.

For Plaintiffs' October 2021 administrative claims to have been timely, their cause of action must have accrued within the prior two years. 28 U.S.C. § 2401(b). Plaintiffs allege their claims accrued on April 15, 2021, when Dr. Stalcup met with them and presented his "newly discovered evidence." *See* ECF 33 ¶¶ 97-98. However, nothing in the Complaint indicates what specific "newly discovered evidence" Dr. Stalcup presented that was previously unknown to Plaintiffs. Rather, every fact within the Complaint, and the evidence the Court is permitted to review under Rule 12(b)(6), indicates that, at best, all Plaintiffs have demonstrated is the presence of additional evidence of a theory that was well known in 1996 and routinely publicly aired throughout the intervening twenty-nine years. Plaintiffs' suggested accrual date of April 15, 2021 is without factual basis or merit and the Court need not accept this legal conclusion as true.

25

*See Iqbal*, 556 U.S. at 678 (the tenet that a court must accept as true all allegations in a complaint is inapplicable to legal conclusions).

The district court in Massachusetts was incorrect on this point. During oral argument the Court asked Plaintiffs' counsel about the April 2021 meeting:

> THE COURT: Would you identify exactly what it was that they learned from Dr. Stalcup --
> MR. WALBURG: Yes, Your Honor.
> THE COURT: -- at this April 2021 meeting.
> MR. WALBURG: Yes, Your Honor. They learned that there were -- there was in existence Navy radar tapes that showed an object barreling towards the airplane on radar and another radar tape that showed an impact with the airplane.

Ex. 12 [Hearing Tr. 22:16-23]. The Court would later write in its opinion: "These copies of the Navy radar tapes were finally released and show an object 'heading straight for TWA 800,'" citing paragraph 84 of the Complaint. *Krick v. Raytheon Co.,* 695 F. Supp. 3d 202, 209 (D. Mass. 2023). Unfortunately, that citation, and Plaintiffs' counsel's statements, are incorrect. Paragraph 84 does not state that a radar tape was released to Dr. Stalcup, or ever shown to Plaintiffs. Rather, the Complaint states that Dr. Stalcup reviewed *an FBI record* that described what was displayed on a Navy radar tape. *See* ECF 33 ¶ 84.

The Complaint does not plead facts that establish the inapplicability of the general rule regarding accrual, *i.e.*, that this claim accrued on July 17, 1996, when TWA Flight 800 exploded. The leading precedent concerning FTCA accrual comes from *United States v. Kubrick,* 444 U.S. 111 (1979). *See Hertz v. United States*, 560 F.3d 616, 618 (6th Cir. 2009). *Kubrick*, a medical malpractice case, applied an "inquiry-notice rule," which provided that an FTCA claim accrues when a plaintiff possesses enough information with respect to her injury that had she sought out expert advice at that point she would have been able to determine in the two-year period whether to file an administrative claim. *Id.* at 618. The Second Circuit has relabeled it as a "diligence-

26

discovery rule" which may apply outside of medical malpractice to latent or unknowable injury cases. *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 177 (2d Cir. 2008).

In the Second Circuit, a plaintiff may delay the accrual of a claim in a situation where she would reasonably have had difficulty discerning the fact or cause of an injury until the time where she has, or with reasonable opportunity should have, discovered the critical facts of both injury and cause. *Id.* Applicable to the FTCA is that the plaintiff knows, or should have known, that the cause of action laid with the government. *Id.* at 177-78. The level of knowledge must go beyond a mere hunch, hint, or suspicion; however, such minimal awareness may give rise to a duty to investigate further. *Id.* at 178. A plaintiff need not know each and every relevant fact of her injury, or even that the injury implicates a cognizable legal claim for it to have accrued. *Mingo v. United States*, 274 F. Supp. 2d 336, 344–45 (E.D.N.Y. 2003). While the exact parameters of the minimum knowledge standard are unclear, what is clear is that a claim accrues when a plaintiff knows enough to protect herself by seeking legal advice. *A.Q.C.*, 656 F.3d at 140. From that point, it is the duty of conscientious counsel "to protect the client's interest by investigating the case and determining whether, when, where, and against whom to bring suit." *Id.*

Airplane crash litigation does not turn on latent or unknowable causes, and it is almost always a result of negligence. For example, in *Hertz v. United States*, a case arising from the crash of an amateur-built aircraft, the plaintiff delayed filing a claim until two years and nine days after the accident. 560 F.3d at 617-18. The United States filed a motion to dismiss on statute of limitations grounds and the plaintiff opposed, arguing that her claim did not accrue until she was told by a government investigator, nearly a month after the accident, that there was likely air traffic controller negligence. *Id.* at 617. Had her claim accrued when she spoke with the

27

investigator, rather than the day of the crash, the administrative claim would have been timely filed. *See id.* at 617-18. The Sixth Circuit found plaintiffs' delayed accrual argument unpersuasive and affirmed the district court's dismissal, reasoning that death caused by an airplane crash is categorically different from a latent injury/medical malpractice case because "[p]lane crashes by their nature typically involve negligence *somewhere* in the causal chain." *Id*. at 619 (emphasis in original).

Likewise in a case arising from a commercial airline crash, the district court dismissed plaintiffs' complaint as untimely. *Ressler v. United States*, No. 11-cv-02253, 2012 WL 4328662, at *3 (D. Colo. Sept. 20, 2012). In *Ressler*, the plane crashed in December 2008. The government received plaintiffs' claim two years and eight days after the crash. *Id*. at *2. Plaintiffs argued that their claim did not accrue on the day of the accident in 2008; but rather in April 2009 when they read in the NTSB factual report that the crash was caused by air traffic controller negligence. *Id*. The district court, favorably citing *Hertz*, concluded that the accrual did not await Plaintiffs' awareness that their injury was suffered because of government negligence. *Id*. The district court charged plaintiffs with the responsibility of protecting themselves in a situation such as a plane crash, in seeking the advice of legal and subject matter experts to determine their rights. *See id*.

In yet another case, *Rademacher v. United States*, the district court was likewise unpersuaded by the proposed intervenors who argued that their claim did not accrue on the day of the accident but rather was delayed until later "discovery" of facts that only became apparent when the NTSB released transcripts of pilot-air traffic controller communications. Ex. 13, 3:19-cv-00157 (N.D. Miss. Mar. 19, 2020), slip op. at 11-12. The proposed intervenors asserted that they conducted a "reasonable investigation" but detrimentally relied on a preliminary NTSB

report, which stated that the pilot reported a mechanical problem prior to the crash and did not mention air traffic controller negligence as a potential cause. *Id*. at 3, 10. In denying their motion to intervene in an FTCA suit that other plaintiffs timely filed and which alleged air traffic control negligence, the district court found that the proposed intervenors offered no factual evidence of the specific steps they took in conducting their investigation and concluded that they did little to no investigation at all. *Id.* at 10.

The explosion of TWA Flight 800 was certainly no less apparent than the crashes in *Hertz*, *Ressler*, or *Rademacher*. All the major networks broadcast the explosion as breaking news that evening, and newspapers headlined it the following day. The investigation that followed was documented step-by-step by journalists, with numerous press conferences held by the FBI and NTSB furnishing information about it. ECF 33 ¶¶ 47, 50. *See Grancio v. De Vecchio*, 572 F. Supp. 2d 299, 308 (E.D.N.Y. 2008) (widespread media coverage can trigger accrual). Beyond the time of the explosion and investigation, TWA Flight 800 provided fodder for FOIA litigation and criminal cases ensuring that the event did not leave the public consciousness over the years.

The midflight explosion of a commercial airliner cannot be classified as a latent injury of which Plaintiffs were unaware at the time. Any reasonable person would have concluded, as expressed in *Hertz, Ressler*, and *Rademacher*, that some form of negligence played a role in causing it. Therefore, Plaintiffs were charged, that day, with the responsibility of obtaining legal and expert advice in order to protect their rights. Plaintiffs saw it this way as well, as representatives for all of the decedents retained counsel, sued other entities, and settled their claims decades ago. Nowhere in the Complaint do Plaintiffs state that they were dissatisfied with the service provided by their prior counsel or were ineffectively represented in the MDL. *See Picarella v. United States*, No. 22-cv-4983, 2024 WL 1435744, at *5 (E.D.N.Y. Apr. 3, 2024)

29

("Once an injured party . . . knows enough to warrant consultation with counsel, and acts with diligence . . . to undertake such consultation, conscientious counsel will have ample time to protect the client's interest by investigating the case and determining whether, when, where, and against whom to bring suit.").

The United States anticipates that Plaintiffs will argue the claim did not accrue at the time of the explosion because the information upon which the claim is based was allegedly suppressed by a purported government cover-up. This argument is baseless. The United States emphasizes that no cover-up occurred, and Plaintiffs have pleaded insufficient facts to suggest otherwise. Under the correct circumstances, fraudulent actions undertaken by a defendant to obscure the fact or cause of an injury can delay accrual. *Wyly*, 788 F. Supp. 2d at 102–03. In those instances the statute does not begin to run until the fraud is discovered. *Id.*; *see also Pearl v. City of Long Beach*, 296 F.3d 76, 82 (2d Cir. 2002) (standard includes known or should have known). Plaintiffs need to plead actual facts of conspiracy, however, and may not just baldly say that the government engaged in one as a conclusion. *Pearl*, 296 F.3d at 87.

The Second Circuit's decision in *Barrett v. United States*, 689 F.2d 324 (2d Cir. 1982), best lays out the factual basis necessary for the rare application of this means of delaying accrual. In *Barrett*, the decedent died after being injected with a chemical compound while in government custody in the 1950s. *Id.* at 327. At the time of his death, the decedent's family was told that he died because of medical incompetence, and the involvement of the United States, or specifically the Army Chemical Corps, was not specifically mentioned. It later became clear through the release of information several decades later that he died because he was being used by the Army Chemical Corps as "a human guinea pig." *Id.* at 329. It was also clear that even if the plaintiff had pursued her claims with more vigor and diligence in the 1950s that she may not

30

have discovered the connection between the death and the government. *Id*. at 330. In that rare instance, the Second Circuit reasoned that "[i]t is illogical to require a party to sue the government for negligence at a time when the Government's responsibility in the matter is suppressed in a manner designed to prevent the party, even with reasonable effort, from finding out about it." *Id*. However, that is not the factual situation here.

As the facts demonstrate, the errant Navy missile test theory and allegations about a government cover-up were pervasive throughout the early investigation. The missile theory and government cover-up contentions have been part of the parlance in popular imagination, the media, FOIA cases, and litigation about TWA Flight 800 since then. The 2000 NTSB factual report would not need an entire section discussing what the eyewitnesses saw, and the CIA would not need to publish a video saying "*It was not a Missile*" during an FBI press conference in 1997, had this theory not been widespread. A government cover-up cannot be so effective as to delay accrual of the claim while at the same time be so inept that it requires repeated episodes of "disinformation" to ensure that the "real" facts remain concealed.

Plaintiffs' Complaint compresses two decades of history, and in so doing removes the context that otherwise demonstrates the weakness of their arguments. The explosion of TWA Flight 800 was open and obvious. Allegations of a missile strike were so pervasive and well-documented that they motivated private citizens, Dr. Stalcup included, who had no connection with this tragedy, to engage in their own "investigations." This included undertaking actions that were illegal, in stealing evidence from a government facility, or incredibly time consuming and expensive such as writing books, producing documentaries, and engaging in decades-long FOIA litigation. *See* factual background at 3-9, *supra*.

31

To the extent the Complaint asserts that Plaintiffs were unaware of their injury until their meeting with Dr. Stalcup in 2021, those contentions lack plausibility to surmount the limitations bar. *See* ECF 33 ¶ 98. Plaintiffs possessed ample evidence long before October of 2019 to bring these claims. If Dr. Stalcup's presentation provided anything, it was merely more evidence of what Plaintiffs already thought they knew. *See Pearl*, 296 F.3d at 85 (citing *Paige v. Police Dept. of Schenectady*, 264 F.3d 197, 200 (2d Cir.2001)); *see also Torres v. United States*, 612 F. App'x 37, 40 (2d Cir. 2015) (all the facts were known by plaintiff prior to the meeting with physician, all the doctor provided was context). The Complaint simply lacks the factual basis to justify the extreme measure of delaying accrual by over two decades.

C.   PLAINTIFFS' ALLEGATIONS DO NOT SUPPORT APPLICATION OF THE FRAUDULENT CONCEALMENT DOCTRINE.

Tolling, as a means of interrupting the running of the statute of limitations on an already accrued claim, can take three forms—1) equitable tolling, 2) fraudulent concealment, and 3) equitable estoppel. *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 182 (2d Cir. 2008). Plaintiffs' Complaint, unfortunately, uses these terms interchangeably. A careful review of the Complaint demonstrates that Plaintiffs' efforts are focused on the second form of tolling, *i.e.*, fraudulent concealment, or as they are more apt to put it—a government cover-up. Plaintiffs have the burden of proving the applicability of tolling. *A.Q.C.*, 656 F.3d at 144. As tolling runs counter to the critical role that statutes of limitations play, it is considered a drastic remedy applied only in rare and exceptional cases. *Id.* (citing *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)); *see also Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004).

For a plaintiff to toll the statute of limitations through the fraudulent concealment doctrine, she must allege with sufficient support that 1) the defendant wrongfully concealed material facts relating to its wrongdoing; 2) the concealment prevented plaintiff's discovery of

32

the claim within the limitations period; and 3) plaintiff exercised due diligence in pursuing the discovery of the claim during the tolled period. *Ellul*, 774 F.3d at 801 (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012)). As the first prong includes evidence of fraud, a plaintiff is additionally obligated to meet the Fed. R. Civ. P. 9(b) pleading standards. *Wyly*, 788 F. Supp. 2d at 104. To satisfy those standards, a complaint must: 1) specify the fraudulent statements; 2) identify the speaker(s); 3) state where and when the statements were made; and 4) explain why the statements were fraudulent. *Id.* at 101.

When a limitations period is stopped by tolling, that stoppage is not perpetual; but rather only lasts as long as the cause of the tolling exists. *Haekal v. Refco, Inc.*, 198 F.3d 37, 43 (2d Cir. 1999). Even then, it does not act to reset the limitations period; but rather, interrupts it. *Id*. This means once the cause of tolling is removed, "the time remaining on the (statute of limitations) clock is calculated by subtracting from the full limitations period whatever time ran before the clock was stopped." *Harper v. Ercole*, 648 F.3d 132, 139 (2d Cir. 2011) (quoting *United States v. Ibarra*, 502 U.S. 1, 4 n.2 (1991)). Meaning here again, Plaintiffs' efforts to compress the long span of history distort the analysis because the Complaint fails to account for extended periods of time, hiding these shortcomings by baldly claiming fraud and cover-up without actually pleading factual details sufficient to meet the burden of proof.

The Complaint fails to meet the Rule 9(b) pleading standards as it does not set forth allegations of specific fraudulent government statements that created a cover-up. In fact, the only statements in the Complaint attributed to the government are the CIA animation, several press conferences, the NTSB report, and potentially some communications from the NTSB Office of Families, the substance or timing of which are not provided. *See* ECF 33 ¶¶ 47, 50. Given the lack of specificity, the only externally verifiable dates of these communications are November

33

1997, for the CIA animation, and August 2000, for the NTSB report. This means these allegedly fraudulent communications first took place over a year after TWA Flight 800 exploded and last took place more than 21 years before Plaintiffs submitted their administrative claim. That leaves a long unaccounted-for time within which the limitations period could have run.

In the years since the NTSB released its allegedly false report, TWA Flight 800 has hardly fallen out of public discourse or faded from collective memory. As stated above, there has been a long-running current of litigation regarding the cause of the explosion, most of it led by individuals making salacious claims, seeking to expose an alleged widespread cover-up involving multiple federal agencies. Beyond the actions of these "truth seekers" are the publicly-available FBI witness summaries and statements eyewitnesses made to the media. These include eyewitnesses who have spoken publicly about how the CIA animation and the NTSB report did not accord with their observations regarding the flare or streak of light they saw on July 17, 1996. Were any of these lawsuits, media stories, or individuals to be credited, Plaintiffs absolutely should have been on notice that their beliefs based on the allegedly fraudulent reports were no longer justified. A reasonable person charged with notice of such facts would have been required to reevaluate their beliefs and seek legal advice.

D.     PLAINTIFFS' ALLEGATIONS DO NOT SUPPORT APPLICATION OF EQUITABLE ESTOPPEL OR LACHES.

Plaintiffs' Complaint also alleges equitable estoppel and laches in the summary paragraph of the "tolling of the statute of limitations" section. No allegations provide justification or a basis for either and the Court should give no weight to either conclusory allegation. That being said, the Complaint does not support either principle on the merits.

Equitable estoppel is applicable *when a plaintiff knows of her cause of action* but reasonably relies on the defendant's conduct or statements in failing to bring a suit. *Ellul*, 774

34

F.3d at 802. For equitable estoppel to apply, Plaintiffs bear the burden of showing 1) the United States made a definite misrepresentation of fact, and had reason to believe that the Plaintiffs would rely on it; and 2) Plaintiffs reasonably relied on that misrepresentation to their detriment. *Id*. (citing *Buttry v. Gen. Signal Corp*., 68 F.3d 1488, 1493 (2d Cir. 1995)). Plaintiffs appear to misunderstand the concept of equitable estoppel; because, in order for it to apply it requires 1) that Plaintiffs admit accrual of a cause of action; and 2) that Plaintiffs failed to timely file a lawsuit because of a government misrepresentation. As the Second Circuit put it in *Ellul*, this relief is applicable in a case where a defendant lulls a plaintiff into not suing by assurances of settlement, for instance. 774 F.3d at 802. Those facts are not pleaded in the Complaint; to the contrary, Plaintiffs aver that their cause of action did not accrue until April 2021. ECF 33 ¶ 97. Subsequent to that alleged date of accrual, Plaintiffs plead no affirmative government misrepresentation that convinced them to not file a claim. Rather, Plaintiffs filed their claim on October 4, 2021, within two years of their conversation with Dr. Stalcup making equitable estoppel inapplicable to this case. Therefore, equitable estoppel does not save this untimely lawsuit.

Plaintiffs also plead laches as a basis for tolling the statute of limitations. ECF 33 ¶ 100. Plaintiffs appear to misunderstand that laches is an affirmative defense under Fed. R. Civ. P. 8(c)(1), and is not a doctrine that protects plaintiffs who file an untimely complaint. Courts of equity developed laches to protect *defendants* against "unreasonable, prejudicial delay in commencing suit." *SCA Hygiene Prod. Aktibolag v. First Quality Baby Prod., LLC*, 580 U.S. 328, 333 (2017). It serves a similar function as a statute of limitation. *Id*. at 334. In contemporary practice laches is a gap-filling doctrine, but where an express statute of limitations exists, like here, there is no gap to fill and thus the doctrine is not applicable. *Id*. at 335.

35

## V.    PLAINTIFFS' COMPLAINT PLEADS AN ADMIRALTY CAUSE OF ACTION; THEREFORE, THIS ACTION BROUGHT UNDER THE FTCA MUST BE DISMISSED.

Plaintiffs have pleaded a textbook admiralty case arising from the crash of a transoceanic flight. However, instead of properly invoking the Court's subject matter jurisdiction over the United States via the Suits in Admiralty Act (SAA), 46 U.S.C. §§ 30901–30918, or the Public Vessels Act (PVA), 46 U.S.C. §§ 31101–30013,[10] Plaintiffs exclusively pleaded the FTCA, 28 U.S.C. § 2674 *et seq*. ECF 33 ¶ 11. The FTCA does not provide a waiver of sovereign immunity for admiralty cases. 28 U.S.C. § 2680(d). Therefore, Plaintiffs fail to invoke the Court's subject matter jurisdiction, and this action should be dismissed. Fed. R. Civ. P. 12(b)(1).

Dismissal is proper where the court lacks the statutory or constitutional power to adjudicate the case. Fed. R. Civ. P. 12(b)(1); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A district court must dismiss the action if it finds that it lacks jurisdiction. Fed. R. Civ. P. 12(h)(3). As the party asserting federal jurisdiction, Plaintiffs bear the burden of establishing, by a preponderance of the evidence, that the district court has jurisdiction. *Crawford v. Electric Boat Corp.*, 515 F. Supp. 2d 282, 285 (D. Conn. 2007) (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)).

Neither the FTCA nor the SAA/PVA create any rights for Plaintiffs; but rather they simply act to withdraw the United States' sovereign immunity. *Crawford*, 515 F. Supp. 2d at 286 (citing *Blanco v. United States*, 775 F.2d 53, 63 n.8 (2d Cir. 1985)). The limits of the United States' waiver of sovereign immunity are strictly construed in the government's favor. *Dept. of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999). One such limit is that the FTCA and

---

[10] The United States reserves the right to challenge Plaintiffs' choice of venue in E.D.N.Y. under the PVA, 46 U.S.C. § 31104, should the case proceed further.

SAA/PVA are mutually exclusive, meaning in cases where one applies the other cannot. *See* 28 U.S.C. § 2680(d). Therefore, if admiralty jurisdiction applies, a complaint based on the FTCA must be dismissed. *Crawford*, 515 F. Supp. 2d at 291.

To determine whether a case lies in admiralty, courts apply a locality and nexus test. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995). To satisfy the locality test, the tort must either have occurred on navigable water or been caused by a vessel on navigable water. *Id*. at 534. This case satisfies the locality test. Plaintiffs pleaded that "the plane exploded and crashed into the Atlantic Ocean," and that the cause of the explosion was an alleged errant missile test which included "live warheads from warship(s) (fired) at aerial missile targets off the coast of New York . . ." and that "[o]ne such missile struck TWA flight 800, causing it to break apart and crash into the Atlantic Ocean . . . ." *See* ECF 33 ¶¶ 2, 5. This application of the locality test is consistent with the Second Circuit's evaluating the prior MDL through an admiralty lens as TWA Flight 800 crashed eight nautical miles south of Long Island. *In re Air Crash*, 209 F.3d at 201.

Turning to the nexus test, the Court conducts a two-part inquiry, analyzing the potentially disruptive impact on maritime commerce, and whether the incident shows a substantial relationship to traditional maritime activity. *Grubart*, 513 U.S. at 534, 541; *see also Taghadomi v. United States*, 401 F.3d 1080, 1087 (9th Cir. 2005). With respect to potential disruptive impact on maritime commerce, an aircraft sinking in the water could create a hazard for the navigation of commercial vessels in the vicinity. *See Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 675 n.5 (1982); *In re Air Crash Into Java Sea on Jan. 9, 2021*, No. 1:23-MD-3072, 2023 WL 5597824, at *5 (E.D. Va. Aug. 25, 2023); *Siswanto v. Airbus Americas, Inc.*, No. 15-CV-5486, 2016 WL 7178458, at *4 (N.D. Ill. Dec. 9, 2016). The in-flight breakup of an aircraft creates a

debris field that poses a risk to those on-scene at the time and for an extended period thereafter. Such a tragedy requires the shuttering of sea lanes, and the use of vessels and specialized equipment to recover the remains of victims, salvage hazardous wreckage, and to mitigate the damage caused by jet fuel, and other petroleum products, to the maritime environment.

With respect to the character of the activity, TWA Flight 800 was a transoceanic flight from New York to Paris. *In re Air Crash*, 209 F.3d at 201. The Supreme Court has noted that a transoceanic crossing bears a relationship to maritime commerce because that voyage "previously would have been performed by waterborne vessels." *Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 264 (1972). "Federal courts have concluded nearly unanimously that transoceanic or island voyages that, but for air travel, would have been conducted by sea have a significant relationship to maritime activity." *In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001*, No. MDL 1448 (RWS), 2006 WL 1288298, at *9 (S.D.N.Y. May 9, 2006) (gathering cases); *see also In re Air Crash Off Point Mugu, Cal., on Jan. 30, 2000*, 145 F. Supp. 2d 1156 (N.D. Cal. 2001) (finding admiralty jurisdiction when flight from California to Mexico crashed less than three miles from the coastline).

Plaintiffs' allegations further implicate the purpose and mission of the U.S. Navy as the protector of American maritime commerce and the free navigation of the seas. The Complaint alleges the explosion was due to an errant missile fired during a test of a new weapons system designed to confront a foreign threat that was "here and now." *See* ECF 33 ¶¶ 4-5, 55-60. Such a challenge delves into the heart of Congress's authority "to provide and maintain a Navy," U.S. Const. art. I, § 8. As the Navy's purpose was explained in the Federalist Papers, "if we mean to be a commercial people, or even secure on our Atlantic side, we must endeavor, as soon as possible, to have a navy." The Federalist No. 24; s*ee also* No. 11 (Alexander Hamilton)

38

("[without a navy] it would be in the power of the maritime nations, availing themselves of our universal impotence, to prescribe the conditions of our political existence . . . and confine us to a passive commerce."). Plaintiffs' allegations lie in admiralty. Plaintiffs opted to plead the FTCA as their sole potential waiver of sovereign immunity against the United States. Because the United States has not waived its sovereign immunity under the FTCA for these admiralty-based allegations, Plaintiffs' Complaint must be dismissed. 28 U.S.C. § 2680(d); see *Williams v. United States*, 711 F.2d 893, 899 (9th Cir. 1983) (affirming dismissal of admiralty action brought under the FTCA).

## CONCLUSION

The United States respectfully requests the Court dismiss Plaintiffs' Second Amended Complaint.

Dated: April 1, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

JOHN J. DURHAM
Interim United States Attorney
Eastern District of New York

ARTEMIS LEKAKIS
Assistant United States Attorney
Eastern District of New York

/s/ Robert Kelly
ROBERT KELLY
JILL DAHLMANN ROSA
Senior Trial Counsel
EMMA HILDEBRAND
Trial Attorney
Torts Branch, Civil Division
U. S. Department of Justice
P.O. Box 14271

39

Washington, D.C. 20044-4271
Robert.Kelly@usdoj.gov
Jill.Rosa@usdoj.gov
Emma.Hildebrand@usdoj.gov

Attorneys for Defendant
UNITED STATES OF AMERICA

To: All attorneys of record via CM/ECF