**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
RONALD KRICK, et al.,

                                  C.A. No.: 1:23-cv-08093-AMD-JAM

               Plaintiffs,

    - against -                     Donnelly, D.J.
                                   Marutollo, M.J.


RAYTHEON COMPANY, et al.,

               Defendants.
-----------------------------------------------------------------X


### DEFENDANT RAYTHEON COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS RULE 12(b)(6) MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT


Ralph V. Pagano, Esq. (RP7138)
FITZPATRICK, HUNT & PAGANO, LLP
12 East 49th Street, 34th Floor
New York, New York 10017
T: (212) 937-4000
F: (212) 937-4050
ralph.pagano@fitzhunt.com

*Attorneys for Defendant*
*RAYTHEON COMPANY*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

PRELIMINARY STATEMENT ...................................................................................1

    PLAINTIFFS LACK STANDING TO PROSECUTE THIS ACTION ............................1

    THE PERSONAL REPRESENTATIVES OF THE DECEDENTS' ESTATES
    RELEASED THESE CLAIMS LONG AGO ...................................................................2

    THE STATUTE OF LIMITATIONS EXPIRED LONG AGO ........................................2

    ASSUMING THE MISSILE THEORY IS TRUE,
    THE POLITICAL QUESTION DOCTRINE BARS THIS ACTION ...............................3

PROCEDURAL HISTORY.............................................................................................3

RELEVANT FACTS AND ALLEGATIONS...................................................................5

ARGUMENT...................................................................................................................7

    I.    PLAINTIFFS' CLAIMS ARE GOVERNED BY MARITIME LAW .........................7

        a.    PLAINTIFFS ALLEGE A TORT
            OCCURING OVER NAVIGABLE WATER .........................................................8

        b.    THE CONDUCT AT ISSUE HAS A SUBSTANTIAL RELATIONSHIP
            TO MARITIME ACTIVITY AND A POTENTIALLY
            DISRUPTIVE INFLUENCE ON MARITIME COMMERCE ..............................9

    II.    BOTH THE PERSONAL REPRESENTATIVES AND INDIVIDUALS
        BRINGING SUIT MUST BE DISMISSED PURSUANT TO RULE 12(B)(6) .........11

        a.    STANDARD OF REVIEW .................................................................................11

        b.    PLAINTIFFS FAIL TO PROPERLY ALLEGE THEIR STATUS
            AS PERSONAL REPRESENTATIVES ..............................................................12

        c.    PLAINTIFFS ASSERTING CLAIMS IN THEIR INDIVIDUAL
            CAPACITIES MUST BE DISMISSED ..............................................................13

    III.    THE RELEASES BAR PLAINTIFFS' CLAIMS AGAINST RAYTHEON ............14

i

a.  THE COURT'S ABILITY TO CONSIDER THE RELEASES ............................15

b.  RAYTHEON IS A RELEASED PARTY ..............................................................17

c.  THE CLAIMS ASSERTED HERE WERE RELEASED ....................................20

d.  THE RELEASES ARE BINDING ON ALL PLAINTIFFS,
    INCLUDING THOSE WHO DID NOT SIGN THE RELEASES ........................22

IV.  DISMISSAL UNDER F.R.C.P. 12(B)(6) IS APPROPRIATE
     BECAUSE THE ACTION EXCEEDS THE STATUTE OF LIMITATIONS
     AND FAILS TO ALLEGE FACTS TO SUPPORT TOLLING ................................24

a.  STANDARD OF REVIEW SPECIFIC
    TO THE STATUTE OF LIMITATIONS .............................................................25

b.  THE "DISCOVERY RULE" DOES NOT RENDER
    PLAINTIFFS' CLAIMS TIMELY .....................................................................25

c.  FRAUDULENT CONCEALMENT DOES NOT TOLL
    THE STATUTE OF LIMITATIONS AGAINST RAYTHEON ..........................29

     i.   THERE ARE NO ALLEGATIONS SPECIFIC TO RAYTHEON ...........30

     ii.  PLAINTIFFS FAIL TO PLEAD THAT THEY ACTED
          WITH REASONABLE DILIGENCE ......................................................30

d.  EQUITABLE ESTOPPEL CANNOT APPLY .....................................................32

V.  PLAINTIFFS' COMPLAINT PRESENTS NONJUSTICIABLE POLITICAL
    QUESTIONS REQUIRING DISMISSAL UNDER RULE 12(B)(6) ........................32

A.  THE COMPLAINT DEMANDS ADJUDICATION OF MATTERS
    CONSTITUTIONALLY COMMITTED TO THE LEGISLATIVE
    AND EXECUTIVE BRANCHES OF GOVERNMENT .....................................34

B.  THERE IS NO JUDICIALLY DISCOVERABLE,
    MANAGEABLE STANDARD FOR RESOLVING THE ISSUES
    IMPLICATED BY THIS LAWSUIT ..................................................................39

C.  POLICY DETERMINATIONS OUTSIDE OF THE COURT'S DISCRETION ARE IMPLICATED...................................................................40

CONCLUSION ...........................................................................................................41

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A. Truck Renting Corp. v. Navistar, Inc.*,
> 81 A.D.3d 674, 916 N.Y.S.2d 194 (2d Dept 2011) ........................................................ 18

*Aktepe v. United States*,
> 105 F.3d 1400 (11th Cir. 1997) ........................................................ 35, 36, 40

*Albert v. City of N.Y.*,
> No. 17-cv-3957-ARR-SMG, 2018 U.S. Dist. LEXIS 179576,
> at *40 (E.D.N.Y. Oct. 18, 2018) ........................................................ 13

*Amedi v. BAE Systems*,
> 782 F. Supp. 2d 1357 (N.D. Ga. 2011) ........................................................ 38-39

*Ashcroft v. Iqbal*,
> 556 U.S. 662 (2009) ........................................................ 11, 12

*Baker v. Carr,*
> 369 U.S. 186 (1962) ........................................................ 32-33, 35, 39

*Bancoult v. McNamara*,
> 445 F.3d 427 (D.C. Cir. 2006) ........................................................ 37

*Beck v. Alaska Air Grp.*,
> No. C 02-01067 CRB, 2002 U.S. Dist. LEXIS 10017,
> at *5 (N.D. Cal. May 24, 2002) ........................................................ 12, 13-14

*Beiswenger Enters. Corp. v. Carletta*,
> 86 F.3d 1032 (11th Cir. 1996) ........................................................ 12

*Bell Atl. Corp. v. Twombly*,
> 550 U.S. 544 (2007) ........................................................ 11, 13

*Benoit v. Fireman's Fund Ins. Co.*,
> 355 So. 2d 892 (La. 1978) ........................................................ 23

*Bensky v. Indyke*,
　　743 F. Supp. 3d 586 (S.D.N.Y. 2024)............................................................... 15-16

*Bentzlin v. Hughes Aircraft Co.*,
　　833 F. Supp. 1486 (C.D. Cal. 1993) ........................................................... 38, 40

*Benzemann v. Houslanger & Assocs.*, PLLC,
　　924 F.3d 73 (2d Cir. 2019)............................................................................. 26

*Bingham v. Zolt*,
　　683 F. Supp. 965 (S.D.N.Y. 1988) .................................................................. 30

*Burrell v. Sowers*,
　　No. 22-2687, 2023 U.S. App. LEXIS 29629, at *2 (2d Cir. Nov. 7, 2023) ............... 17, 18

*Buttry v. Gen. Signal Corp.*,
　　68 F.3d 1488 (2d Cir. 1995)........................................................................... 32

*Calton v. Zapata Lexington*,
　　811 F.2d 919 (5th Cir. 1987) ......................................................................... 23

*Can v. United States*,
　　820 F. Supp. 106 (S.D.N.Y. 1993) .................................................................. 34

*Carmichael v. Kellogg, Brown & Root Servs.*,
　　572 F.3d 1271 (11th Cir. 2009) ...................................................... 34-35, 36, 40

*Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V.*,
　　17 N.Y.3d 269, 929 N.Y.S.2d 3, 952 N.E.2d 995 (2011)........................................ 18, 21

*Cerbone v. Int'l Ladies' Garment Workers' Union*,
　　768 F.2d 45 (2d Cir. 1985).............................................................................. 32

*City of N.Y. v. FedEx Ground Package Sys.*,
　　351 F. Supp. 3d 456 (S.D.N.Y. 2018)............................................................... 25

*Collins v. Harrison-Bode*,
　　303 F.3d 429 (2d Cir. 2002)............................................................................ 17

v

*Complaint of Cosmopolitan Shipping Co., S. A.*,
  453 F. Supp. 265 (S.D.N.Y. 1978) ................................................................. 12

*Concerned About Trident v. Schlesinger*
  400 F. Supp. 454 (D.D.C. 1975) .................................................................... 37

*Corcoran v. N.Y. Power Auth.*,
  202 F.3d 530 (2d Cir. 1999) .......................................................................... 29

*Cowan v. Ernest Codelia, P.C.*,
  149 F. Supp. 2d 67 (S.D.N.Y. 2001) ............................................................. 16

*Crawford v. Elec. Boat Corp.*,
  515 F. Supp. 2d 282 (D. Conn. 2007) ............................................................. 9

*Cruz v. Korean Air Lines Co.*,
  838 F. Supp. 843 (S.D.N.Y. 1993) ....................................................... 13, 22-23

*Ctr. For Biological Diversity v. Mattis*,
  868 F.3d 803 (9th Cir. 2017) ......................................................................... 33

*Deylii v. Novartis Pharms. Corp.*,
  No. 13-CV-06669 (NSR), 2014 U.S. Dist. LEXIS 82442,
  at *11 (S.D.N.Y. June 16, 2014) .................................................................... 16

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010) .......................................................................... 15

*Doe v. Deutsche Bank Aktiengesellschaft*,
  671 F. Supp. 3d 387 (S.D.N.Y. 2023) ............................................................ 15

*Ellul v. Congregation of Christian Bros.*,
  774 F.3d 791 (2d Cir. 2014) ..................................................................... 25, 32

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) ...................................................................... 40

*E. River S.S. Corp. v. Transamerica Delaval*,
  476 U.S. 858 (1986) ....................................................................................... 7

*Exec. Jet Aviation v. City of Cleveland,*
    409 U.S. 249 (1972) ................................................................................................ 7

*Faulkner v. Beer*,
    463 F.3d 130 (2d Cir. 2006) .................................................................................. 15

*Fire & Police Pension Ass'n v. Bank of Montreal*,
    368 F. Supp. 3d 681 (S.D.N.Y. 2019) ............................................................... 30-31

*Franklin v. New York City*,
    2017 U.S. Dist. LEXIS 20233, at *9 (S.D.N.Y. Feb. 10, 2017) ....................................... 26

*Futch v. Midland Enters., Inc.*,
    471 F.2d 1195 (5th Cir. 1973) ............................................................................. 12

*Gen. Motors Corp. v. Superior Court*,
    12 Cal. App. 4th 435, 15 Cal. Rptr. 2d 622 (1993) ............................................... 18, 19

*Germain v. Ficarra (In re Germain)*,
    824 F.3d 258 (2d Cir. 2016) .................................................................................. 10

*Gilligan v. Morgan*,
    413 U.S. 1 (1973) ........................................................................................ 35, 39-40

*Giuffre v. Andrew*,
    579 F. Supp. 3d 429 (S.D.N.Y. 2022) ................................................................... 15

*Global Mins. & Metals Corp. v. Holme*,
    35 A.D.3d 93, 824 N.Y.S.2d 210 (1st Dept 2006) .................................................. 18

*Gonzalez v. Wright*,
    665 F. Supp. 2d 334 (S.D.N.Y. 2009) ................................................................... 26

*Greenfield v. Kanwit*,
    87 F.R.D. 129 (S.D.N.Y. 1980) ........................................................................... 30

*Grell v. Trump*,
    330 F. Supp. 3d 311 (D.D.C. 2018) ..................................................................... 34

*Guilbert v. Gardner*,
   480 F.3d 140 (2d Cir. 2007)........................................................................................ 26

*Haig v. Agee*,
   453 U.S. 280 (1981)..................................................................................................... 40

*Harris v. Kellogg Brown & Root Servs.*,
   724 F.3d 458 (3d Cir. 2013)........................................................................................ 33

*Homlaor v. Korean Air Lines Co.*,
   MDL No. 565, Misc. No. 83-0345, 84 Civ. 4083 (TPG),
   1997 U.S. Dist. LEXIS 7592, at *7 (S.D.N.Y. May 29, 1997)............................. 12, 13, 23

*In re Air Crash off Long Island*
   209 F.3d 200 (2d Cir. 2000)......................................................................................... 8

*In re Air Crash at Belle Harbor*,
   2006 U.S. Dist. LEXIS 27387, at *44 (S.D.N.Y. May 9, 2006).............................. 8, 9, 10

*In re Complaint of Midland Enters., Inc.*,
   886 F.2d 812 (6th Cir. 1989) ...................................................................................... 12

*In re D'Ancona*,
   2023 U.S. Dist. LEXIS 16490, at *7 (E.D.N.Y. Jan. 30, 2023) ........................................ 9

*In re Fire Island Ferries, Inc.*,
   No. CV 11-3475, 2016 U.S. Dist. LEXIS 16538, at *10 (E.D.N.Y. Feb. 4, 2016).......... 25

*In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*,
   No. 00-cv-7804, 2004 U.S. Dist. LEXIS 3892 (S.D.N.Y. Mar. 12, 2004)....................... 29

*In re Korean Air Lines Disaster*,
   597 F. Supp. 613 (D.D.C. 1984).................................................................................. 37

*In re Marquette Transp. Co. Offshore, LLC*,
   No. 23-6403, 2024 U.S. Dist. LEXIS 83197, at *11 (E.D. La. May 6, 2024)....... 12, 13-14

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*,
   No. 2179, 2017 U.S. Dist. LEXIS 193121, at *14 (E.D. La. Nov. 22, 2017).................. 23

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
  478 U.S. 221 (1986) .......................................................................................... 32

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
  513 U.S. 527 (1995) ............................................................................... 8, 9, 10

*Jordan v. Metro. Jewish Hospice*,
  122 A.D.3d 682, 995 N.Y.S.2d 610 (2d Dept 2014) ...................................... 12

*Koch v. Christie's Int'l PLC*,
  699 F.3d 141 (2d Cir. 2012)................................................................. 28, 29, 30

*Kramer v. Time Warner, Inc.*,
  937 F.2d 767 (2d Cir. 1991)............................................................................. 15

*Krick v. Raytheon Co.*,
  695 F. Supp. 3d 202 (D. Mass. 2023) .............................................................. 16

*Lane v. Halliburton*,
  529 F.3d 548 (5th Cir. 2008) ........................................................................... 33

*Levy v. BASF Metals Ltd.*,
  917 F.3d 106 (2d Cir. 2019).................................................................... 26-27, 28

*Litle v. Arab Bank*, PLC,
  No. 04-CV-5449 (NG)(VVP), 2007 U.S. Dist. LEXIS 20539,
  at *8 (E.D.N.Y. Mar. 22, 2007) ...................................................................... 26

*Loquasto v. Fluor Corp.*,
  512 F. Supp. 3d 728 (N.D. Tex. 2021) ............................................................ 33

*Lucky Brand Dungarees Inc. v. Ally Apparel Res. LLC*,
  No. 05Civ.6757 (LTS) (MHD), 2006 U.S. Dist. LEXIS 91998
  (S.D.N.Y. Dec. 20, 2006).................................................................................. 16

*Mangiafico v. Blumenthal*
  471 F.3d 391 (2d Cir. 2006).............................................................................. 15

*Markel Am. Ins. Co. v. Mr. Demolition, Inc.*
  717 F. Supp. 3d 238 (E.D.N.Y. 2024) .............................................................. 11

ix

*McMahon v. Presidential Airways, Inc.*,
    502 F.3d 1331 (11th Cir. 2007) ......................................................................... 39

*Mobil Oil Corp. v. Higginbotham*,
    436 U.S. 618 (1978) ........................................................................................... 8

*Moragne v. State Marine Lines*,
    398 U.S. 375 (1970) ...................................................................................... 8, 13

*National Union Fire Ins. Co. v. Califinvest*,
    1992 U.S. Dist. LEXIS 1956, *26 (S.D.N.Y. Feb. 13, 1992) ..................................... 29-30

*Nejad v. United States*,
    724 F. Supp. 753 (C.D. Cal. 1989) ..................................................................... 40

*Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*,
    830 F.3d 152 (2d Cir. 2016) ............................................................................... 17

*Renner v. Rockwell Int'l Corp.*,
    403 F. Supp. 849 (C.D. Cal. 1975) ..................................................................... 14

*Renner v. Rockwell Int'l Corp.*,
    587 F.2d 1030 (9th Cir. 1978) ........................................................................... 14

*Roane v. Greenwich Swim Comm.*,
    330 F. Supp. 2d 306 (S.D.N.Y. 2004) ................................................................... 7

*Rodriguez v. Oto*,
    212 Cal. App. 4th 1020, 151 Cal. Rptr. 3d 667 (2013) ................................. 18, 19

*Roeder v. J.P. Morgan Chase & Co.*
    523 F. Supp. 3d 601, 606-07 (S.D.N.Y. 2021), *aff'd*, No. 21-552,
    2022 U.S. App. LEXIS 2183 (2d Cir. Jan. 25, 2022) .................................... 27, 28

*Rolon v. Henneman*,
    517 F.3d 140 (2d Cir. 2008) ............................................................................... 11

*Rotella v. Wood*,
    528 U.S. 549 (2000) ............................................................................... 26, 27, 28

*Schneider v. Kissinger*,
  412 F.3d 190 (D.C. Cir. 2005) ............................................................................... 34

*SEC v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 1216,
  185 L. Ed. 2d 297 (2013) ...................................................................................... 25

*Simmons v. Reich*,
  2021 U.S. App. LEXIS 32372, at *7 (2d Cir. Oct. 29, 2021) .............................. 31

*Smith v. Local 819 I.B.T. Pension Plan*,
  291 F.3d 236 (2d Cir. 2002) ............................................................................. 11-12

*Sonenberg v. Princess Cruise Lines*
  No. CV 14-08971, 2015 U.S. Dist. LEXIS 199928,
  at *23 (C.D. Cal. Apr. 22, 2015) ......................................................................... 13

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406, 425 (2d Cir. 2008) ......................................................................... 25

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
  425 F.3d 119 (2d Cir. 2005) ................................................................................. 19

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,
  752 F.3d 239 (2d Cir. 2014) ................................................................................ 9-10

*Tarros S.p.A. v. United States*,
  982 F. Supp. 2d 325 (S.D.N.Y. 2013) ............................................................... 33-34

*Tidewater Marine Towing, Inc. v. Dow Chemical Co.*,
  689 F.2d 1251 (5th Cir. 1982) .............................................................................. 12

*Tromp v. City of N.Y.*,
  465 F. App'x 50 (2d Cir. 2012) ............................................................................ 17

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001) ................................................................................................ 25

*Union Pac. R. Co. v. Beckham*,
  138 F.3d 325 (8th Cir. 1998) ............................................................................... 26

*United States ex rel. Ranasinghe v. Ocwen Loan Servicing LLC*,
No. 20-CV-02890 (OEM) (LKE), 2025 U.S. Dist. LEXIS 45070,
at *17 (E.D.N.Y. Mar. 12, 2025) ................................................................................... 29

*United States* v. *Reliable Transfer Co.*,
421 U.S. 397 (1975) .................................................................................................... 7-8

*Vasquez v. GMD Shipyard Corp.*,
582 F.3d 293 (2d Cir. 2009) ..................................................................................... 8, 9

*Vieth v. Jubelirer*,
541 U.S. 267 (2004) ...................................................................................................... 33

*Wang v. Paterson*,
No. 07-2032, 2008 U.S. Dist. LEXIS 102495, at *4 (S.D.N.Y. Dec. 18, 2008) .............. 17

*Wahlstrom v. Kawasaki Heavy Indus.*,
4 F.3d 1084 (2d Cir. 1993) ............................................................................................ 8

*Wells v. Shearson Lehman/American Express, Inc.*,
72 N.Y.2d 11, 530 N.Y.S.2d 517, 526 N.E.2d 8 (1988) .................................................. 19

*Whitaker v. Kellogg Brown & Root, Inc.*,
444 F. Supp. 2d 1277 (M.D. Ga. 2006) ................................................................... 33, 35

*Winet v. Price*,
4 Cal. App. 4th 1159, 6 Cal. Rptr. 2d 554 (1992) ........................................................ 21

*Wolson v. Reed Elsevier Inc.*,
No. 09 Civ. 4040(DC), 2010 U.S. Dist. LEXIS 7533,
2010 WL 334919, at *1 (S.D.N.Y. Jan. 29, 2010) ........................................................ 16

*Yamaha Motor Corp., U.S. A. v. Calhoun*,
516 U.S. 199 (1996) .................................................................................................. 7, 8

*Zirvi v. Flatley,*
838 F. App'x 582 (2d Cir. 2020) .................................................................................. 29

*Zuckerbraun v. Gen. Dynamics Corp.*,
755 F. Supp. 1134 (D. Conn. 1990) .............................................................................. 40

**Statutes**

28 U.S.C. § 1333(1) ...............................................................................................................7

33 U.S.C. § 901 .....................................................................................................................8

42 U.S.C. § 1985(1) .............................................................................................................27

46 U.S.C. app. § 688 (1988) .......................................................................................8, 12, 23

46 U.S.C. § 30106 ......................................................................................................24, 25, 28

46 U.S.C. §§ 30301–30308 ..............................................................................8, 12, 13, 14, 23

7 U.S.C.S. § 1.......................................................................................................................27

Cal. Civ. Code § 1542 ..........................................................................................................21

Cal. Civ. Code § 1559 ..........................................................................................................19

Cal. Civ. Code § 1636 ..........................................................................................................18

Cal. Civ. Code § 1638 ..........................................................................................................18

Cal. Civ. Code § 1639 ..........................................................................................................18

Cal. Prob. Code § 58 ............................................................................................................24

Fed. R. Civ. P. 9(b) .........................................................................................................29, 30

Fed. R. Civ. P. 12(b)(6)..............................................................................11, 15, 17, 24, 25, 32

Fed. R. Civ. P. 12(b)(1)....................................................................................................16, 34

Fed. R. Civ. P. 201...............................................................................................................15

N.Y. Est. Powers & Trusts Law § 1-2.13 ......................................................................... 12-13

N.Y. Est. Powers & Trusts Law § 5-4.1(1)............................................................................13

**Other Authorities**

2 Benedict on Admiralty § 83(a)(1)...........................................................................................12

Restatement (Second) of Contracts § 302 (Am. Law Inst. 1981)....................................................19

U.S. Const. art. I, § 8 ...............................................................................................................34

U.S. Const. art. II, § 2 ...............................................................................................................34

**PRELIMINARY STATEMENT**

This case arises from the July 17, 1996, crash of a Boeing 747 operated as Trans World Airways Flight 800 ("TWA Flight 800") off the coast of Long Island. The crash resulted in the death of all 230 occupants on board. The National Transportation Safety Board's ("NTSB") investigation concluded that the likely cause of the crash was an explosion of flammable vapors in the aircraft's center fuel tank. Representatives of the aircraft's occupants sued Boeing, TWA, and Hydro-Aire, Inc. (fuel system manufacturer) within the three-year statute of limitations and those cases were consolidated in a Multidistrict Litigation ("MDL") proceeding in the Southern District of New York. The MDL resulted in full and final settlements and dismissals with prejudice pursuant to broad releases.

Plaintiffs representing six passengers onboard the flight bring the instant lawsuit against Raytheon Company ("Raytheon"), Lockheed Martin Corporation, and the United States twenty-six years after the accident and over twenty years after they settled their claims. Plaintiffs allege that on April 15, 2021, they received a presentation from a physicist, Dr. Thomas Stalcup, advising them that an errant U.S. missile hit the aircraft during testing and that they now know this was the "real" cause of the accident. Plaintiffs also contend that this revelation tolled the three-year statute of limitations until 2021 and excuses the untimely filing of this case. It does not, and Plaintiffs' claims must be dismissed for the following additional reasons.

*Plaintiffs Lack Standing to Prosecute This Action*

Plaintiffs' claims fall within this Court's admiralty jurisdiction and thus substantive maritime law applies. Under maritime law, the personal representatives of the decedents' estates are the only parties with standing to prosecute these claims. While certain Plaintiffs allege that they bring these cases "as personal representative" of their respective decedents' estates, they offer

1

no support for this allegation that would allow the litigants to ascertain the when, how, or in what capacity they were appointed. Without alleging such basic, requisite information, Plaintiffs' Second Amended Complaint for Damages ("Complaint") fails to state a claim. Moreover, because only personal representatives can bring the claims asserted, Plaintiffs bringing suit in their individual capacities must be dismissed[1].

### The Personal Representatives of The Decedents' Estates Released These Claims Long Ago

The releases entered into as a result of the MDL litigation over twenty years ago unambiguously bar the claims against Raytheon here. Plaintiffs Ronald Krick, Margaret Krick, Christopher Krick, Douglas Kevorkian, Christine Grogan, and Eileen Zaharioudakis all signed the releases in either their individual or representative capacities (or both) and were all represented by counsel. While Plaintiffs Craig Gaetke, Wanda Kemp, and Michael Deteresa did not sign the releases, the personal representatives representing their respective decedents in the MDL litigation did and the releases are therefore binding upon all heirs and beneficiaries, including them.

### The Statute of Limitations Expired Long Ago

Plaintiffs candidly admit that their Complaint is untimely but seek relief from the three-year statute of limitations through (1) the discovery rule, (2) the doctrine of fraudulent concealment, and (3) equitable estoppel. None of these doctrines can revive Plaintiffs' untimely claims.

The discovery rule is a rule of accrual. Under the rule, Plaintiffs' causes of action accrue when they discover their "injury" and not the other elements of their claims. The "injury" was their decedents' tragic deaths and therefore the claims accrued when they learned of the deaths over twenty years before bringing this lawsuit. Their claims are thus untimely.

---

[1] Raytheon also adopts and joins Co-Defendant The United States' Rule 12(b)(1) argument on why the probate records attached to its motion demonstrate that Plaintiffs lack standing for not having a personal representative appointed.

The doctrine of fraudulent concealment must be pled with Fed. R. Civ. P. 9(b) specificity as to <u>each</u> Defendant. However, Plaintiffs' Complaint is devoid of any allegations providing the who, what, when, where, or how <u>Raytheon</u> participated in the alleged "cover-up". Moreover, the doctrine requires Plaintiffs to plead their due diligence in attempting to discover their claim during the period they seek to have tolled. No such allegations are present in the Complaint. As a result, Plaintiffs cannot utilize the doctrine to save their untimely claims.

Equitable estoppel requires a plaintiff to allege that they <u>knew</u> they had a cause of action, but the defendant lulled them into not filing a timely lawsuit. Here, Plaintiffs allege they did not file a timely suit because they did <u>not</u> know of their cause of action. Equitable estoppel therefore does not apply.

***Assuming the Missile Theory is True, the Political Question Doctrine Bars This Action***

Additionally, dismissal of the Complaint is necessary because the allegations require this Court to adjudicate issues that the Constitution makes the sole responsibility of the Legislative and/or Executive branches of the U.S. The allegations in the Complaint squarely take aim at the U.S. Government's assessment of the need for the Aegis missile system that allegedly brought down TWA Flight 800 in view of national safety issues and its decisions regarding the development, design specifications, operability and (alleged) actual testing of the Aegis missile system—including when to test, where to test, and how to test. These matters are not to be adjudicated by the judiciary and should be dismissed under the political question doctrine.

## **PROCEDURAL HISTORY**

On June 28, 2022, thirteen Plaintiffs purporting familial relationships to seven decedents on board TWA Flight 800 commenced litigation in the United States District Court for the District of Massachusetts against U.S. governmental agencies, Raytheon Technologies Corporation,

3

Raytheon Company, and Lockheed Martin Corporation seeking compensatory and non-compensatory damages under theories of negligence and strict liability for the death of their relatives on board the flight. [*See* Dkt. 1, Compl. at ¶¶ 15-27]. On September 19, 2022, Plaintiffs filed a substantively identical First Amended Complaint adding two Plaintiffs to the case. [*See* Dkt. 6, Am. Compl.]. On November 17, 2022, Plaintiffs filed the operative Second Amended Complaint ("Complaint"), correcting the caption by naming the United States in place of the government agencies, dropping Raytheon Technologies Corporation, and dropping the two Plaintiffs added to the First Amended Complaint. [*See* Dkt. 33, 2d Am. Compl. ("Compl.")]. The Second Amended Complaint is substantively identical to its predecessors.

Each Defendant filed separate motions to dismiss, [Dkts. 41, 43, 72], to which Plaintiffs responded. [Dkts. 75, 85]. The District Court denied Defendants' motions to dismiss without prejudice and ordered that the case be transferred to a proper venue pursuant to the United States' argument that venue was improper. [Dkt. 95]. The case then landed here. [Dkts. 99-100].

After the transfer, Defendants filed notice that they intended to renew their Rule 12(b) motions. [Dkts. 108-110]. Thereafter, Raytheon submitted a request to Magistrate Marutollo that sought permission to issue a limited, pre-discovery subpoena to obtain copies of the settlement agreements or releases related to the original MDL litigation. [Dkt. 131]. Plaintiffs did not oppose the request, [Dkt. 132], and Raytheon procured the releases sought from Boeing via subpoena.

This set off a series of events delaying the instant motion, including the withdrawal of Plaintiffs' former counsel, [Dkt. 159], and dismissal of the Plaintiffs related to decedent Rojany. [Dkts. 139, 148]. Ultimately, Plaintiffs acquired new counsel and a briefing schedule was entered for Defendants' motions.

## RELEVANT FACTS AND ALLEGATIONS

On July 17, 1996, a Boeing 747 operated as TWA Flight 800 departed John F. Kennedy International Airport en route to Paris, France at approximately 8:20 p.m. [Dkt. 33, Compl. at ¶ 2]. Twelve minutes after take-off, the aircraft crashed into the Atlantic Ocean resulting in the deaths of all 230 persons on board. [*Id.*] The NTSB launched an investigation into the accident, ultimately concluding that the likely cause of the accident was an explosion of flammable vapors in the plane's center fuel tank. [*Id.* at ¶ 50].

The accident resulted in a MDL venued in the Southern District of New York captioned: *In re: Air Crash TWA*, No. 1:96-cv-7986, MDL No. 1161 (Oct. 24, 1996). [*See* Ex. A, *TWA Flight 800 MDL* Docket attached to Pagano Decl.]. The representatives of the Estates of all decedents identified in the Complaint were represented by counsel in those proceedings and sued Boeing, TWA, and Hydro-Aire, Inc. All claims, including those brought on behalf of Plaintiffs' decedents, were settled and dismissed with prejudice. [*Id.* at Dkts. 261 (Kevorkian), 290 (Gaetke), 315 (Gough), 345 (Krick), 418 (Ashton L. Allen), 420 (O. Lamar Allen), 421 (O. Lamar Allen #2[2]), 470 (Dismissal of all Defendants); *see also* Ex. B, Stipulations and Orders of Dismissal attached to Pagano Decl.].

The instant Complaint alleges that the NTSB's conclusion was "false", and TWA Flight 800 was actually brought down by a "United States missile fired at aerial target drones flying nearby." [Dkt. 33, Compl. at ¶ 4]. Plaintiffs allege the Defendants, led by the U.S. government, took "active steps to mislead the families and the public, as well as conceal that the TWA 800 crash was caused by a missile, including confiscating and concealing evidence from the United States Navy." [*Id.* at ¶ 99]. Plaintiffs' Complaint does not allege any specific acts of concealment

---

[2] This action was brought separately and solely by decedent O. Lamar Allen's daughter, Dr. Christine Grogan, who is a Plaintiff here.

by Raytheon, or indeed specify any actions or statements it made in the course of the investigation.

As to the origin of the "cover-up," Plaintiffs allege that numerous witnesses described seeing a streak of light from the surface of the ocean moving towards TWA Flight 800 before seeing an explosion. [*Id.* at ¶ 35]. The FBI subsequently took charge of leading the investigation rather than the NTSB, which is typically tasked with investigating aviation accidents. [*Id.* at ¶ 39]. The FBI then removed all copies of Navy radar tapes that purport to show a missile near TWA Flight 800 to place them out of the NTSB's reach, and refused to allow the NTSB to conduct eyewitness interviews or review the FBI's records that indicated the true cause of the crash. [*Id.* at ¶ 40]. The FBI also threatened witnesses and enlisted the help of the CIA, which concocted materials to discredit eyewitnesses. [*Id.* at ¶¶ 39-47]. The FBI even held a nationally-televised press conference to reconcile the eyewitness testimony with the official position that the crash was caused by a defect in the center fuel tank. [*Id.* at ¶ 47]. It showed a video and animation by the CIA titled "What Did the Eyewitnesses See?" that contained a scene showing the words: "NOT A MISSILE." [*Id.* at ¶¶ 48-49]. The NTSB released a report thereafter affirming its conclusion that the explosion originated in the center fuel tank. [*Id.* at ¶ 50].

Plaintiffs allege that they only learned of the "true" cause of the accident when they attended a meeting hosted by physicist Dr. Thomas Stalcup on April 15, 2021, who informed them of "the key facts he learned in his FOIA lawsuit indicating that the TWA 800 crash was caused by a missile." [*Id.* at ¶¶ 95-100]. Plaintiffs allege that these facts are found in (1) "an 'original [Navy radar] tape' showing an object 'heading straight for TWA 800'" and another record describing an object impacting the TWA 800; (2) witness statements about seeing a flair go up and hit an object in the sky; (3) "internal government communications" indicating that a missile was involved; and (4) a private consultation with a former FBI official who informed him that drone targets were

6

flying in the area when TWA Flight 800 crashed. [*Id.* at ¶¶ 49, 84, 86]. Plaintiffs do not describe any of their own efforts to investigate the missile theory prior to this meeting.

Plaintiffs' allegations also focus heavily on the decision-making of the U.S. Government to take certain actions with respect to the Aegis missile program, the testing of which allegedly resulted in TWA Flight 800 being shot down. [*Id.* at ¶ 5]. Plaintiffs allege the missile program "became a high priority for the U.S. Government in 1996, when former Secretary of Defense William Perry sought a significant increase in funding for the Navy's Aegis Missile system from the U.S. Senate's Armed Services Committee." [*Id.* at ¶ 55]. Plaintiffs claim the Department of Defense proposed that the Aegis missile system proceed "as quickly as possible to production and deployment" to increase the United States' defense capability against missiles from hostile countries. [*Id.* at ¶ 56]. Plaintiffs allege that Secretary Perry "characterized the missile threat from rogue nations as 'here and now.'" [*Id.* at ¶ 57]. As a result of these governmental decisions, Plaintiffs allege that the testing of the system was expedited, conducted in close proximity to people and commercial aircraft, and resulted in the loss of TWA Flight 800. [*Id.* at ¶¶ 55-74].

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE GOVERNED BY MARITIME LAW

In deciding whether maritime law applies, a court must determine whether the plaintiff's claim(s) fall within the court's federal admiralty jurisdiction under 28 U.S.C. § 1333(1). *Roane v. Greenwich Swim Comm.*, 330 F. Supp. 2d 306, 311 (S.D.N.Y. 2004). With the attachment of admiralty jurisdiction comes the application of substantive admiralty law. *See Exec. Jet Aviation v. City of Cleveland,* 409 U.S. 249, 255, 266-68 (1972); *Yamaha Motor Corp., U.S.A. v. Calhoun,* 516 U.S. 199, 206 (1996). Where there is no admiralty statute governing a given issue, "the general maritime law, as developed by the judiciary, applies." *E. River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 864 (1986) (citing *United States* v. *Reliable Transfer Co.*, 421 U.S. 397, 409

7

(1975)).

Plaintiffs plead that their decedents died when their aircraft "exploded and crashed into the Atlantic Ocean off the coast of Long Island, New York." [Dkt. 33, Compl. at ¶ 2]. The location of the crash was approximately eight nautical miles south of the shore of Long Island, which is within the territorial waters of the United States. *See In re Air Crash off Long Island*, 209 F.3d 200, 201-02 (2d Cir. 2000) (finding that the TWA 800 accident occurred in territorial waters). For commercial aviation accidents, there is no admiralty statute for wrongful deaths of non-seafarers[3] in territorial waters, so in these cases, the general maritime law and wrongful death action recognized in *Moragne v. State Marine Lines*, 398 U.S. 375, 395 (1970) ("*Moragne*") applies[4]. *See In re Air Crash at Belle Harbor*, 2006 U.S. Dist. LEXIS 27387, at *44 (S.D.N.Y. May 9, 2006) (citing *Yamaha Motor Corp.*, 516 U.S. at 215 n.7) (holding passenger death claims arising from crash of American Airlines Flight over Belle Harbor, New York fell within admiralty jurisdiction and thus were *Moragne* death and survival claims). Therefore, if admiralty jurisdiction attaches, Plaintiffs' wrongful death claims and survival claims are general maritime *Moragne* actions.

### a. Plaintiffs Allege a Tort Occurring Over Navigable Water

To determine whether a tort action falls within a federal court's admiralty jurisdiction, courts apply a two-part test. *Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 298 (2d Cir. 2009). "First, the alleged tort must have occurred on or over 'navigable waters.'" *Id.* (citing *Jerome B.*

---

[3] "Nonseafarers" are "persons who are neither seamen covered by the Jones Act, 46 U.S.C. App. § 688 (1988 ed.), nor longshore workers covered by the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.*" *Yamaha*, 516 U.S. at 205 n.2. Neither statute is pled nor applies.

[4] When the Supreme Court created *Moragne* actions, it did not define all aspects of the cause of action, such as damages and beneficiaries. The Supreme Court has since noted that: "As *Moragne* itself implied, [The Death On The High Seas Act (DOHSA)] should be the courts' primary guide as they refine the nonstatutory death remedy, both because of the interest in uniformity and because Congress' considered judgment has great force in its own right." *Wahlstrom v. Kawasaki Heavy Indus.*, 4 F.3d 1084, 1090 (2d Cir. 1993) (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 624 (1978)). Thus, this brief utilizes case law applying DOHSA (46 U.S.C. §§ 30301–30308) to supplement its analysis of the *Moragne* action.

8

*Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995)). "Where the tort occurred" is defined as where the alleged negligence takes effect, rather than where the negligent act occurred, so even if the negligent act at issue originates on land, this portion of the test is satisfied as long as the injuries occurred on or over navigable waters. *See In re D'Ancona*, 2023 U.S. Dist. LEXIS 16490, at *7 (E.D.N.Y. Jan. 30, 2023) (citations omitted).

Here, TWA Flight 800 exploded over, and crashed into, the Atlantic Ocean. [*See* Dkt. 33, Compl. at ¶¶ 2, 8]. As the Atlantic Ocean is navigable water, the locality requirement is clearly satisfied. *See Crawford v. Elec. Boat Corp.*, 515 F. Supp. 2d 282, 288 n.4 (D. Conn. 2007) (finding that the Atlantic Ocean "undoubtedly qualifies as 'navigable water'").

### b. The Conduct at Issue Has a Substantial Relationship to Maritime Activity and a Potentially Disruptive Influence on Maritime Commerce

The second part of the test requires that "the activity giving rise to the incident must have had a substantial relationship to traditional maritime activity, such that the incident had a potentially disruptive influence on maritime commerce." *Vasquez*, 582 F.3d at 298 (citing *Grubart*, 513 U.S. at 534). This requires two inquiries: "A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *In re Air Crash at Belle Harbor*, 2006 U.S. Dist. LEXIS 27387, at *26 (quoting *Grubart*, 513 U.S. at 534).

In assessing the potential effect of a given incident on maritime commerce, the Supreme Court has instructed courts to "begin by describing the incident 'at an intermediate level of possible generality.'" *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 249 (2d Cir. 2014) (quoting *Grubart*, 513 U.S. at 538). "[The] description should be general enough to capture

9

the possible effects of similar incidents on maritime commerce, but specific enough to exclude irrelevant cases." *Id.* A court then uses the description to determine whether the type of incident at issue is "likely to disrupt [maritime] commercial activity." *Id.* (quoting *Grubart*, 513 U.S. at 538). "The overall purpose of the exercise is to determine 'whether the incident could be seen within a class of incidents that pose[] more than a fanciful risk to commercial shipping." *Id.* (quoting *Grubart*, 513 at 539). Put another way, the focus on this part of the test "is on capturing possible effects of similar incidents on maritime commerce." *Germain v. Ficarra (In re Germain)*, 824 F.3d 258, 272 (2d Cir. 2016).

Following this guidance, Raytheon submits that the incident alleged in Plaintiffs' Complaint can be described as a transoceanic commercial flight crashing into navigable waters due to military warships testing weapons in the vicinity of commercial flight paths. [*See* Dkt. 33, Compl. at ¶¶ 5, 32-37, 70-82]. That such activity could disrupt maritime commercial activity cannot reasonably be disputed. By their very nature, transoceanic flights *are* commercial activities, so their destruction disrupts maritime commerce. Similarly, the necessary search and recovery efforts following such a loss will undoubtedly block routes for commercial shipping, thereby disrupting maritime commerce. *See In re Air Crash at Belle Harbor*, 2006 U.S. Dist. LEXIS 27387, at *31-*32 (finding large piece of aircraft sinking in navigable waters satisfied test as aircraft sinking in water could create hazard for commercial vessel navigation). This portion of the test is thus satisfied.

As to the second inquiry, whether there is "a substantial relationship to traditional maritime activity" "[f]ederal courts have concluded nearly unanimously that transoceanic or island voyages, but for air travel, would have been conducted by sea [and] have a significant relationship to maritime activity." *Id.* at *27-*28 (finding "no question" that transoceanic flight from New York

10

to the Dominican Republic bore significant relationship to traditional maritime activity) (collecting cases). Since the flight at issue was a transoceanic trip from New York to Paris that would have been conducted by sea but for air travel, it has a significant relationship to maritime activity.

As both parts of the test are met, admiralty jurisdiction attaches. This means Plaintiffs assert *Moragne* general maritime death actions, the effect of which is articulated below.

## II.    BOTH THE PERSONAL REPRESENTATIVES AND INDIVIDUALS BRINGING SUIT MUST BE DISMISSED PURSUANT TO RULE 12(b)(6)

The only parties entitled to bring *Moragne* death actions are the personal representatives of the decedents' estates. This presents two problems for Plaintiffs. First, the Plaintiffs purporting to be personal representatives do not allege sufficient facts for their averment on the requirement to be taken as true. Second, Plaintiffs' bringing suit in their individual capacities must be dismissed because only personal representatives may bring the instant action.

Raytheon also joins Defendant the United States' separate argument on why the Estate documents it cites demonstrate that Plaintiffs lack standing and incorporates that argument as if set forth in full herein.

### a.  Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although all allegations contained in a complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *Markel Am. Ins. Co. v. Mr. Demolition, Inc.*, 717 F. Supp. 3d 238, 243 (E.D.N.Y. 2024) (quoting *Iqbal*, 556 U.S. at 678). A court is "not bound to accept 'conclusory allegations or legal conclusions masquerading as factual conclusions.'" *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (quoting *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240

11

(2d Cir. 2002)). While "detailed factual allegations" are not required, the Complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### b. Plaintiffs Fail to Properly Allege Their Status as Personal Representatives

Only the personal representative of a decedent's estate is entitled to bring a *Moragne* death action[5]. *See Complaint of Cosmopolitan Shipping Co., S. A.*, 453 F. Supp. 265, 266-67 (S.D.N.Y. 1978) (noting that the Jones Act, DOHSA, and *Moragne* maritime actions at issue vest in the personal representative of the deceased); *Beck v. Alaska Air Grp.*, No. C 02-01067 CRB, 2002 U.S. Dist. LEXIS 10017, at *5 (N.D. Cal. May 24, 2002) ("The federal courts have uniformly held that wrongful death actions under general maritime law…, may only be brought by the personal representative of the deceased's estate.") (citing *Beiswenger Enters. Corp. v. Carletta*, 86 F.3d 1032, 1041 (11th Cir. 1996); *In re Complaint of Midland Enters, Inc.*, 886 F.2d 812, 816 (6th Cir. 1989); *Tidewater Marine Towing, Inc. v. Dow Chemical Co.*, 689 F.2d 1251, 1253 (5th Cir. 1982)); *In re Marquette Transp. Co. Offshore, LLC*, No. 23-6403, 2024 U.S. Dist. LEXIS 83197, at *11 (E.D. La. May 6, 2024) (same); *Futch v. Midland Enters., Inc.*, 471 F.2d 1195, 1195-96 (5th Cir. 1973) (same); 2 Benedict on Admiralty § 83(a)(1) ("The decedent's personal representative is…the proper plaintiff in *Moragne* actions."). "The 'personal representative' of the decedent must be a person empowered **by law** to administer the decedent's estate." *Homlaor v. Korean Air Lines Co.*, MDL No. 565, Misc. No. 83-0345, 84 Civ. 4083 (TPG), 1997 U.S. Dist. LEXIS 7592, at *7 (S.D.N.Y. May 29, 1997) (emphasis added). In New York, for instance, "[a] personal representative is a person who has received letters to administer the estate of a decedent." N.Y.

---

[5] The same is true under New York law. *See Jordan v. Metro. Jewish Hospice*, 122 A.D.3d 682, 995 N.Y.S.2d 610, 610 (2d Dept 2014) ("A personal representative who has obtained letters of administration to administer the estate of a decedent is the only party who is authorized to commence…a wrongful death action.").

Est. Powers & Trusts Law § 1-2.13. Thus, if the plaintiff is not a legally-appointed personal representative, they cannot bring the claim.

Plaintiffs purporting to be representatives of their decedents' estates merely allege, without more, that they bring this action "as personal representative on behalf of" their given decedents' estate. [Dkt. 33, Compl. at ¶¶ 15, 18, 21, 24, 26]. They do not allege that they were <u>legally</u> appointed as such or provide any details as to where, when, in what capacity, or by whom they were appointed. That is not enough. In *Sonenberg v. Princess Cruise Lines*, for example, the plaintiff bringing an admiralty action (DOHSA) alleged she was "the personal representative of the estate of the deceased." No. CV 14-08971, 2015 U.S. Dist. LEXIS 199928, at *23 (C.D. Cal. Apr. 22, 2015). That was insufficient because the "bare allegation" did not indicate she was appointed by a court as executrix or administratrix of her decedent's estate and thus did not give a plausible inference she was the "personal representative." *Id.* at *23-*24 (citing *Twombly*, 550 U.S. at 555). Consequently, her claim was dismissed for lack of standing. *Id.* at *24. The same result is warranted here as Plaintiffs' bare allegations that they bring this case "as personal representatives" provide no inference that they were <u>legally appointed</u> as such.

### c. Plaintiffs Asserting Claims in Their Individual Capacities Must Be Dismissed

Because personal representatives are the only parties with standing to bring *Moragne* claims, it is improper for beneficiaries to bring claims in their individual capacities and all such claims should be dismissed[6]. *See In re Marquette Transp. Co. Offshore, LLC*, No. 23-6403, 2024

---

[6] The cases cited here are specifically within the context of *Moragne* actions. The same result occurs under New York's wrongful death statute and the Death on the High Seas Act (DOHSA). *See, e.g. Cruz v. Korean Air Lines Co.*, 838 F. Supp. 843, 846-47 (S.D.N.Y. 1993) (holding that beneficiaries have no right to sue on their own behalf under DOHSA); *Homlaor*, No. 84 Civ. 4083 (TPG), 1997 U.S. Dist. LEXIS 7592 (same); *Albert v. City of N.Y.*, No. 17-cv-3957-ARR-SMG, 2018 U.S. Dist. LEXIS 179576, at *40 (E.D.N.Y. Oct. 18, 2018) (dismissing children of decedent as plaintiffs because only the personal representative of the estate has the power to bring wrongful death claims under New York law) (citing N.Y. Est. Powers & Trusts Law § 5-4.1(1)).

U.S. Dist. LEXIS 83197, at *10-11 (dismissing beneficiaries in their individual capacities); *Beck*, No. C 02-01067 CRB, 2002 U.S. Dist. LEXIS 10017, at *5 (noting the plaintiff would still be dismissed for lack of standing even if found to be a beneficiary because she was not a personal representative); *Renner v. Rockwell Int'l Corp.*, 403 F. Supp. 849, 851 (C.D. Cal. 1975), *vacated on other grounds in Renner v. Rockwell Int'l Corp.*, 587 F.2d 1030, 1031 (9th Cir. 1978) (holding that actions under both DOHSA and general maritime law must be brought by the personal representative and therefore all plaintiffs besides the personal representative must be dismissed).

Plaintiffs Margareta Krick, Christopher Krick, Craig Gaetke, Christine Grogan, and Michael Deteresa must be dismissed because they bring their actions solely in their individual capacities. [*See* Dkt. 33, Compl. at ¶¶ 15-27 (listing parties and their capacities)]. Similarly, as to the Plaintiffs purporting to be personal representatives that also bring claims in their individual capacities, the claims brought in their individual capacities must be dismissed. [*Id.*]

### III.    THE RELEASES BAR PLAINTIFFS' CLAIMS AGAINST RAYTHEON

In the original MDL action arising from this loss, the Estates and beneficiaries of all decedents identified in the instant Complaint were represented by counsel and sued Boeing, TWA, and Hydro-Aire, Inc. [*See* Exs. A-B, MDL Litigation Docs]. All of their claims were ultimately dismissed with prejudice pursuant to settlement. [*Id.*] Boeing provided Raytheon with copies of the releases entered into as a condition of the settlements and the terms unambiguously release the claims Plaintiffs assert.

Most, but not all, of the individual Plaintiffs here signed the releases. The Plaintiffs who did not sign the releases are still bound by them because the personal representatives of their decedents' estates did so and they are thus binding on all potential beneficiaries. Therefore, all claims must be dismissed as being barred by the releases.

14

### a. The Court's Ability to Consider the Releases

On a Rule 12(b)(6) motion to dismiss, a Court may consider "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). Even where a document is not incorporated by reference, "the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). If it is "integral," it must be clear that no dispute exists as to its authenticity or accuracy and that there are no material disputed issues of fact regarding the relevance of the document. *Id.* (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). A court may also consider documents subject to judicial notice under Fed. R. Civ. P. 201. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

When considering a Rule 12(b)(6) motion, "the Court retains discretion to consider even at this early stage an affirmative defense that presents a straightforward issue of law…, where the relevant facts are not in dispute." *Doe v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 401 (S.D.N.Y. 2023). In *Doe*, the court considered a release attached to a Rule 12(b)(6) motion despite it not being mentioned in the complaint because the "[t]he authenticity … is not disputed, and neither party has suggested that extrinsic evidence would inform the Court's interpretation of it." *Id.* It noted that as evaluating the agreement "present[ed] an unfettered question of law that c[ould] be resolved on a motion to dismiss [it] should not be deferred." *Id.* A related proceeding also took judicial notice of a release because it appeared authentic and "[i]ts wording (as distinguished from its legal effect) [wa]s undisputed." *Giuffre v. Andrew*, 579 F. Supp. 3d 429, 438 (S.D.N.Y. 2022); *see also Bensky v. Indyke*, 743 F. Supp. 3d 586, 593 (S.D.N.Y. 2024)

15

(considering releases in related case because authenticity was not disputed and neither party suggested extrinsic evidence was needed to interpret it).

The releases here present a simple question of law (their legal effect) and there have been no challenges made that they are inauthentic. Indeed, Plaintiffs acknowledged in contesting a motion to seal the releases that "[t]he releases at issue here emerged from th[]e settlements" of the original MDL litigation. [Dkt. 174, Resp. to Mot. To Seal at PageID 467]. They also fought the sealing on the basis that "the fact of [the] settlement releases has been judicially reported." [*Id.* at PageID 473 (citing *Krick v. Raytheon Co.*, 695 F. Supp. 3d 202, 208 (D. Mass. 2023)). And, when this case was transferred to this Court, Defendants requested authority to issue a subpoena for the releases, Plaintiffs did not oppose it, and the Releases were provided by Boeing. [Dkts. 131, 132, Subpoena Request and Resp.]. Thus, Defendants, Plaintiffs, and the Court have known these releases are central to these claim – and the early disposition thereof – and it makes little sense to defer their consideration.

Moreover, this situation is unique in that one Defendant – the United States – has the ability to attach the Releases as extrinsic evidence to support its Rule 12(b)(1) motion because they may deprive the Court of subject-matter jurisdiction. They will thus be a matter of record on the Court's docket and courts may take judicial notice of settlement agreements on a public docket to determine if claims are barred. *See Deylii v. Novartis Pharms. Corp.*, No. 13-CV-06669 (NSR), 2014 U.S. Dist. LEXIS 82442, at *11 (S.D.N.Y. June 16, 2014) (citing *Cowan v. Ernest Codelia, P.C.*, 149 F. Supp. 2d 67 (S.D.N.Y. 2001); *Lucky Brand Dungarees Inc. v. Ally Apparel Res. LLC*, No. 05Civ.6757 (LTS) (MHD), 2006 U.S. Dist. LEXIS 91998 (S.D.N.Y. Dec. 20, 2006); *Wolson v. Reed Elsevier Inc.*, No. 09 Civ. 4040(DC), 2010 U.S. Dist. LEXIS 7533, 2010 WL 334919, at *1 (S.D.N.Y. Jan. 29, 2010)). It would make little sense and waste judicial resources if the Court

16

were to evaluate the releases as to one Defendant but not the others when the analysis is the same.

Therefore, Raytheon respectfully requests that the Court consider the releases under Rule 12(b)(6).

### b.  Raytheon Is a Released Party

Attached hereto are the seven Releases governing all of the claims alleged in Plaintiffs' Complaint ("the Releases"). [Exs. C-I, Releases attached to Pagano Decl. ]. All of the releases are governed by New York law, save for the Kevorkian release, which is governed by California law. [Ex. C, Krick Release at BOE0041 at ¶ 26; Ex. I, Kevorkian Release at BOE005, ¶ 16]. The release provisions at issue are nearly identical, so Raytheon refers solely to the Krick release[7]. [Ex. C, Krick Release]. As the analysis of whether the Releases bar the claims at issue is generally the same as to each Defendant, Raytheon incorporates and references the United States' and Lockheed Martin's arguments as supplementing the arguments herein.

Under New York law, settlement agreements are contracts and are therefore construed according to general principles of contract law. *Tromp v. City of N.Y.*, 465 F. App'x 50, 51 (2d Cir. 2012) (quoting *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002)). Where the language of a release is clear, effect must be given to the intent of the parties as indicated by the language of the document. *Id.* (quoting *Wang v. Paterson*, No. 07-2032, 2008 U.S. Dist. LEXIS 102495, at *4 (S.D.N.Y. Dec. 18, 2008)). A contract is unambiguous "if the contract language has a definite and precise meaning … and concerning which there is no reasonable basis for a difference of opinion." *Burrell v. Sowers*, No. 22-2687, 2023 U.S. App. LEXIS 29629, at *2 (2d Cir. Nov. 7, 2023) (quoting *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016)).

---

[7] The only differences among the release provisions cited below are the use of plural v. singular language and gender-specific language.

Generally, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276, 929 N.Y.S.2d 3, 952 N.E.2d 995 (2011) (quoting *Global Mins. & Metals Corp. v. Holme*, 35 A.D.3d 93, 98, 824 N.Y.S.2d 210 [1st Dept 2006]). "[W]ords of general release are clearly operative not only as to all controversies and causes of action between the releasor and releasees which had, by that time, actually ripened into litigation, but to all such issues which might then have been adjudicated as a result of pre-existent controversies." *Burrell v. Sowers*, No. 22-2687, 2023 U.S. App. LEXIS 29629, at *2 (2d Cir. Nov. 7, 2023) (quoting *A.A. Truck Renting Corp. v. Navistar, Inc.*, 81 A.D.3d 674, 916 N.Y.S.2d 194, 196 (2d Dept 2011)). California applies similar standards.

Under California law, "the interpretation of a release or settlement agreement is governed by the same principles applicable to any other contractual agreement." *Gen. Motors Corp. v. Superior Court*, 12 Cal. App. 4th 435, 439, 15 Cal. Rptr. 2d 622 (1993) (citations omitted). "The existence of a valid release is a complete defense to a tort action against the releasee." *Rodriguez v. Oto*, 212 Cal. App. 4th 1020, 1026, 151 Cal. Rptr. 3d 667 (2013).

In California, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. Generally, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." *Id.* at § 1638. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible…" *Id.* at § 1639.

First, it is clear that the intent of the Releases were to include unnamed entities like Raytheon within their scope. In defining the scope of the released parties (the "Releasees"), the Releases list Boeing and other specifically-named entities as well as:

…all other persons and entities not specifically identified who are or may be liable to Releasors in whole or in part for any and/or all damages and losses to Releasors, whether known or unknown, arising out of or in any way related to or resulting from the loss of TWA Flight 800 (hereinafter collectively referred to as "Releasees"). [Ex. C, Krick Release at BOE0037].

The plain language of this provision includes all entities, like Raytheon, "who are or may be liable" to Releasors for "known or unknown" damages that arise out of, relate to, or result from "the loss of TWA Flight 800." This interpretation is bolstered by ¶ 5, which states:

5. Releasors intend this Release to constitute a full release and discharge of any and all claims that they may have arising out of the injury to and death of Decedent. **Releasors state that they intend to release fully all individuals, entities or corporations, whether specifically named or not, that might be liable for damages arising out of the injury to or death of Decedent**…. [*Id.* at BOE0038 (emphasis added)].

This language demonstrates the Releasors' unmistakable intent to release unnamed parties from liability arising out of the death of Plaintiffs' decedents and is sufficient to do so under New York and California law[8]. *Wells v. Shearson Lehman/American Express, Inc.*, 72 N.Y.2d 11, 20-25, 530 N.Y.S.2d 517, 526 N.E.2d 8 (1988) (holding that release of "anyone else" in connection with the events at issue sufficient to release unnamed party under New York law); *Gen. Motors Corp.*, 12 Cal. App. 4th at 438, 441 (finding "any and all other persons, firms, and corporations, whether herein named or referred to or not" sufficient language to release unnamed corporation and the "rest of the world" under California law). Reading these paragraphs in conjunction leaves no doubt that entities not specifically named in the releases were contemplated within the scope of the Releases at the time of signing.

---

[8] This is also express language that the contracting parties <u>intended</u> to confer enforceable rights to nonparties like Raytheon. *See Rodriguez*, 212 Cal. App. 4th at 1028 (citing Restatement (Second) of Contracts § 302; Cal. Civ. Code § 1559) (noting the governing principle of whether a nonparty who claims benefits under a contract is whether contracting parties *intended* to confer the benefit rather than incidentally do so); *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005) (citation omitted) (noting a claimant must establish that the parties to the contract *intended* to confer a benefit on the third-party for it to enforce the contract as a beneficiary).

### c.  The Claims Asserted Here Were Released

The Releases also unambiguously apply to the <u>claims</u> brought here. Paragraph 3 defines what claims are released in consideration of the payment, stating:

> 3… For and in consideration of payment of the sum of [REDACTED], Releasors release and forever discharge any and all actions, causes of action…, claims, and demands whatsoever, in law, admiralty or equity, which against Releasees the Releasors ever had, now have or hereafter can, shall or may have, for, upon, by reason of, arising out of, or in any way related to the Event, including but not limited to: injury to or death of Decedent (whether assertable by Decedents heirs, beneficiaries, dependents, or personal representative, or by anyone else, and whether characterized as claims for wrongful death, survival, survivorship, personal injuries, or otherwise)…. [Ex. C, Krick Release at BOE0037-038]

This provision broadly covers "any and all" claims "whatsoever" that could arise from or relate to both the "Event[9]" or the "injury to or death of Decedent," including those assertable by the beneficiaries, personal representatives, or anyone else. As such, there can be no doubt that the claims in Plaintiffs' Complaint are covered and released. This is reaffirmed in ¶ 5, which states: "Releasors intend this Release to constitute a full release and discharge of any and all claims that they may have arising out of the injury to and death of Decedent." [*Id.*]. Paragraph 6 further expands the scope to release claims assertable by beneficiaries or claimants not specifically identified:

> 6. This Release is intended to, and Releasors represent and warrant that it will, dispose of all liability of Releasees to Releasors and all heirs and dependents of Decedent not otherwise identified, and their successors and assigns, that might now or in the future assert a claim, demand, action or bring suit arising out of injury to or the death of decedent…. [*Id.* at BOE0038-39].

---

[9] "Event" is defined as: "On or about July 17, 1996, Decedent died in the loss of TWA Flight 800, a Boeing 747-131, Registration No. N93119, off the coast of Long Island, New York (hereinafter referred to as 'Event')." [Ex. C, Krick Release at BOE0037].

Then, ¶ 8 removes any doubt as to whether claims not specifically known at the time the Releases were entered into were covered:

> 8. Releasors intend to discharge Releasees from all liability for all losses, injuries or damages arising out of the injury to or death of Decedent, both those now known and those that may be subsequently discovered. This release shall not be subject to any claim of mistake of fact or law by Releasors. Releasors also fully understand and acknowledge that facts concerning their claims may be found hereafter to be other than or different from the facts they now believe to be true. Releasors expressly accept and assume the risk of any such possible differences in facts and agree that this Release shall remain in full effect notwithstanding any such difference in facts. Releasors waive any rights or benefits conferred by any statute or common law decision with respect to unknown or unsuspected claims, including, but not limited to, Section 1542 of the Civil Code of the State of California:
>
>> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

[*Id.* at BOE0039-40]. This provision is significant for two reasons. First, Releasors understood, acknowledged, and expressly accepted the possibility that new or different facts about the accident could become known but it was their fully informed intent to release all potential claims anyway. Second, they waived their right to invoke any statutes or authority that would allow them to claim that "unknown or unsuspected claims" were beyond the scope of the release. Such language is enforceable under both New York and California law. *See Centro Empresarial*, 17 N.Y.3d at 276, 929 N.Y.S.2d at 8 ("[A] release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is 'fairly and knowingly made.'") (citations omitted); *Winet v. Price*, 4 Cal. App. 4th 1159, 1166-69, 6 Cal. Rptr. 2d 554 (1992) (finding language releasing all known or unknown claims sufficient to bar unknown claims and identifying waiver of Cal. Civ. Code § 1542 as additional evidence of intent to do so).

In sum, the Releases unambiguously operate to release claims against known and unknown entities potentially liable for Plaintiffs' damages as well as claims that were not yet discovered at

the time the Releases were entered into. This speaks directly to the situation presented by the instant litigation and bars Plaintiffs' claims.

### d. The Releases Are Binding on All Plaintiffs, Including Those Who Did Not Sign the Releases

Plaintiffs Ronald Krick, Margareta Krick, Christopher Krick, Douglas Kevorkian, Christine Grogan, and Eileen Zaharioudakis all signed the releases in either their individual or representative capacities (or both). As such, their claims are barred. Plaintiffs Craig Gaetke, Wanda Kemp, and Michael Deteresa did not sign the Releases, but the Releases also operate to bar their claims.

Personal representatives have the sole authority to settle *Moragne* actions and do so on behalf of all beneficiaries. Their decisions are thus binding on anyone entitled to recover for the loss. In *Cruz v. Korean Air Lines Co.*, for instance, the plaintiff brought a wrongful death action arising from an airline crash "as executrix on behalf of the estate of her deceased husband and on behalf of her five adult children." 838 F. Supp. 843, 844 (S.D.N.Y. 1993). Plaintiff's attorney negotiated an $800,000 settlement authorized by the plaintiff and sent releases to plaintiff and her five adult children. *Id.* at 844-45. The plaintiff and three of her children signed the release, but eventually the plaintiff and all her children expressed their desire not to accept the settlement. *Id.* at 845. The defendant then moved to enforce the release.

The court first found that plaintiff's signature created an enforceable settlement. It then addressed the argument that the release was not binding on the children that had not signed it because they did not give authority to settle their claims. *Id.* at 846. The court rejected this argument, holding:

> [T]he children misconceive their legal status in relation to the claims for their benefit. Although claims existed for their benefit, the children had no authority either to bring or to settle such claims. They are in the position of passive

22

beneficiaries. Roberta Cruz, as the legal representative of the decedent's estate, had the sole authority to bring claims for the children and had full authority to settle those claims, with or without her children's approval. *Id.*

This result was warranted under both New York law and the DOHSA. *Id.* Thus, the Releases agreed to by the personal representatives of Plaintiffs' decedents are binding on all beneficiaries whether the beneficiaries signed them or not. *See also In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2179, 2017 U.S. Dist. LEXIS 193121, at *14 (E.D. La. Nov. 22, 2017) (dismissing plaintiff's claim under the Jones Act, DOHSA, and general maritime law because decedent's wife had already released defendants as personal representative and administratrix of decedent's estate); *Calton v. Zapata Lexington*, 811 F.2d 919 (5th Cir. 1987) (dismissing Jones Act admiralty claim brought by ex-wife and children of decedent because personal representative already settled the claim); *Benoit v. Fireman's Fund Ins. Co.*, 355 So. 2d 892, 894 (La. 1978) (finding that personal representative had sole authority to settle Jones Act, DOHSA, and general maritime claims); *Homlaor*, MDL No. 565, Misc. No. 83-0345, 84 Civ. 4083 (TPG), 1997 U.S. Dist. LEXIS 7592, at *8 (holding personal representative has sole control over DOHSA claims and beneficiaries "have no legal right to settle claims"). This occurred here[10]:

- For the Oliver Krick claim, Plaintiffs Ronald and Margaret Krick both signed the Release as "Co-Personal Representative of Decedent's Estate." [Ex. C, Krick Release at BOE0042-43]. Plaintiff Christopher Krick also signed the release in his individual capacity [*Id.*];

- For the Ashton L. Allen claim, non-party Betty Anne Allen signed the release as "Decedent's Mother, Personal Representative, and Administrator of Decedent's Estate" [Ex. D, A. Allen Release at BOE0065];

- For the O. Lamar Allen claim, non-party Betty Anne Allen signed the release as "Decedent's Wife, Personal Representative and Executrix of Decedent's Estate. [Ex. E, O. Lamar Allen Release No. 1 at BOE0073].  Plaintiff Christine Grogan

---

[10] Each of the Releases also contains a clause where Releasors "represent and warrant" that "there is no Executor, Executrix, Administrator, Administratrix, or other Personal Representative" other than the undersigned, who is "authorized without further court approval to execute this release on behalf of Decedent's Estate and all heirs thereto." [Ex. C, Krick Release at BOE0037, ¶ 2]. That is, save for Plaintiff Dr. Christine Grogan's Release, which only warrants that she is the daughter of her decedent. [Ex. F, Grogan Release at BOE0075, ¶ 2].

also signed a separate release in her individual capacity. [Ex. F, O. Lamar Allen Release No. 2 at BOE0080];

- For the Ralph Kevorkian claim, Plaintiff Douglas Kevorkian signed the release "Individually and as Personal Representative of the Estate of Ralph George Kevorkian." [Ex. I, Kevorkian Release at BOE0007].

- For the Daniel Gaetke claim, non-party Jodelle M. Gearon signed the release "Individually as Decedent's Sister and as Decedent's Personal Representative and Administrator Ad Litem of Decedent's Estate." [Ex. G, D. Gaetke Release at BOE0014].

For the Donald Gough claim, Plaintiff Eileen Zaharioudakis signed the release as "Decedent's sister and sole surviving sibling" and non-party Erik E. Gough signed the release as "Decedent's son and sole child." [Ex. H, Gough Release at BOE0022-23]. The signature of the personal representative is left blank, but Erik Gough, who was the "Special Administrator" of the California Estate, retained responsibility for pursuing wrongful death actions on behalf of the Estate, as demonstrated by the documents attached to the release. [*Id.* at BOE0031-33 at ¶¶ 3-5, 7, BOE0034-36 at ¶ 3]. Under Cal. Prob. Code § 58, the definition of "personal representative" includes "Special Administrator." Thus, Erik Gough was the personal representative of the Estate at the time the release was signed and extinguished all current and future claims related to this tragic accident.

In conclusion, the Releases at issue released Raytheon from all claims brought herein and are binding on all Plaintiffs in the present action.

## IV.   DISMISSAL UNDER F.R.C.P. 12(B)(6) IS APPROPRIATE BECAUSE THE ACTION EXCEEDS THE STATUTE OF LIMITATIONS AND FAILS TO ALLEGE FACTS TO SUPPORT TOLLING

The Uniform Statute of Limitations for Maritime Torts ("USLMT") applies to all maritime tort claims. The statute provides that "a civil action for damages for personal injury or death arising out of a maritime tort must be brought within 3 years after the cause of action arose." 46 U.S.C. § 30106. As the subject accident occurred on July 17, 1996, Plaintiffs acknowledge that "[u]nder

24

normal circumstances, the statute of limitations would have run" on their claims. [Dkt. 33, Compl. at ¶ 94]. They argue that the discovery rule, fraudulent concealment doctrine, and equitable estoppel render their claims timely, however[11]. [*Id.* at ¶ 95]. That is not the case.

###### a. Standard of Review Specific to the Statute of Limitations

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in [an] answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 (2d Cir. 2014) (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)). Such is the case here.

###### b. The "Discovery Rule" Does Not Render Plaintiffs' Claims Timely

When a federal statute like the USLMT does not define when a cause of action accrues, courts sometimes apply the federal "discovery rule" of accrual. While Raytheon contends that the discovery rule should not apply here[12], the result is the same if it does. Assuming, *arguendo*, that the discovery rule applies, Plaintiffs' claims are barred because their causes of action accrued on the date they learned of their "injuries." That is, when they learned that their decedents died in a plane crash on July 17, 1996.

---

[11] Plaintiffs also allege that the doctrine of "laches" saves their time-barred claims, but that doctrine no longer applies to personal injury or death claims after the enactment of the USLMT. *See In re Fire Island Ferries, Inc.*, No. CV 11-3475, 2016 U.S. Dist. LEXIS 16538, at *10 (E.D.N.Y. Feb. 4, 2016).

[12] "The standard rule is that a claim accrues when the plaintiff has a complete and present cause of action." *City of N.Y. v. FedEx Ground Package Sys.*, 351 F. Supp. 3d 456, 475 (S.D.N.Y. 2018). While lower federal courts have applied a discovery accrual rule where a federal statute is silent on the issue, the Supreme Court has disclaimed that position as its own. *Id.* (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 27 (2001)). Claims of this nature, where the <u>injury</u> at issue is not inherently self-concealing, should be governed by the "standard rule." *See SEC v. Gabelli*, 653 F.3d 49, 59 (2d Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 1216, 185 L. Ed. 2d 297 (2013) ("As a general matter, [the discovery] rule does not govern the accrual of most claims because most claims do not involve conduct that is inherently self-concealing.").

Under the federal discovery rule, "a plaintiff's cause of action accrues when he discovers, or with due diligence should have discovered, **the injury** that is the basis of the litigation." *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) (emphasis added) (quoting *Union Pac. R. Co. v. Beckham*, 138 F.3d 325, 330 (8th Cir. 1998)); *Benzemann v. Houslanger & Assocs.*, PLLC, 924 F.3d 73, 81 (2d Cir. 2019) (same). It is anticipated that Plaintiffs will argue that the discovery rule requires that they know of both their injury "and its cause" before their claims accrue, but that is an inaccurate interpretation of the rule.

The U.S. Supreme Court has explained that "in applying a discovery accrual rule, [it] ha[s] been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella v. Wood*, 528 U.S. 549, 555 (2000). Indeed, "delay in discovering the cause of the injury does not prevent the claim from accruing." *Franklin v. New York City*, 2017 U.S. Dist. LEXIS 20233, at *9 (S.D.N.Y. Feb. 10, 2017) (quoting *Gonzalez v. Wright*, 665 F. Supp. 2d 334, 348-49 (S.D.N.Y. 2009) (quoting *Rotella*, 528 U.S. at 555). Put another way, "the question of when the plaintiffs knew or had reason to know of the defendant's participation in the tortious conduct is irrelevant. It is the discovery of the plaintiffs' injuries…, that starts the clock." *Litle v. Arab Bank*, No. 04-CV-5449, 2007 U.S. Dist. LEXIS 20539, at *8 (E.D.N.Y. Mar. 22, 2007) (Magistrate Pohorelsky, V.) (finding that under the discovery rule, plaintiffs' claims accrued upon sustaining physical injuries in a terrorist attack and not upon learning of defendants' role in it). Therefore, because Plaintiffs learned of their decedents' deaths immediately after this tragic accident, the claim accrued at that time.

In *Levy v. BASF Metals Ltd.*, for example, the plaintiff sustained investment losses in the platinum market in 2008 and brought suit against various defendants for causing her losses through market manipulation. 917 F.3d 106, 108 (2d Cir. 2019). She settled that claim and brought another

26

lawsuit against different defendants in 2015 for manipulating the platinum market. *Id.* She alleged she only became aware of this different manipulation scheme through a class action complaint she received after settling her prior lawsuit. *Id.* The federal claims in her second case were barred as untimely.

On appeal, the plaintiff argued, *inter alia*, that the district court erred in dismissing her claim under the Commodity Exchange Act ("CEA") because it conflated the date she suffered her investment losses with the date her cause of action accrued. *Id.* at 108. As the CEA does not articulate when a cause of action accrues, the Court applied the discovery accrual rule under *Rotella*. *Id.* It rejected her argument, explaining:

> The relevant inquiry, however, is not whether Levy had discovered the identity of the defendants or whether she had discovered the manipulation scheme she alleges in her complaint. Rather, the question is when Levy discovered her CEA injury— that is, a loss that was the result of a CEA violation. *Id.*

Thus, because she alleged that her investment losses occurred in 2008 when the platinum market dropped by over 50% with no explanation other than market manipulation, she knew of her CEA injury at that time and the cause of action accrued. *Id.* at 108-109.

Similarly, in *Roeder v. J.P. Morgan Chase & Co.*, the plaintiffs, former hostages and their family members, brought suit against Chase Bank ("Chase") for its involvement in the 1979 Iran hostage crisis that led to the hostages' seizure and delayed release. 523 F. Supp. 3d 601, 606-07 (S.D.N.Y. 2021), *aff'd*, No. 21-552, 2022 U.S. App. LEXIS 2183 (2d Cir. Jan. 25, 2022). Plaintiffs filed suit in March 2020 alleging various state law causes of action and a single federal cause of action for conspiracy to impede or injure an officer of the United States in violation of 42 U.S.C. § 1985(1). *Id.* at 610, 612.

In their complaint, the plaintiffs relied on the discovery rule to allege that their federal claim accrued on December 29, 2019, when the *New York Times* first revealed the records showing

27

the critical facts about how and why Chase had injured them. *Id.* at 613. The court rejected this argument[13].

It explained that Plaintiffs misread *Rotella* and their suggestion that the statute of limitations did not begin to run against a particular defendant until they knew the defendant had caused their injury was mistaken. *Id.* It stated that, "[t]he broader discussion in *Rotella* makes clear that the 'critical facts' for purposes of the discovery rule is 'discovery of the injury, not discovery of the other elements of the claim.'" *Id.* (quoting *Rotella*, 528 U.S. at 556). Thus, plaintiffs' claims accrued in January 1981 when the hostages were released from imprisonment, which was when the claim was complete and plaintiffs were aware of their injuries. *Id.* at 615. "It d[id] not matter that, at the time, Plaintiffs were not aware that the injury was a consequence of a conspiracy" as they "need not know of their cause of action for the statute of limitations to run." *Id.* (citing *Rotella*, 528 U.S. at 555-57; *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012)).

Like the plaintiffs in *Levy* and *Roeder*, Plaintiffs' claims accrued when they learned of their injuries (their decedents' deaths) and not when they allegedly learned about the involvement of any specific Defendant or cause. Moreover, Plaintiffs cannot plausibly suggest that they did not suspect that their decedents' deaths were wrongfully caused until much later because they filed suit against Boeing and other defendants in the MDL litigation alleging wrongful death. As such, the statute of limitations began to run when they learned of their decedents' deaths in 1996 and the three-year statute of limitations under the USLMT has long since passed.[14]

---

[13] The Court found that plaintiffs abandoned the argument in briefing and at oral argument, but still addressed it.

[14] At best, the latest Plaintiffs could argue their cause of action accrued was upon filing suit against Boeing and its co-defendants. At that time it is clear that they knew the deaths were wrongfully caused.

28

### c. Fraudulent Concealment Does Not Toll the Statute of Limitations Against Raytheon

Plaintiffs also argue that the "fraudulent concealment doctrine toll[s] the statute of limitations in this case." [Dkt. 33, Compl. at ¶ 95]. This argument fails because Plaintiffs do not adequately plead the doctrine under Rule 9(b)'s heightened pleading standard and they cannot demonstrate that they exercised the necessary due diligence in pursuing the discovery of their claim.

Fraudulent concealment is a form of equitable tolling. *Zirvi v. Flatley,* 838 F. App'x 582, 585 (2d Cir. 2020). To invoke the doctrine, a plaintiff must show that: "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's 'discovery of the nature of the claim within the limitations period'; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Koch*, 699 F.3d at 157 (quoting *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999)). These allegations are subject to Fed. R. Civ. P. 9(b). *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 462 (S.D.N.Y. 2020) (citing *In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, No. 00-cv-7804, 2004 U.S. Dist. LEXIS 3892 (S.D.N.Y. Mar. 12, 2004)). This requires the complaint to "set forth the who, what, when, where, and how of the alleged fraud." *United States ex rel. Ranasinghe v. Ocwen Loan Servicing LLC*, No. 20-CV-02890 (OEM) (LKE), 2025 U.S. Dist. LEXIS 45070, at *17 (E.D.N.Y. Mar. 12, 2025) (citation omitted). Plaintiffs' Complaint is devoid of these required allegations.

Critically, "[a]llegations that other defendants acted to deceive plaintiffs from filing suit do not plead fraudulent concealment against <u>all</u> defendants" because "[t]he doctrine of fraudulent concealment tolls the statute of limitations <u>only</u> as to those defendants who committed the

29

concealment." *National Union Fire Ins. Co. v. Califinvest*, 1992 U.S. Dist. LEXIS 1956, *26 (S.D.N.Y. Feb. 13, 1992) (emphasis in original) (quoting *Bingham v. Zolt*, 683 F. Supp. 965, 975 (S.D.N.Y. 1988)). "Thus, a plaintiff may not use fraudulent concealment by one defendant as a basis for tolling the statute of limitations against another defendant who did not engage in affirmative fraudulent acts to conceal." *Id.* (citing *Greenfield v. Kanwit*, 87 F.R.D. 129, 132 (S.D.N.Y. 1980)).

### i.    There Are No Allegations Specific to Raytheon

Plaintiffs' only allegations as to Raytheon's alleged concealment are that "these Defendants engaged in a top-down cover-up to prevent the public from learning the truth about TWA 800" and that "Defendants, led by the United States government, took active steps to mislead the families and the public, as well as conceal that the TWA 800 crash was caused by a missile, including confiscating and concealing evidence from the United States Navy." [Dkt. 33, Compl. at ¶¶ 6, 99]. However, there are no allegations as to the who, what, when, where, or how of Raytheon's actions. While Plaintiffs allege a host of actions taken by the NTSB, FBI, and CIA to cover-up the missile theory during the investigation, [*Id.* at ¶¶ 38-54], none of them allege Raytheon's involvement. As Plaintiffs are required to allege what Raytheon <u>itself</u> did - with Rule 9(b) specificity - their allegations fall far short. For this reason alone, Plaintiff cannot invoke fraudulent concealment to toll the statute of limitations against Raytheon.

### ii.    Plaintiffs Fail to Plead That They Acted With Reasonable Diligence[15]

"Reasonable diligence is a prerequisite to the applicability of equitable tolling." *Koch*, 699 F.3d 141, 157. "Due diligence is not adequately pled if plaintiffs did not allege in the complaint that they exercised due diligence or if they make no allegation of any specific inquiries of

---

[15] If Court evaluates Plaintiffs' diligence in discovering their cause of action under the "discovery rule," this argument also demonstrates that diligence would have provide sufficient notice for their cause of action to accrue.

defendants, or detail when such inquiries were made, to whom, regarding what, and with what response." *Fire & Police Pension Ass'n v. Bank of Montreal*, 368 F. Supp. 3d 681, 704 (S.D.N.Y. 2019) (internal citations omitted). These details are completely absent from Plaintiffs' Complaint.

Plaintiffs' allegations make clear that the missile theory was not concealed. Indeed, they identify "a nationally televised FBI press conference that attempted to reconcile the eyewitness testimony that the plane was struck by a projectile with the U.S. Government's official position." [Dkt. 33, Compl. at ¶¶ 47]. The FBI even showed a video that said "NOT A MISSILE." [*Id.* at ¶ 48]. They further allege that NTSB "told the victims' families that the idea that TWA 800 was brought down by a missile was an implausible 'conspiracy theory'" and "the same misinformation was provided to the press, which widely reported it to the public." [*Id.* at ¶¶ 52-53]. The missile theory was thus known to Plaintiffs, but there are no allegations that they made any inquiries about it despite having the ability to do so. *See Simmons v. Reich*, 2021 U.S. App. LEXIS 32372, at *7 (2d Cir. Oct. 29, 2021) (finding fraudulent concealment inapplicable where plaintiffs had notice of fraud at issue, but failed to allege any inquiries or investigations to obtain withheld information).

Plaintiffs allege that the FBI confiscated Navy radar tape showing an object headed straight for TWA 800 and that records obtained in Dr. Stalcup's FOIA litigation show an object impacting TWA 800. [Dkt 33, Compl. at ¶¶ 91-92]. They also allege a host of witnesses that saw objects in the sky consistent with a projectile, describing it as "overwhelming eyewitness testimony indicat[ing] that TWA 800 was struck by a missile." [*Id.* at ¶¶ 40-48]. Plaintiffs do not plead that they attempted to procure that Navy radar tape or any other types of documents obtained in the FOIA litigation, whether independently or through the discovery vehicles available to them in the MDL litigation when they were represented by sophisticated counsel. They also fail to describe

31

any attempt (or impediment) to speak with or depose the eyewitnesses. Therefore, they fail to allege any due diligence during the decades they seek to have tolled despite being on notice of the missile theory. They cannot invoke fraudulent concealment.

### d.   Equitable Estoppel Cannot Apply

"Unlike equitable tolling, which is invoked in cases where the plaintiff is ignorant of his cause of action because of the defendant's fraudulent concealment, equitable estoppel is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay in bringing his lawsuit." *Ellul*, 774 F.3d at 802 (citing *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 49-50 (2d Cir. 1985)). "To invoke equitable estoppel, a plaintiff must show that: '(1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment.'" *Id.* (quoting *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995)).

Plaintiffs' cannot utilize equitable estoppel here because they allege that they did <u>not</u> know of the existence of their cause of action against Raytheon until April 15, 2021, well after the statute of limitations had expired. [Dkt. 33, Compl. at ¶¶ 96-99]. Furthermore, as explained above, they did not plead any misrepresentations or reliance as to Raytheon. The doctrine cannot save Plaintiffs' untimely claim.

### V.    PLAINTIFFS' COMPLAINT PRESENTS NONJUSTICIABLE POLITICAL QUESTIONS REQUIRING DISMISSAL UNDER RULE 12(B)(6)

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or in the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). A political question exists if any one of the factors set

32

forth by the Supreme Court in *Baker v. Carr* is "inextricable from the case at bar." *Baker v. Carr,*

369 U.S. 186, 217 (1962). These factors include:

(1) A textually demonstrable constitutional commitment of the issue to a coordinate political department; or

(2) A lack of judicially discoverable and manageable standards for resolving it; or

(3) The impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

(4) The impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or

(5) An unusual need for unquestioning adherence to a political decision already made; or

(6) The potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id*. These factors are "probably listed in descending order of both importance and certainty." *Vieth*

*v. Jubelirer*, 541 U.S. 267, 277 (2004). The first two factors carry the most weight. *See Ctr. For*

*Biological Diversity v. Mattis*, 868 F.3d 803, 822 (9th Cir. 2017).

In determining whether a political question exists, courts will consider the whole case,

looking not only to the plaintiff's claims, but also to the defendant's potential defenses, as well as

the apportionment of liability or causation, to determine whether reviewing any of them will

require review of military judgments or policies. *Harris v. Kellogg Brown & Root Servs.*, 724 F.3d

458, 467-77 (3d Cir. 2013) (reviewing plaintiffs' claims and defenses, including proximate cause

and contributory negligence); *Lane v. Halliburton*, 529 F.3d 548, 564-65 (5th Cir. 2008)

(reviewing plaintiffs' claims and elements thereof); *Id*. at 565-68 (reviewing causation); *Loquasto*

*v. Fluor Corp.*, 512 F. Supp. 3d 728, 737-38 (N.D. Tex. 2021) (reviewing defendants' affirmative

defenses). The classic political question is observed when the question at issue "necessarily

implicates the wisdom of the military's strategic and tactical decisions." *Whitaker v. Kellogg*

*Brown & Root, Inc.*, 444 F. Supp. 2d 1277, 1282 (M.D. Ga. 2006); *see also Tarros S.p.A. v. United*

33

*States*, 982 F. Supp. 2d 325, 332 (S.D.N.Y. 2013) ("Cases touching upon foreign relations and military affairs are, therefore, particularly sensitive to political question concerns.").

The allegations in Plaintiffs' Complaint, and Raytheon's anticipated defenses, are inextricably intertwined with matters that are textually committed to the Legislative and Executive Branches. To rule on the ultimate issues in this case, the Court must question matters of policy and decision making by these Branches. This case also requires resolution of matters for which there are no judicially ascertainable standards. Thus, because litigation of Plaintiffs' claims demands inquiry and adjudication into nonjusticiable political questions, dismissal is warranted. See *Tarros S.p.A. v. United States*, 982 F. Supp. 2d 325 (S.D.N.Y. 2013) (granting 12(b)(1) dismissal as the claim required an assessment of the United States' decision to divert a vessel near Libya during ongoing coalition action); *Can v. United States*, 820 F. Supp. 106 (S.D.N.Y. 1993) (plaintiff's claim to recover foreign assets frozen under federal law following the Vietnam War was dismissed as it presented a political question regarding United States foreign policy and military actions).

### A. The Complaint Demands Adjudication of Matters Constitutionally Committed to the Legislative and Executive Branches of Government

The Constitution grants Congress the power to declare war, and provide for, organize, arm, maintain, and govern the military. U.S. Const. art. I, § 8, cls. 11-16. The Constitution also designates the President as the Commander in Chief of the Armed Forces. U.S. Const. art. II, § 2, cl. 1. Relying on these Constitutional provisions, courts have held that decisions regarding foreign policy and national security are textually committed to the political branches of the government. *See Grell v. Trump*, 330 F. Supp. 3d 311, 317 (D.D.C. 2018) (explaining that there is "no doubt that decision-making in the fields of foreign policy and national security is textually committed to the political branches of government") (quoting *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005)). Additionally, there is "little doubt" that military judgments are constitutionally

34

committed to these branches. *Carmichael v. Kellogg, Brown & Root Servs.*, 572 F.3d 1271, 1281 (11th Cir. 2009); *see also Whitaker*, 444 F. Supp. 2d at 1281 (explaining that a political question is implicated when military decisions are at issue where the military partners with a contractor that is subject to the government's orders, regulations, and plans). Further, the Constitution "reserves to the legislative and executive branches responsibility for developing military training procedures that will ensure the combat effectiveness of [the United States'] fighting forces." *Aktepe v. United States*, 105 F.3d 1400, 1403 (11th Cir. 1997); *see also Whitaker*, 444 F. Supp. at 1280-82 (relying on *Aktepe*'s reasoning to find a political question where the claims were brought against a contractor). In these circumstances, the first *Baker* factor – i.e., "a textually demonstrable constitutional commitment of the issue to a coordinate political department" – is established. *Baker*, 369 U.S. at 217.

A good example of this is found in *Gilligan v. Morgan*, where the Supreme Court declined to review plaintiffs' request for injunctive relief regarding the Ohio National Guard's training, weaponry, and orders, observing that "[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). The *Gilligan* case involved neither foreign military operations nor active wartime decisions, but the Court nonetheless observed and respected the Constitutional commitment of military training and weaponry to the other branches of government. *Id*. at 10-12. The decision to enhance the Aegis missile system and to test it – as alleged in Plaintiffs' Complaint – is equally subject to the professional decision-making of our military.

Decisions regarding military training, and by logical extension the testing of military weapons, implicate a political question because these procedures are aimed at ensuring the

35

"combat effectiveness of our fighting forces." *Aktepe*, 105 F.3d at 1403 (finding analysis of NATO training exercises beyond judicial review); *see also Carmichael*, 572 F.3d at 1293 (finding that a "negligent training claim would entail judicial scrutiny of sensitive judgments customarily entrusted to the military"). These decisions result from a "complex, subtle balancing of many technical and military considerations, including the trade-off between safety and greater combat effectiveness." *Aktepe*, 105 F.3d at 1404. Thus, the government's testing of the Aegis system – including how, when and where – are not subject to judicial inquiry.

In *Aktepe v. United States*, the Eleventh Circuit found that it could not determine whether the Navy was negligent in conducting a NATO military training simulated attack exercise with Turkey when two live missiles were fired after a miscommunication, killing and injuring individuals from the Turkish forces participating in the exercise. *Id*. at 1402-03. The court explained that the determination of negligence would necessarily require the court to question the necessity of simulating actual battle conditions. *Id*. at 1403. These matters are political questions, beyond the purview of the judiciary. *See id*.

Likewise, adjudication of Plaintiffs' claims here, if true, would require the Court to question whether it was necessary for the military to test the Aegis missile system when it did, how it did, and where it did. Resolution of these issues directly implicates questions about what is necessary to prepare our nation to defend itself against foreign threats and whether the Executive Brach accurately perceived these threats as imminent. [Dkt. 33, Compl. at ¶¶ 55-58]. These are precisely the type of matters the Constitution has delegated to the Legislative and Executive branches.

Similarly, the DoD and Congress' decision to enhance the Aegis missile system, how to achieve this goal, and when to implement the system in testing or in the field, is unreviewable. In

36

*Concerned About Trident v. Schlesinger*, the D.C. District Court determined that the decision to begin development on a missile program and where to place its base is an unreviewable political question. 400 F. Supp. 454, 482-83 (D.D.C. 1975). The court explained that "substantive decisions relating to the national defense and national security lie within the narrow band of matters wholly [committed] to official discretion both because of the delicate security issues they raise and the constitutional delegation of those concerns to the political departments of our government." *Id.* Further, courts have declined to evaluate decisions regarding base and housing locations under the guise of political question doctrine, in that there are tactical implications as to why certain locations are chosen. *See Bancoult v. McNamara*, 445 F.3d 427, 436 (D.C. Cir. 2006). The issues Plaintiffs raise about the Aegis missile system compel the same disposition.

Plaintiffs allege that United States Secretary of Defense Perry made certain decisions regarding the Aegis system due to the "here and now" threat from rogue nations. [Dkt. 33, Compl. at ¶ 57]. Any decisions that the Department of Defense made to advance the security of our nation, keeping it safe from a perceived threat of foreign enemies, is a military decision concerning our nation's security that is exempt from judicial review. See *In re Korean Air Lines Disaster*, 597 F. Supp. 613, 616 (D.D.C. 1984) ("[P]laintiffs may not present these claims against the government based upon the decisions of the military concerning the national security.").

Further, Plaintiffs' challenge to the manufacture and warnings relating to the Aegis missile system necessarily requires inquiry into government and military decisions. Considering the claims and anticipated defenses, this action will require examination into the military design specifications for each component of the system, how the systems and features were intended to work together, whether they functioned as intended or some other feature of the system acted to inhibit intended function, whether the military specifications were followed and manufactured in

37

accordance with the specifications, whether any decision making or instruction from the military during the design or testing process caused the alleged event, and whether some act by the military was the proximate cause of the event. Determination of these issues necessarily requires evaluation of other variables and causes that involve military strategy. *See Bentzlin v. Hughes Aircraft Co.,* 833 F. Supp. 1486, 1497 (C.D. Cal. 1993) (explaining that the case requires inquiry into other possible causes of a friendly fire incident during wartime, and no fact finder could reach the manufacturing defect issue without eliminating other variables that would involve military strategy and orders to troops).

In *Amedi v. BAE Systems*, the court held that claims against a government contractor for alleged defects in its Mine Resistant Ambush Protected ("MRAP") vehicle implicated political questions that could not be evaluated by the court. 782 F. Supp. 2d 1357, 1358 (N.D. Ga. 2011). Plaintiff alleged that BAE Systems negligently designed its MRAP vehicle and because of that negligence the vehicle failed to protect her husband from the blast of an explosive device while traveling with a convoy in Iraq. *Id.* at 1351-52. Plaintiff argued that there were no military decisions involved because it was BAE's negligence that caused her husband's death. *Id.* at 1356. The court flatly rejected plaintiff's contention and concluded that the defendant would "inevitably raise the issues of the formation of the convoy, the number of vehicles selected, the route used, whether there were sufficient safeguards taken to avoid improvised explosive devices, and so forth, as a means of defending against liability and rebutting Plaintiff's assertion that issues of manufacturing were the sole cause" of decedent's death. *Id.* at 1357.

The *Amedi* court also noted that the "military decisions that could potentially have contributed" to decedent's death went well beyond the date of the incident. *Id.* The military decided the type of vehicle, that it was a priority to have it designed, and made the decision to fast-track

38

the production of the vehicle. *Id*. The court noted the government initiated the MRAP program in response to an urgent need to offer greater protection to military personnel and the Secretary of Defense declared this program to be of highest priority within the DoD. *Id*. at 1352. The court acknowledged that the government contractor defense could address some of the issues raised in the case, but that it also would require the court to reexamine the military decisions in "every aspect," including beyond the incident itself. *Id*. at 1357.

This Court is faced with the same issue. Specifically, in order to resolve Plaintiffs' manufacturing defect, failure to warn, and negligence claims, the Court will be compelled to assess the actions of the military during the alleged testing, including: whether and where targets or missiles should have been launched, how they should have been launched, and the timing and all other potential actions by the military that could have caused the alleged events. This Court would further have to the address the DoD, Congress, and the military's decisions in response to national security threats, including the expedited development of the Aegis missile system as one of those responses. Inquiries into military decisions would be pervasive, and Raytheon respectfully submits, beyond judicial review.

**B. There is No Judicially Discoverable, Manageable Standard for Resolving the Issues Implicated by This Lawsuit**

Litigating this case to conclusion would require the Court to adjudicate questions for which there are no "judicially discoverable and manageable standards." *Baker*, 369 U.S. at 217. Other courts have concluded that they were unable to apply judicially manageable standards when the issues in a case implicate combat and training activities. *See McMahon v. Presidential Airways*, Inc., 502 F.3d 1331, 1363 (11th Cir. 2007). This is the logical conclusion here too because in order to determine whether the missile testing was performed negligently, this Court would have to determine how and where a reasonable military force would have conducted the testing. As the

Supreme Court noted in a related context, "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan*, 413 U.S. at 10.

It is difficult, if not impossible, for a court to discern the relevant standards of care for cases involving military action, which often differ from those in standard tort cases. *See Carmichael*, 572 F.3d at 1288-89. For example, in *Aktepe*, where the plaintiffs alleged negligence by the Navy in a missile firing drill, the Eleventh Circuit explained that it would have to determine how a reasonable military force would have conducted such drill, but it lacked knowledge of the facts or standards sufficient to determine whether reasonable care was indeed taken, or what such reasonable care might look like. *See Aktepe*, 105 F.3d at 1404. Questions such as what a "reasonable intercept" is or what a "reasonable military training exercise" might entail, where it might occur, and the reasons it may occur in a particular location and at a particular time based on perceived threats, necessarily invoke a judicially unmanageable standard. *See generally id*.

**C.  Policy Determinations Outside of the Court's Discretion are Implicated**

"Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981). The political branches of government are afforded a high degree of deference regarding military affairs because the Constitution delegates such authority to them. *See Aktepe*, 105 F.3d at 1403. Decisions regarding the development of a missile program inherently call into question the decision making of the Congress and the Armed Forces. *See, e.g.*, *Bentzlin*, 833 F. Supp. at 1497 (friendly fire incident which killed Marines); *Zuckerbraun v. Gen. Dynamics Corp*., 755 F. Supp. 1134, 1141-42 (D. Conn. 1990) (manufacturing defects in missile systems); *Nejad v. United States*, 724 F. Supp. 753, 754-55 (C.D. Cal. 1989) (missile that shot down civilian airplane in Iran); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 843-44 (D.C. Cir. 2010) (President's decision to launch missile at foreign target).

40

By Plaintiffs' own word, the Aegis missile system was enhanced, designed, and implemented to counter the "here and now" threats presented by rogue nations. [Dkt. 33, Compl. at ¶ 57]. This concern also prompted the accelerated timetable to implement the system and led to its alleged testing in a congested area. [*Id.* at ¶¶ 65-74]. The reasons for developing a new radar system or enhancing a missile program in view of government perceived threats to the nation are not ripe for judicial intervention. The military and Congress' decisions to fund the program, "fast track" the program, and if true, test the program in the alleged manner and location, are all matters of policy left to these other branches of government. These issues raise nonjusticiable political questions, necessitating dismissal of the Complaint.

## CONCLUSION

For the reasons set forth herein, Raytheon respectfully requests that Plaintiffs' Complaint be dismissed with prejudice, requesting costs, fees, and any other relief the Court may deem just and proper.

Dated: April 1, 2025

Respectfully submitted,

FITZPATRICK, HUNT & PAGANO, LLP

By:

Ralph V. Pagano, Esq. (RP7138)
12 East 49th Street, 34th Floor
New York, New York 10017
T: (212) 937-4000
F: (212) 937-4050
ralph.pagano@fitzhunt.com

*Attorneys for Defendant*
*RAYTHEON COMPANY*

41

## LOCAL RULE 7.1(c) CERTIFICATE OF WORD COUNT COMPLIANCE

The undersigned certifies that this document complies with the word and page limitations in Local Rule 7.1(c). Each additional page beyond the 25-page limit, which was authorized by the Court, contains no more than 350 additional words per page. The entire brief contains 13,865 words, calculated in accordance with the strictures of Local Rule 7.1(c).

By: _____

Ralph V. Pagano, Esq. (RP7138)
12 East 49th Street, 34th Floor
New York, New York 10017
T: (212) 937-4000
F: (212) 937-4050
ralph.pagano@fitzhunt.com

*Attorneys for Defendant*
*RAYTHEON COMPANY*

42

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on April 1, 2025, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the U.S. District Court for the Eastern District of New York, by using the CM/ECF system, which will send notification of such filing to all CM/ECF participants of record in this matter.

Dated: April 1, 2025

By:    /s/ Anca Popa

Anca Popa

43