AYERS DEC. ATT. A

1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - -   X
3
RONALD KRICK, ET AL.,         :
4                                    23-CV-8093(AMD)
            Plaintiffs,       :
5

6      -against-              :

7                              United States Courthouse
                               Brooklyn, New York
RAYTHEON COMPANY, ET AL.,   :
8                              December 13, 2023
            Defendants.     :  3:30 p.m.
9
- - - - - - - - - - - - -   X
10
       TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
11        BEFORE THE HONORABLE ANN M. DONNELLY
           UNITED STATES CHIEF DISTRICT JUDGE
12

13  APPEARANCES:

14

For the Plaintiffs:        BAILEY & GLASSER LLP
15                          1999 Harrison Street
                            Suite 660
16                          Oakland, CA 94612
                            BY: TODD A. WALBURG, ESQ.
17

18  For the Defendants:     FITZPATRICK, HUNT & PAGANO, LLP
                            12 E. 49th Street
19                          Ste 31st Floor
                            New York, NY 10017
20                          BY: TARA E. NICOLA, ESQ.

21

                            FITZPATRICK & HUNT, TUCKER,
22                          COLLIER PAGANO, AUBERT LLP
                            Tower 49, Twelve East 49th St.
23                          31st Fl.
                            New York, NY 10017
24                          BY:  RALPH V. PAGANO, ESQ.

25

APPEARANCES: (Continued)

                              WILSON ELSER MOSKOWITZ
                              EDELMAN & DICKER LLP
                              150 E 42nd Street
                              New York, NY 10017
                              BY:  JOHN KELLY, ESQ.


                              WILSON, ELSER
                              8444 Westpark Drive, Suite 510
                              McLean, VA 22102
                              BY: KATHRYN A. GRACE, ESQ.


                              DOJ-CIV
                              CIVIL DIVISION, T-ASA
                              175 N St NE
                              8th Floor
                              Washington, DC 20002
                              BY:  THOMAS M. BROWN, ESQ.


                              DOJ-CIV
                              AVIATION, SPACE & ADMIRALTY
                              170 N St NE
                              Washington, DC 20002
                              BY: EMMA K. HILDEBRAND, ESQ.


                              UNITED STATES DEPARTMENT OF JUSTICE
                              P.O. Box 14271
                              Washington, DC 20044-4271
                              BY:  ROBERT E. KELLY, ESQ.


                              UNITED STATES ATTORNEYS OFFICE
                              EASTERN DISTRICT OF NEW YORK
                              271 Cadman Plaza East
                              Brooklyn, NY 11201-1820
                              BY: ARTEMIS LEKAKIS, ESQ.


Court Reporter:          Andronikh M. Barna
                         225 Cadman Plaza East
                         Brooklyn, New York
                         (718) 613-2178

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1          THE COURTROOM DEPUTY:  This is civil cause for a

2   status conference, Docket No. 23-CV-8093, Krick, et al.

3   versus Raytheon Company, et al.

4          Counsel, state your appearance.  Plaintiffs first.

5          MR. WALBURG:  Good afternoon, Your Honor.

6          Todd Walburg, appearing for the plaintiffs.

7          THE COURT:  Good afternoon.

8          MS. NICOLA:  Good afternoon, Your Honor.

9          Tara Nicola from the law firm of Fitzpatrick & Hunt

10  for Raytheon Company.

11         THE COURT:  Good afternoon.

12         MR. PAGANO:  Good afternoon, Your Honor.

13         Ralph Pagano, Fitzpatrick & Hunt, for the Raytheon

14  Company.

15         THE COURT:  Good afternoon.

16         MR. KELLY:  Good afternoon, Your Honor.

17         John Kelly from the law firm of Wilson Elser

18  Moskowitz Edelman & Dicker on behalf of Lockheed Martin.

19         THE COURT:  Good afternoon.

20         MS. GRACE:  Good afternoon, Your Honor.

21         My name is Kathryn Grace, also with Wilson Elser, on

22  behalf of Lockheed Martin.

23         I think you're aware about my pro hac --

24         THE COURT:  It's all good.

25         MS. GRACE:  Appreciate it.

1          THE COURT:  All right.

2          MR. BROWN:  Good afternoon, Your Honor.

3          Thomas Brown on behalf of the United States.

4          THE COURT:  Good afternoon.

5          MS. HILDEBRAND:  Good afternoon.

6          Emma Hildebrand on behalf of the United States.

7          THE COURT:  Good afternoon.

8          MR. ROBERT KELLY:  Good afternoon, Your Honor.

9          Robert Kelly on behalf of the United States.

10          And if you could indulge me for a minute.  My

11 colleague, Emma Hildebrand, this is her first appearance as a

12 lawyer in district court.

13          THE COURT:  Great.

14          Are you going to let her talk?

15          MR. ROBERT KELLY:  Apparently not.

16          THE COURT:  Well, you know, in my individual rules,

17 I don't know if you all are familiar, but I do -- and it's no

18 pressure, but I do really appreciate hearing from less

19 experienced lawyers.  No offense to anybody, but they usually

20 know the most about the case.  And I also just think that

21 there are so few opportunities for people to stand up in

22 court.

23          And this is a pretty safe space, so I'm unlikely to

24 yell and scream at you.  And I think most of my colleagues

25 aren't likely to yell and scream at you, too.  But I think

1    it's a good chance, you know, to get used to it.

2          I will say that I was nervous every single time I

3    stood up in court, including the last appearance after having

4    been a lawyer for 25 years, so I don't think you ever get rid

5    of it.

6          So, welcome to you.

7          MS. HILDEBRAND:  Thank you.

8          THE COURT:  Okay.

9          So this case comes to me from Judge Kelley in

10   Massachusetts and she has already decided the question of the

11   statute of limitations.  And then so really I think the issue,

12   it's been briefed already, the question of, at least by two of

13   the parties, about whether this is a political question.

14         Is that something that you intend to move on as

15   well?

16         MR. ROBERT KELLY:  Your Honor, not to start off by

17   correcting you, but Judge Kelley did not decide the issue of

18   statute of limitations.  She left that specifically for you.

19         THE COURT:  It was a pretty good decision.

20         MR. ROBERT KELLY:  Noted.

21         But the reason she granted the motion was on venue.

22         THE COURT:  Just to get it here.

23         MR. ROBERT KELLY:  To get it here.

24         And the reason she went into the discussion about

25   the statute of limitations was because the United States had

1    argued that it would be futile to move it anywhere else.

2              THE COURT:  Right.

3              MR. ROBERT KELLY:  So we do consider it to be a live

4    issue, especially now that we're in the Second Circuit where

5    the law is different.

6              THE COURT:  Okay.  So that's something that you're

7    planning to brief as well?

8              MR. ROBERT KELLY:  Yes.

9              We did not move under political question doctrine.

10   That's Raytheon and Lockheed's territory.

11             THE COURT:  Is that something that you anticipate

12   moving on or not?

13             MR. ROBERT KELLY:  No, Your Honor.

14             THE COURT:  Okay.

15             And I think this is probably a triumph of hope over

16   experience, but I assume there's no possibility of resolving

17   your differences; is that right?

18             MR. ROBERT KELLY:  No, Your Honor, there is none.

19             THE COURT:  All right.

20             One thing that I just -- I don't think you all

21   probably need to be reminded of this, but I just want to make

22   sure our court reporter can hear everything.  So if you're

23   going to speak, grab one of the microphones and just don't

24   speak too quickly.

25             Okay.  So, I mean, I appreciate and I think I

actually did know that the Judge hadn't ruled on that as a
final matter, but in my just limited, you know, time that I've
had the case, it's pretty persuasive reasoning.  I am open to
hearing about why that is not correct.  But under the unusual
circumstances of this case, I think Judge Kelley was spot-on.
But, you know, I can be persuaded that I'm not right.  But we
can talk about that if you want.

I am just also curious about this political question
issue.  And you weren't in this circuit when you made your
arguments, but I don't -- is there something -- is the *Cooney*
case -- that's the Ninth Circuit case, I think -- is that
still good law as far as -- I know this is not your issue, so
I'm actually asking the --

MR. ROBERT KELLY:  I am turning microphone around.

THE COURT:  Yes.

MS. NICOLA:  It is still good law, Your Honor.

THE COURT:  Okay.

And I haven't done a ton of research on this.  Is
there anything in this circuit that's different from...

MS. NICOLA:  I believe there's only one political
question decision in this circuit that could have some
relevance but doesn't materially change the arguments.

THE COURT:  Okay.  All right.

I mean, one of the issues is that, you know, at the
motion to dismiss stage a lot of times the Court will order

1    jurisdictional discovery.  I don't know that this case is a

2    fit for that.  Do you have a position on that?

3              MR. WALBURG:  I don't think it's necessary at this

4    time, Your Honor, jurisdictional discovery.

5              THE COURT:  All right.

6              And then the other question I have is just in terms

7    of the litigation, the FOIA litigation.  Is that still going

8    on?  Is there something pending in the First Circuit?

9              MR. WALBURG:  Yes, there's been numerous FOIA cases

10   that arose from this.

11             THE COURT:  I'm just wondering if they were still

12   live.

13             MR. WALBURG:  I believe there is one still live.

14             THE COURT:  And what is at issue there?

15             MR. WALBURG:  That's one of Dr. Stalcup's cases.  I

16   can't recall the issue.  I think it has to do with --

17   actually, I shouldn't speak out of turn.  I can't recall what

18   it is.

19             THE COURT:  Okay.  All right.

20             So I guess one of the questions that I have is, I

21   know that at least for Lockheed and Raytheon that one of the

22   things that -- one of the reasons why I say that this presents

23   nonjusticiable issues is because I would have to review

24   military decisions.  I just don't know why I would have to do

25   that.  This seems like a straight tort case.  And I think one

1  of the issues is that -- or one of the claims is that the
2  defendants didn't comply with already-existing regulations.
3        I don't know what wants to answer.  But whoever does
4  it, into the microphone.
5        MS. GRACE:  Your Honor, Kathryn Grace on behalf of
6  Lockheed.
7        Respectfully, I would say it's an incredibly complex
8  analysis and I think it necessarily stems with a discussion on
9  the relationships of the defendants which necessarily is going
10 to get into contracts relationships, military operations and
11 the like.
12       It has been briefed in Massachusetts, so we are
13 certainly well equipped.  We are prepared with our letter to
14 present to Your Honor.  I know that is something that you
15 require.
16       THE COURT:  Oh, I'm not sure it's so necessary here.
17 I mean, it seems like a waste of time since you've already
18 drafted it.
19       I mean, to me, I guess what I was wondering is -- I
20 think probably the answer is just to go ahead and brief it and
21 I guess you will explain to me in that.
22       I mean, there's no injunctive relief being sought
23 here.  That's why I don't see how this is a political
24 question.
25       MS. NICOLA:  Your Honor, one of the issues that we

have here is the grounds of the complaint is about the

decision to test in this New York airspace. And assuming

plaintiffs' allegations are true, as we do at this stage, what

we're looking at is the plaintiffs' allegations that the

government and these defendants tested in New York airspace on

this day. And if that happened, as plaintiffs' complaint

alleges, that decision is a government decision in terms of

protecting the citizens of this country from any hostile

threats, if that happened. That's a decision the government

makes. Only they know why they would make the decision to

test here. And so to go into discovery on those issues

necessarily probes the decision-making of the entire military

in testing, if they did so here.

THE COURT: Well, I thought that the issue was a

little more simple than that. Just by, again, accepting the

allegations in the complaint as true, that whatever the

reasons for the decision, the fact is that the allegation is

that the decision was made to fire missiles in perhaps one of

the busiest parts of the country and so I'm not sure you would

have to go into the reasons for it.

And this couple of subsidiary questions I have on

that is in part because this case, this happened so long ago,

and it sounds like there's been a lot of information that's

been obtained by the FOIA process. So I don't know how much

of that kind of undermines the argument that this is going to

1  require all kinds of exploration into the government reasons,

2  the reasons that they were doing this.

3          MS. NICOLA:  Well, I guess I would argue that

4  because one of the allegations is negligent training, or

5  negligent testing, rather, and the decision to test here.  The

6  very fact that it occurred and the reasons why it occurred are

7  fundamental to that negligent testing claim, so we need to

8  know why it would even happen here.  The plaintiffs argue it

9  was negligent to test here, period, so we would need to know

10  why the government made that decision.

11          THE COURT:  But it sounds like they -- I mean, well,

12  what if -- I don't know, I haven't seen anything with the FOIA

13  information, but what if the FOIA information says here's why

14  we're doing it?  Then we would have to worry about that.

15          MS. NICOLA:  None of that information is included in

16  the complaint.  None of that information has been raised or

17  shared with us at this point, so.

18          THE COURT:  But there are allegations in the

19  complaint about the reasons for the activity.

20          MS. NICOLA:  Yes.

21          THE COURT:  I don't know what's that based on.

22          MS. NICOLA:  Respectfully, they all talk about the

23  government's concern of hostile military threats to this

24  country and that being a reason.  So we would need to probe if

25  the testing did occur, what the threats were, why.  And if the

1　government decided this was necessary to protect us --

2　　　　THE COURT:  Slow down.

3　　　　MS. NICOLA:  Sorry.

4　　　　THE COURT:  That's okay.

5　　　　MS. NICOLA:  -- then that's what the government

6　decided and we can't change that decision.

7　　　　THE COURT:  What do you have to say about all of

8　this?

9　　　　MR. WALBURG:  Your Honor, I agree with you that this

10　is more of a negligence case.  And the fact that this happened

11　in 1996 I think moots many of the issues about protecting

12　military secrets.

13　　　　THE COURT:  I think that the California case was an

14　aegis case also.  It's also kind of an old case, but I think

15　it also dealt with the same system.  That case, the Court

16　decided for other reasons that the case couldn't proceed, but

17　it wasn't based on just to see testing ability.

18　　　　Sorry.  Go ahead.

19　　　　MR. WALBURG:  Yes, I agree, Your Honor.  I don't

20　think the political question doctrine was intended for this

21　type of a case.  There has been many other litigations

22　involving negligence by the military that are tort cases and

23　have gone forward.

24　　　　You know, this would be akin to, for example, you

25　know, soldiers at a shooting range, a shooting range was set

up near a school and a child at the school was shot.  That
would be a negligence case.

So I don't think we need to delve into the military
or government secrets that need to be protected here.  It's
more about the defendants were negligent in the way that they
test-fired the missiles.  And then there's, you know,
obviously allegations of concealment after that.  But the
actual event in question, it seems to be a simple negligence
case, as Your Honor mentioned earlier.

THE COURT:  Well, I don't think -- go ahead.

MS. GRACE:  Thank you, Your Honor.  If I may, on
behalf of Lockheed.

I would respectfully urge the Court to consider that
the notion that we could litigate this case without getting
into military decisions is naive.  I think it necessarily is
going to do that.

When you think about the allegations with respect to
concealment and also conspiracy, effectively, it is getting
into the relationship of the United States with these two
defendants, these two private defendants.  And when you look
at the allegations with respect to testing missiles, the
missile program, what the DOD proposed and so on, getting into
the later allegations about the United States working closely
with the defendants in conducting the missile testing, that's
all going to be squarely within the discovery that the

Andronikh M. Barna, Official Court Reporter, RPR, CRR

1  plaintiffs are going to be seeking and I think that

2  necessarily is going to probe what the political question

3  doctrine intends to cover in an umbrella fashion.

4      I think what Your Honor said at the start of this

5  inquiry is spot-on, which is, it requires briefing.  I think

6  it's something that we all need to more fully develop, taking

7  into account your points today and addressing specifically

8  your concern that is this really just a tort case.

9      But what I would respectfully urge all parties to

10 consider how it is necessarily going to be required that we

11 probe issues that are intended to be protected by the

12 political doctrine.

13     THE COURT:  Well, then my other question is, you

14 know, in a situation like this, do plaintiffs have no recourse

15 at all then?  Is that just an unfortunate consequence of -- I

16 mean, let's say the government -- you know, I take it that if

17 this weren't the government, that if there were -- this is

18 probably a bad comparison.  But if this were a, you know,

19 fireworks company testing fireworks in the harbor and it

20 distracted a pilot and the plane crashed, we wouldn't be

21 having this conversation, you know, you can bring a negligence

22 case.

23     But, I mean, the allegations here are that the

24 survivors, the plaintiffs in this case, that their loved ones

25 were on this plane, that the plane was downed by this missile

1   testing and then it was covered up in the 25 years that

2   followed.  And so my question is, do they have any recourse?

3            MS. GRACE:  Your Honor, I think that's a fair

4   question.

5            And the first answer to that is the government has

6   not raised this defense.  This case can certainly proceed

7   against the government without Raytheon and Lockheed.

8            My second answer to that question is more general,

9   which is, the law is the law.  To the extent that the

10  political doctrine is intended to cover these claims and

11  protect military decisions, then that is the law.  And I think

12  what we're here to do is to advocate for that.

13           The third point, which is tangential and I don't

14  know that this would have even reached you yet, there has been

15  litigation in this case and there has been recovery in this

16  case against other entities.  One aspect of discovery, to the

17  extent it gets that far, will certainly be to understand the

18  scope of any releases with respect to other entities of which

19  these defendants were not involved, whether they were general

20  releases.  Because we understand at least most of, if not all,

21  of the plaintiffs in this case have, in fact, recovered --

22           THE COURT:  I suppose though counter to that would

23  be did they recover under the theory that -- I mean, by the

24  way, I don't -- I'm, as I'm required to do, accepting the

25  allegations in the complaint as true.  But according to the

1  complaint, they were misled for all these years to believe

2  that it was some kind of an explosion or something in the --

3  are you appearing on this case?

4        MR. LEKAKIS:  Yes, Your Honor.

5        I'm Artemis Lekakis, United States Attorney's

6  Office.

7        THE COURT:  Oh.  Do you want to sit up here?

8        MR. LEKAKIS:  I can.

9        THE COURT:  It's up to you.  We started a little

10  early.  Sorry about that.

11        MR. LEKAKIS:  That's okay.

12        THE COURT:  I made myself lose my place.

13        MR. WALBURG:  Your Honor, you were discussing that

14  the theory was based on an explosion in the center fuel tank.

15        THE COURT:  Thank you.

16        So, I mean, does that change it at all, the theory

17  of what happened?  Perhaps there -- and I'm just speaking

18  hypothetically here, but maybe, you know, the damages are

19  different because there's -- you know, because of the, I guess

20  the claim of withholding of information.  It seems that's kind

21  of a different case.

22        MS. GRACE:  Thank you, Your Honor.  Two points in

23  response to that.

24        The first is, we have no idea because we weren't a

25  party to that agreement.

1          The second of which is, you used a word before we

2     broke there for a second which was "misled" and my answer to

3     that is:  Misled by whom?  The complaint is very clear that

4     the allegation is "misled by the government."  There is no

5     specificity or particularly with regard to concealment on

6     behalf of Raytheon and Lockheed.

7          But these are all very intriguing questions and help

8     us ensure that we are going to brief this adequately for

9     Your Honor.

10          THE COURT:  Sure.

11          And then the other question that I have, and maybe

12     it's not a very smart question, but isn't one of the claims a

13     manufacturing defect?  Is that one of the claims?

14          MR. WALBURG:  Yes, that's one of the claims,

15     Your Honor.

16          THE COURT:  Would that also require an exploration

17     into military matters?

18          MS. GRACE:  Yes, Your Honor.

19          THE COURT:  A manufacturing defect?

20          MS. GRACE:  Yes, Your Honor, because the contracts

21     with the government are what triggered the manufacture of the

22     product.  So it is going to necessarily require discovery into

23     discussions, contractual relationships with the government and

24     the like.  So I think it is not as simple as just saying

25     manufacturing defect, therefore let's step aside.  It is

1  necessarily going to require further analysis into government

2  relationships that are intended to be protected by the

3  political doctrine.

4          THE COURT:  All right.

5          And then the next possibly not smart question I have

6  is, if the government isn't asserting that this is going to

7  require, you know, all kinds of exploration into military

8  secrets, is that something that should be significant to me?

9          MS. GRACE:  Absolutely not, Your Honor.

10          The strategy that Mr. Kelly and his team employ

11  should certainly not negatively impact the ability of the

12  codefendants to raise this defense.

13          THE COURT:  All right.

14          It just seems to me that if it's the government's

15  secrets, they seem like they would be the ones who would be

16  the most eager to protect them, but I don't know what I don't

17  know.

18          All right.  So, I'm sorry, go ahead.

19          MS. NICOLA:  Your Honor, on the issue of releases,

20  we have never seen the releases from the MDL case.

21          THE COURT:  Right.

22          MS. NICOLA:  It is possible those releases may

23  release the claims here.

24          In an ordinary case like this, an injury case, a

25  release may be broadened up to include the claims that are

1    alleged against these defendants here.  So we're wondering if

2    maybe now would be a good time for us to be able to see those

3    releases if those are case dispositive.  If those releases

4    release this claim, we could do away with this case in its

5    entirety and stop utilizing the resources of the various

6    courts involved.

7             THE COURT:  Do you have anything you want to say

8    about that?

9             MR. WALBURG:  I don't have the releases.  I have

10   seen part of one, but these date back to 1998.  So I think we

11   would have to use some other method to compel those from

12   another party other than me.

13            MS. NICOLA:  I believe we would be able to issue

14   subpoenas probably to Boeing.

15            THE COURT:  Well, I mean, so fortunately for me and

16   for you, Judge Marutollo is the magistrate judge who will

17   supervise discovery, so if you want to put those things to

18   him.  Ordinarily, we wouldn't do that before the motion

19   practice, but maybe that is a preliminary thing to do first.

20            I suppose one of the issues in response would be

21   that in signing those releases, I know they were not privy to

22   information that might have changed their minds.  I mean, that

23   could create a whole other set of fascinating briefs.

24            MR. WALBURG:  Right.

25            THE COURT:  But, I mean, I think that might be --

1   like I say, it's always dangerous to speak off the top of your

2   head, but it's one issue that sort of comes to mind.

3            So I was going to give you a briefing schedule, but

4   does it make more sense to check into this question of

5   releases, or?

6            MR. ROBERT KELLY:  Your Honor, before we get to

7   that.  There is an issue that is specific to the United States

8   and the Court's inherent power to hear this case, and that is

9   the fact that the plaintiffs have raised this as a Federal

10  Tort Claims Act case.

11           THE COURT:  Right.

12           MR. ROBERT KELLY:  Exclusively.  That's it.

13           The Federal Tort Claims Act is not the appropriate

14  waiver of sovereign immunity given the facts of plaintiffs'

15  complaint.  We're in a position where we would have to move

16  under 12(b)(1) to dismiss plaintiffs' complaints.  And if

17  those complaints are dismissed, we're right back into a

18  statute of limitations argument as well, because this is

19  clearly an admiralty case.

20           THE COURT:  Didn't Judge Kelley disagree with you?

21           MR. ROBERT KELLY:  She didn't rule on that.  We

22  didn't raise that issue with her at the time.

23           There's plenty of precedent here in the

24  Second Circuit, including the plaintiffs' own previous

25  litigation positions regarding Death on the High Seas Act and

1  the applicability of *Moragne* and other cases where they have

2  already admitted that this is an admiralty case.

3           THE COURT:  Let me ask you.

4           If it is an admiralty case and the allegation is

5  that the details of what happened are not what they were

6  represented to be, would that affect the statute of

7  limitations analysis in an admiralty case?

8           MR. ROBERT KELLY:  Admiralty law, if it's an

9  admiralty case, substantive admiralty law would apply.  And

10 admiralty law is different than act law.  So Second Circuit

11 precedent on the FTCA, you know, may be different than it

12 would be in admiralty.  And especially when it comes down to

13 the equitable issues, admiralty has always been an issue of

14 equity.  Those equitable considerations with equitable

15 estoppel and tolling are categorically different in admiralty.

16 But beyond that, venue is different in admiralty than it would

17 be under the Federal Tort Claims Act.

18          THE COURT:  Venue in the Eastern District would not

19 be appropriate when this happened in the Eastern District?

20          MR. ROBERT KELLY:  This happened off the coast of

21 the Eastern District.  It did not happen within the

22 Eastern District.

23          THE COURT:  So where does it belong then?

24          MR. ROBERT KELLY:  If this is an admiralty case, we

25 need to know the name of the warship that fired the purported

1  missile.  Under the Public Vessels Act, the venue provisions

2  are where that warship was --

3          THE COURT:  New Jersey?

4          MR. ROBERT KELLY:  Well, where the warship was the

5  date that the claim was filed.

6          So in 2022, when plaintiffs filed this claim, where

7  was this purported ship?  We've asked plaintiffs for the name

8  of the ship and plaintiffs have never provided it.

9          We have watched plaintiffs' expert's documentary.

10 And plaintiffs' expert's documentary talks about three

11 different ships firing three different missiles.  So we're

12 dealing with a lot of unknowns and, frankly, only known to

13 plaintiffs and their expert.

14         THE COURT:  Well, I mean, I'll just push back on

15 that a little bit.

16         If they were right -- I don't know if they're right

17 or not, but if they're right, it seems like the government

18 would know where the ships were, assuming it happened this

19 way.  It's kind of a Catch-22.

20         MR. ROBERT KELLY:  And that's the entire problem of

21 the statute of limitations in this case as well, is that this

22 case is so old, this case comes from facts that were so

23 well-known, including the missile hypothesis that it should

24 have been brought in 1996, 1997, and 1998, notwithstanding --

25         THE COURT:  I have to tell you that I find

1   Judge Kelley's reasoning on that a little more persuasive.

2          I mean, just whether it's admiralty law or whether

3   it's not, the claim is -- and it may not be correct -- that

4   the true cause of this tragedy was covered up and that people

5   were told, you know, who said they saw -- you know, I remember

6   when -- I do remember when this happened.  It was a -- because

7   I'm old.  But there was discussion at the time.  But according

8   to the plaintiff, you know, that was dismissed as a crackpot

9   conspiracy theory.  Maybe it is a crackpot conspiracy theory,

10  I don't know.  But if it isn't, it seems odd and not equitable

11  to hold the plaintiff responsible for not knowing what was

12  happening when they're just, you know, people whose loved ones

13  got killed in a plane crash.

14         So, I don't know, I mean, you may be right, but it's

15  something that I guess you're going to brief.

16         MR. ROBERT KELLY:  And, Your Honor, I hope you will

17  understand that we do intend on doing that.  Because it's our

18  belief that while we now consider this to be a conspiracy

19  theory, in 1996, 1997, and 1998, before the NTSB report was

20  released, this was not a conspiracy theory with all these

21  pejoratives.  This was a very real theory of the

22  Federal Bureau of Investigations, the Central Intelligence

23  Agency, the NTSB, the FAA.

24         Sorry.

25         THE COURT:  It's hard on the court reporter is all.

1      MR. ROBERT KELLY:  All of those agencies took it

2 very serious and expended incredible amounts of resources in

3 trying to figure out and, in fact, debunking.  You know, it's

4 a theory and a thesis that's been out there forever.  Just

5 because somebody now disagrees with something 26 years later

6 doesn't automatically make everything that's happened since

7 then a coverup.

8      THE COURT:  Well, I specifically said I didn't -- I

9 wasn't -- I'm just going by what the complaint says, which I

10 believe is one of the rules.  So, I mean, operating under that

11 theory, you know, assuming if the case were to proceed, that

12 will be a factual question.  But I'm just trying to figure out

13 where we go from here.

14      I had a briefing schedule that begins in January.  I

15 really believe in efficiency, and so I'm just trying to think

16 of what the best way forward is.  I think it might not be a

17 bad idea to just go ahead with the briefing schedule since it

18 sounds like -- well, since I know you all have already briefed

19 part of it and you've briefed the statute of limitations

20 question.  So I think I will set that schedule.

21      Although, do you think we should move it out a

22 little bit, like another month or something?

23      THE LAW CLERK:  For each one.

24      THE COURT:  Yes, for each one.  Okay.

25      So I think what I'm going to do is, if the motions

1  to dismiss -- this is going to be a little bit thorny because

2  there are going to be different motions.  I am just trying to

3  think.  I'm sure I can predict that I am going to get a

4  request for additional pages, but --

5          MS. NICOLA:  Your Honor, may I actually raise an

6  issue that might help here?

7          THE COURT:  Sure.

8          MS. NICOLA:  So that maybe we can streamline the

9  briefing.

10         When we were before Judge Kelley, at least as to

11  Raytheon and Lockheed, plaintiffs conceded that he does not

12  have a fraudulent concealment theory against Raytheon and

13  Lockheed.

14         THE COURT:  Right.

15         MS. NICOLA:  And if we can confirm that that's

16  eliminated and we don't still have to brief that issue and we

17  are solely dealing with the discovery rule application, that

18  tightens up the briefing a little bit as far as we're

19  concerned.

20         THE COURT:  Do you want to tell them later?

21         MR. WALBURG:  Yes, I think so.

22         THE COURT:  Okay.

23         MR. WALBURG:  I just got out of a long trial and I

24  need to review Judge Kelley's order again.

25         THE COURT:  Okay.

1       MR. WALBURG:  But I think she addressed all these

2  issues very well.

3       THE COURT:  Okay.

4       MR. ROBERT KELLY:  And, Your Honor, if I may.

5       It would potentially make quite a bit of sense if we

6  could nail down the admiralty law application as well.  We've

7  been in discussions with plaintiffs' counsel about the

8  appropriate waiver of sovereign immunity and we've just been

9  awaiting a response.  Because right now we would have to brief

10  it twice, basically.

11       THE COURT:  Here's what we're going to do.  I'm

12  going to not set a briefing schedule today.  You are going to

13  meet and confer, see what you can resolve.  You are going to

14  come back -- I'm going to hope you enjoy your holidays -- in

15  January and tell me where we are in terms of what the issues

16  are.

17       And once I get -- you could also propose a briefing

18  schedule if you want.  We don't bundle.  I don't know this --

19  at least I don't.  Some judges do.  So if you want to propose

20  a briefing schedule, you can do that.

21       But why don't we do that, I don't know, like the

22  third week of January.  Is that enough time?

23       How is that for you, Counsel?

24       MR. WALBURG:  Third week of January, that should

25  work.

1      THE COURT:  Or I can just -- or to make it cleaner,

2  we can just do it February 1st.

3      MR. WALBURG:  That would be better for the

4  plaintiffs, Your Honor.

5      THE COURT:  That's not a weekend, is it?

6      THE COURTROOM DEPUTY:  It is not.  It's a Thursday.

7      THE COURT:  Okay.  So February 1st for an update,

8  just a joint status.  And then we'll proceed from there.

9  Okay?

10      MR. WALBURG:  Thank you, Your Honor.

11      MS. NICOLA:  Your Honor, on the issue of the

12  releases, should we contact Judge Marutollo's chambers?

13      THE COURT:  Well, yes, you could.

14      Maybe you can talk amongst yourselves.  You might be

15  able to work it out.

16      MS. NICOLA:  Well, in this case, he said he doesn't

17  have them, so I figure we have to issue subpoenas or use some

18  other method of discovery.

19      THE COURT:  Yes.  You can talk to Judge...

20      MS. GRACE:  Your Honor, respectfully, I would expect

21  the plaintiffs would have them.  At least it would be within

22  their possession, custody, or control.  They could go back to

23  their counsel --

24      THE COURT:  Why don't you talk amongst yourselves.

25      MS. GRACE:  Yes.

1          THE COURT:  I don't think you need me for that part.

2          MS. GRACE:  Yes, Your Honor.

3          THE COURT:  Okay?

4          All right, everybody.  Thanks so much.  Have a nice

5   holiday.

6          MR. WALBURG:  Thanks, Your Honor.  Appreciate your

7   time.  Happy holidays.

8          (Matter concluded.)

9

10                    *     *     *     *     *

11

12  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

13

14     /s/ Andronikh M. Barna              February 9, 2024

15     _____    _____
       ANDRONIKH M. BARNA                   DATE

16

17

18

19

20

21

22

23

24

25