**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------X
RONALD KRICK, et. al.,

                                     Civil Action No.
             Plaintiffs,        1:23-cv-08093-AMD-JAM

      v.                            (Donnelly, D.J.)
                                     (Marutollo, M.J.)

RAYTHEON COMPANY, et. al.,

            Defendants.
---------------------------------------------------------------------X

---

**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

---

Stephani L. Ayers
T.M. GUYER AND AYERS & FRIENDS, PC
116 Mistletoe Street
Medford, OR. 97501

stephani@guyerayers.com
(813) 382-7865

Counsel for Plaintiffs
Pro Hac Vice

# TABLE OF CONTENTS

I.    INTRODUCTION    6

II.    PROCEDURAL HISTORY    7

III.    FACTUAL BACKGROUND    8

    A.    The Crash    9

    B.    The Coverup    9

    C.    The MDL Aviation Litigation Against Boeing and TWA    11

    D.    FOIA Litigation Relating to TWA 800    11

IV.    LEGAL STANDARD    15

    A.    Rule 12(b)(1) and 12(b)(6) Standards    15

    B.    Objection to Defendants' Exhibits    16

V.    THE 2ND AMENDED COMPLAINT REBUTTS DEFENDANTS' ASSERTIONS    16

    A.    Massachusetts Court Findings Establish Persuasive Authority for Factual Disputes    16

    B.    Statute of Limitations: Government's Continuing Concealment Through 2019    17

        1.    Fraudulent Concealment and the Discovery Rule    17

        2.    Affirmative Denials and/or Concealment:    18

        3.    FBI Radar Data:    18

        4.    Drone Activity Concealment:    19

        5.    Judge Kelley Acknowledged Government's Delegitimizing Efforts:    19

        6.    Judge Kelley On The Role of the Contractors    20

VI.    RULE 12(B)(6) ANALYSIS: FACTUAL DISPUTE OVER DISCOVERY TIMELINE    20

VII.    PLAINTIFFS' ESTATE STATUS CONTRADICTS DEFENDANTS' ASSERTIONS    21

    A.    There Are Factual Disputes as to the Status of the Estates    21

    B.    The Federal Rules Allow for Reasonable Time After Objection for Estate Defects To Be Cured    22

VIII.    RELEASE: NEWLY DISCOVERED EVIDENCE DEMONSTRATES FRAUD    24

    A.    Defendants' Core Assertion and Plaintiff's Factual Rebuttal: Fraudulent Concealment of Material Evidence    25

    B.    Fraud Vitiation Standard    26

IX.    ADMIRALTY JURISDICTION: FACTUAL DISPUTES REQUIRE DISCOVERY    27

    A.    Defendants' Core Assertion and Plaintiffs' Factual Rebuttal: Land-Based Negligence and Jurisdiction    27

B. Massachusetts Court's Findings and Burden Shifting on Limitations 28

C. Dual Jurisdiction Theory: Maritime and Non-Maritime Claims 29

X. POLITICAL QUESTION DOCTRINE 30

A. Command-Level vs. Political-Level Distinction 30

B. Standard Negligence Principles Apply 31

XI. THE MASSACHUSETTS DECISION IS PERSUASIVE AUTHORITY 33

XII. 2ND AMENDED COMPLAINT STATES VALID CLAIMS FOR RELIEF 34

A. Plaintiffs' Claims Are Not Time-Barred 35

1. The Discovery Rule Tolls the Statute of Limitations 36

2. The Fraudulent Concealment Doctrine Also Tolls the Statute of Limitations 37

B. Plaintiffs Have Standing To Pursue Their Claims 38

C. Plaintiffs' Claims Are Not Defeated By Fraudulent Settlements 38

XIII. THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS 39

A. Admiralty Jurisdiction Would Not Bar Plaintiffs' FTCA Claims 39

B. All Individual Plaintiffs Have Standing 40

XIV. THE POLITICAL QUESTION DOCTRINE DOES NOT APPLY 40

A. Plaintiffs' claims do not implicate the first Baker factor 41

B. Plaintiffs' claims do not implicate the second Baker factor 43

C. The Contractor Defendants' reliance on Aktepe and Carmichael is misplaced. 44

D. *The three remaining Baker factors are inapplicable* 45

E. *The Contractor Defendants' potential defenses are not dispositive* 45

F. *It would be premature to dismiss Plaintiffs' case without discovery* 46

XV. PLAINTIFF CHRISTOPHER KRICK HAS STANDING UNDER FTCA 46

XVI. CONCLUSION 48

CERTIFICATE OF SERVICE 50

## TABLE OF AUTHORITIES

### CASES

*A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 140 (2d Cir. 2011) ............................................ 36

*Adams v. United States*, 615 F.2d 284 (5th Cir. 1980), clarified, 622 F.2d 197 (5th Cir. 1980)............ 46

*Aktepe v. U.S.*, 105 F.3d 1400 (11th Cir. 1997),.................................................................................. 44

*Amedi v. BAE Systems, Inc.,* 782 F. Supp. 2d 1350 (N.D. Ga. 2011)..................................................... 45

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)........................................................................................ 15

*Baker v. Carr*, 369 U.S. 186, 217 (1962). ........................................................................................... 30

*Barrett v. United States*, 689 F.2d 324, 330 (2d Cir. 1982)................................................................... 36

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007)......................................................................... 15

*Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271 (11th Cir. 2009)............................ 44

*Carrick v. Central Gen. Hosp.*, 51 N.Y.2d 242, 249-50 (1980) ............................................................ 23

*Centro Empresarial v. América Móvil*, 17 N.Y.3d 269, 276 (2011), ...................................................... 39

Collins v. United States, 996 F.3d 102, 111 (2d Cir. 2021). .................................................................. 46

*Eisner v. United States*, No. 21-CV-06834 (OEM) (ARL), 2025 U.S. Dist. LEXIS 34884, at *25-26

    (E.D.N.Y. Feb. 26, 2025)................................................................................................................. 23

*Emery v. United States*, 920 F. Supp. 788, 791 (W.D. Mich. 1996) ...................................................... 47

*Estate of Sullivan v. United States*, 777 F. Supp. 695, 701 (N.D. Ind. 1991)........................................ 47

*Gabelli v. SEC*, 568 U.S. 442, 449 (2013)............................................................................................ 17

Global Minerals and Metals Corp. v. Holme, 824 N.Y.S.2d 210, 214-15 (N.Y. App. Div. 2006)... 25,39

*Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002)............................................................... 36

*Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 324 (2d Cir. 2011) ................................................... 35

*In re Air Crash Off Long Island, N.Y.*, on July 17, 1996, 209 F.3d 200, 212 (2d Cir. 2000)................. 39

*In re Air Crash Off Long Island, New York*, 209 F.3d 200, 201 (2d Cir. 2000)..................................... 11

*Indian Towing Co. v. United States*, 350 U.S. 61, 68-69 (1955) ............................................................ 40

*Joachim v. United States*, No. 22-cv-5719, 2023 WL 6292542, n.2 (E.D.N.Y. Sept. 27, 2023) ........... 23

*Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995). ................................................................ 45

*Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992), ................................................................ 45

Krick v. Raytheon Co., 695 F. Supp. 3d 202, 219 (D. Mass. 2023) ........................................................ 17

*Kronisch v. United States*, 150 F.3d 112, 121 and 126 (2d Cir. 1998) ...................................................... 37

*Levinson v. Deupree*, 345 U.S. 648 (1953) .................................................................................. 22

*McMahon v. Presidential Airways, Inc.*, 460 F. Supp. 2d 1315 (M.D. Fla. 2006) ............................... 44

*McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1364 (11th Cir. 2007) .................................. 42

*Peterson v. U.S.*, 673 F.2d 237, 240–42 (8th Cir. 1982), ................................................................ 42

*Porat v. Lincoln Towers Cmty. Ass'n,* 464 F.3d 274, 276 (2d Cir. 2006) ............................................. 48

*Sephton v. F.B.I.*, 365 F. Supp. 2d 91, 92 (D. Mass. 2005) ................................................................ 11

*Stalcup v. CIA*, 768 F.3d 65 (1st Cir. 2014) ............................................................................. 12

*Stalcup v. Dep't of Defense*, No. 13-11967-LTS, 2015 WL 5545059, at *1 (D. Mass. 2015) .............. 12

*The Paquete Habana,* 175 U.S. 677 (1900) ................................................................................. 45

*United Air Lines, Inc. v. Wiener*, 335 F.2d 379, 393–95 (9th Cir. 1964) applying 14 C.F.R. § 617.4) . 43

*United States v. Kubrick*, 444 U.S. 111 (1979), ........................................................................... 36

*United States v. Rockland Tr. Co.*, 860 F. Supp. 895, 904 (D. Mass. 1994) ......................................... 20

*Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) ............................................................ 25

*Ward v. U.S.*, 471 F.2d 667, 669 (3d Cir. 1973) ........................................................................... 42

**STATUTES**

28 U.S.C. § 1346 ............................................................................................................ 40

28 U.S.C. § 1631 ................................................................................................... 27, 28, 39

28 U.S.C. § 2675 ....................................................................................................... 46, 47

## I.  INTRODUCTION

This litigation arises from one of the deadliest aviation incidents in United States history and what plaintiffs allege was one of the nation's biggest cover-ups.[1] On July 17, 1996, Trans World Airlines Flight 800 ("TWA 800") exploded shortly after takeoff, killing all 230 passengers and crew members aboard.[2] For decades, the government maintained that the explosion resulted from an electrical fire in the aircraft's center fuel tank.[3]  However, compelling evidence has now emerged indicating that TWA 800 was actually struck by a United States missile during weapons testing conducted by the Defendants.[4]This case comes before the Court with a significant procedural history that should guide its consideration of the pending motions to dismiss. District Judge Angel Kelley, District of Massachusetts, issued a comprehensive Memorandum and Order denying all three Defendants' Motions to Dismiss on the statute of limitations argument. The case was transferred to this Court solely for venue reasons, not due to any substantive deficiencies in the pleadings. As Judge Kelley found, Plaintiffs' allegations are sufficient to survive Rule 12(b)(6) scrutiny and the statute of limitations has been properly tolled.

Defendants Raytheon Company ("Raytheon"), Lockheed Martin Corporation ("Lockheed"), and the United States (collectively, "Defendants") have renewed their Motions to Dismiss, including by recycling the same arguments that Judge Angel Kelley already rejected. These arguments fail for the same reasons they failed in Massachusetts. First, the Second Amended Complaint ("SAC") contains detailed, specific factual allegations that, taken as true, state plausible claims for relief. Second, while the crash occurred in 1996, the statute of limitations was tolled by both the discovery rule and fraudulent concealment doctrine, as plaintiffs could not have reasonably discovered the true

---

1  Second Amended Complaint (SAC) ¶ 1 [ECF Doc. #33]
2  SAC, ¶ 2.
3  SAC, ¶ 3
4  *Id.* at ¶¶ 4-5, page 2.

cause of the crash until Dr. Thomas Stalcup shared his findings with them in April 2021. Third, Plaintiffs have standing to bring these claims, and any issues regarding estate documentation can be resolved through reasonable deadlines rather than dismissal. Fourth, Defendants' affirmative defenses—including admiralty jurisdiction, political question doctrine, and prior settlements—do not bar Plaintiffs' claims.

The factual disputes identified below preclude Rule 12(b)(6) and 12(b)(1) dismissal because they present "plausible claim[s] for relief" under this Court's jurisdiction.[5] As demonstrated below, Defendants' characterizations of key facts are directly contradicted by the allegations in the Second Amended Complaint, allegations which must be accepted as true at this stage. These are not mere legal disagreements but genuine factual disputes that, when viewed in the light most favorable to Plaintiffs, establish viable claims that must proceed to discovery.

For these reasons, and as more fully set forth below, Defendants' Motions to Dismiss should be denied in their entirety.

## II. PROCEDURAL HISTORY

Plaintiffs filed their initial complaint on June 28, 2022, in the United States District Court for the District of Massachusetts. After amendments, Plaintiffs filed their Second Amended Complaint (SAC) on November 17, 2022. All three Defendants moved to dismiss the SAC, making the same argument they raise now as to statute of limitations. On September 29, 2023, Judge Angel Kelley issued a comprehensive Memorandum and Order denying all three motions to dismiss.[6] Judge Kelley found that venue was improper in Massachusetts under the Federal Tort Claims Act's venue provisions, but denied the motions to dismiss and instead transferred the case to this Court as the proper venue.[7]

---

5 *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).
6 Memorandum and Order on Motions to Dismiss, *Krick v. Raytheon Co.*, No. 1:22-cv-11032-AK, 2023 WL 6328494 (D. Mass. Sept. 29, 2023) [ECF #95]
7 *Id.*, at pp 21-24.

Critically, Judge Kelley's decision explained that the transfer was solely for venue reasons and not due to any deficiencies in the pleadings.[8]  After transfer to this Court, Defendants have renewed their Motions to Dismiss, repeating the same statute of limitations arguments already rejected by Judge Kelley.

Following transfer to this District, Judge Donnelly expressed approval of the Massachusetts Court's analysis. Judge Donnelly specifically endorsed Judge Kelley's decision as a "pretty good decision," indicating judicial recognition of its thorough legal analysis and factual findings.[9] This endorsement carries particular weight given that this Court now faces identical legal and factual issues that Judge Kelley comprehensively addressed and resolved in Plaintiffs' favor. Defendants' renewed motions ignore this judicial guidance and instead attempt to re-litigate the factual determinations already made through extensive analysis of the same legal theories that were thoroughly considered in Massachusetts.

## III.   FACTUAL BACKGROUND

The following facts cited from the Second Amended Complaint must be accepted as true for Rule 12(b) purposes. Significantly, these factual allegations are systematically contradicted by Defendants' characterizations in their Motions, creating genuine disputes of material fact that preclude dismissal. Where Defendants claim "public knowledge" of missile involvement, Plaintiffs allege systematic concealment (supported by the District of Massachusetts findings). Where Defendants claim "closed estates," current documentation shows open estate status. Where Defendants claim "knowing settlement," Plaintiffs allege, lack of knowledge and fraudulent inducement through concealed evidence. These factual conflicts require resolution through discovery, not dismissal.

---

8  *Id.*
9  Ayers Dec., Exhibit A, December 13, 2023 Transcripts of Status Conference Hearing, p.5, ¶ 19.

## A.  The Crash

On July 17, 1996, a Boeing 747 headed for Paris departed from New York's John F. Kennedy International Airport at around 8:20 p.m.  On that evening, many eyewitnesses described seeing a streak of light arcing from the surface of the ocean toward TWA 800 and then seeing an explosion and an object break apart and fall into the ocean. Twelve minutes after the plane took off, it broke apart and caught fire 13,800 feet over the Atlantic Ocean, precisely where the surface-originating streak observed by the eyewitnesses exploded.[10].

The killed passengers were beloved family members and included: Flight Engineer trainee Oliver Krick (son of Plaintiffs Margareta Krick and Ronald Krick and brother of Christopher Krick), O. Lamar Allen and his 15 year-old son Ashton Allen (the father and brother of Plaintiff Christine Grogan and the uncle and nephew of Plaintiff Wanda Kemp), Capt. Ralph Kevorkian (father of Plaintiff Douglas Kevorkian), Capt. Donald Gough (the brother of Plaintiff Eileen Zahariousdakis and uncle of Plaintiff Michael DeTeresa), and Charles Henry "Hank" Gray (father of Plaintiffs Charles and Chadwick Gray).[11]

## B.  The Coverup

In the wake of the TWA 800 tragedy, the federal government purported to investigate its cause. However, instead of allowing the National Transportation Safety Board ("NTSB"), the agency tasked with investigating all domestic aviation incidents, to lead the investigation of the TWA 800 incident, the Federal Bureau of Investigation ("FBI") took charge. The FBI also enlisted the assistance of the Central Intelligence Agency ("CIA"). Id. at ¶ 39.

Indeed, the FBI essentially froze the NTSB out of the investigation. The FBI removed nearly all copies of Navy radar tapes from the Navy, placing them out of the NTSB's reach, and

---

10  SAC at ¶¶ 34-37
11  SAC ¶¶ 15-18, 24-27 [ECF #33, pp. 4-5].

refused to allow the NTSB to conduct eyewitness interviews that indicated the true cause of the TWA 800 crash. Eyewitnesses interviewed by the FBI recall being threatened. For example, one eyewitness recalls being told to keep quiet about the "rocket" she saw in the sky or risk her citizenship application being denied. Id. at ¶¶ 40-41.

The CIA assisted in the coverup by concocting materials to discredit eyewitnesses who could confirm that TWA 800 had been downed by some kind of projectile. These materials included a video and animation that was displayed during a nationally televised FBI press conference that purported to show that a missile did not cause the crash and contained a scene with large, capitalized, and underlined words, "NOT A MISSILE." To ensure that audiences did not miss the point, a narrator read those words aloud. Id. ¶ 47-48.

Nearly three years after the FBI's press conference, the NTSB released a detailed report stating that the likely cause of the crash was an explosion of flammable vapors in the plane's center fuel tank. This became the publicly accepted view of what happened, and Plaintiffs relied upon this misinformation. Id. ¶ 50. See also ECF No. 45-1 (full copy of NTSB Report).

The NTSB report repeatedly rejected the theory that a missile was responsible for the crash of TWA 800. See, e.g., ECF 45-1 at 259 ("the Safety Board concluded that the inflight breakup of TWA flight 800 was not initiated by a bomb or a missile strike."); id. at 262 (dismissing eyewitness accounts "report[ing] seeing a streak of light before the appearance of a fireball" and stating that "because the physical evidence indicates that a missile did not strike the airplane, the witnesses must have been observing something other than a missile.") (footnotes omitted); id. at 264 (stating that helicopter pilot who reported seeing a missile "must have been observing the late stages of an airplane breakup and not a missile attack.") (footnotes omitted).

The NTSB also formed a new NTSB "Office of Families," headed by a public relations expert, that successfully deceived the victims' families about the true cause of the crash. Through a series of misleading official communications, the Office of Families promoted a fuel tank scenario as

10

the only possible explanation for the crash, and told the victims' families that the idea that TWA 800 was brought down by a missile was an implausible "conspiracy theory" without any basis in fact. SAC ¶ 52. This same misinformation was provided to the press, which widely reported it to the public. SAC ¶ 53.

In short, for nearly 30 years, Plaintiffs and the public were led to believe— by their own government and the Defendants—that the victims of the TWA 800 crash were killed by a one-of-a-kind exploding fuel tank.

## C.  **The MDL Aviation Litigation Against Boeing and TWA**

In keeping with the U.S. Government's official position that the TWA 800 crash was caused by a defect in the aircraft's fuel system, multiple relatives and estate representatives of TWA crash victims filed suit against TWA, Boeing (the plane's manufacturer), and Hydro-Aire, Inc. (the manufacturer of the aircraft's fuel pumps). These cases alleged negligence, product liability, and warranty claims against Boeing, and negligence and warranty claims against TWA. *See* 96 Civ. 7986 (RWS), 97 Civ. 4254, 1998 WL 34778577 (July 13, 1998). In February 1997, the Judicial Panel on Multidistrict Litigation ("MDL") transferred these cases to the Southern District of New York for consolidated pretrial proceedings. *See In re Air Crash Off Long Island, New York*, 209 F.3d 200, 201 (2d Cir. 2000). The MDL cases were settled and dismissed with prejudice as to the named defendants. *See In Re Air Crash off Long Island*, No. 96 Civ. 7986, MDL No. 1161 (S.D.N.Y. Oct. 24, 1996).

## D.  **FOIA Litigation Relating to TWA 800**

In the wake of the crash, some family members and victims' groups attempted to conduct their own investigations into the cause of the crash. In 1998, a group supported by family members of victims submitted requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking release of documents from the FBI concerning its investigation. *See Sephton v. F.B.I.*, 365 F. Supp. 2d 91, 92 (D. Mass. 2005). As the District Court explained, "the process did not go smoothly" because of "rigidity and negligence" of the FBI. *Id.* at 92. After more than seven years of litigation,

11

which included "three trips to the Court of Appeals and the death of the judge who originally presided," the Court reluctantly granted the government's motion for summary judgment, noting that "[t]he FBI's halting response to the plaintiffs' requests has exacerbated an already excruciating situation and undoubtedly deepened the mistrust felt by the grieving families who have supported this FOIA initiative." Id.; see also id. (noting that "[t]he families deserved better from their government.").

Several years later, after several unsuccessful attempts to obtain records via FOIA from other U.S. government agencies, see *Stalcup v. CIA*, 768 F.3d 65 (1st Cir. 2014), Dr. Stalcup submitted FOIA requests to three entities within the Department of Defense ("DoD") seeking information relating to any missile tests conducted off the East Coast of the U.S. between May 1996 and October 1996. *See Stalcup v. Dep't of Defense*, No. 13-11967-LTS, 2015 WL 5545059, at *1 (D. Mass. 2015). After extensive proceedings in the district court, one trip to the First Circuit (where Dr. Stalcup prevailed), *see Stalcup v. C.I.A.*, 768 F.3d 65 (1st Cir. 2014), and yet more extensive proceedings in the district court, *see Stalcup v. Dep't of Defense*, No. 13-CV-11967-LTS, 2018 WL 4963169 (D. Mass. Oct. 15, 2018), Dr. Stalcup was finally granted something that almost never occurs in FOIA litigation: permission to take discovery of high-level agency officials, including former Secretary of Defense William Perry. *See Stalcup v Department of Defense*, Case 1:13-cv-11967-LTS, ECF No. 231-1 at ¶ 13 (Supplemental Declaration of Thomas Stalcup describing discovery taken in case)); see also *Taylor v. Babbitt*, 673 F. Supp. 2d 20, 23 (D.D.C. 2009) (stating that "it is the exceptional case in which a court permits discovery in a FOIA action").[12]

---

12  Dr. Stalcup also deposed former Director of the Office of Test and Evaluation at the Office of the Secretary of Defense Philip E. Coyle, id. at ¶ 14; Chief Technology Officer at Johns Hopkins Applied Physics Laboratory Dr. Jerry Krill, who co-invented the U.S. Navy's Cooperative Engagement Capability (or "CEC"), a missile defense system tested off the East Coast of the United States in 1996 in conjunction with the land-based test site the Aegis Combat Systems Center ("ACSC"), id.at ¶ 15; former CEC Program Manager Michael O'Driscoll, id. at ¶ 16; former ACSC Executive Director Steven Habeger, id. at ¶ 17; former Program Manager for the U.S. Navy's Aegis Weapons System (which was being tested with and integrated into the CEC) Rear Admiral George Hutching, id.at ¶ 18; Lockheed Martin's Vice President of Naval Combat and Missile Defense Systems James Sheridan, id. at ¶ 19; former Executive Director of the U.S. Navy's Operational Test and Evaluation

Ultimately, over 10 years after sending his FOIA requests to the DoD, Dr. Stalcup's efforts uncovered several records never released to the TWA 800 families or the public. One described an "original [Navy radar] tape" showing an object "heading straight for TWA 800." SAC at ¶ 84. Another indicates an object on radar prior to "impact" and "spiral[ling] away" after impact, while also stating that witnesses described seeing a "flair (sic) going up. . . . , orbit/circle another object. Subsequently debris fell from the sky." Id. These records were never made part of the NTSB investigation, and no eyewitnesses were permitted to testify at any NTSB hearing. Id. at ¶ 85. As such, the Plaintiffs were never informed of this information.

In addition, on around October 2, 2019, Dr. Stalcup privately consulted with a former high-level FBI official who informed him that aerial target drones were flying in TWA 800's vicinity when TWA 800 went down—the very drones documented to have been used in East Coast missile tests of the Navy's Aegis System that very summer of 1996. Those target drones ultimately parachuted to the ocean below, unscathed and abandoned. Id. at ¶ 87. The FBI later ordered the Navy to retrieve these targets, which is contrary to the usual chain of command. Id. at ¶ 88.

In addition to the documentary evidence uncovered in the FOIA Litigation, Dr. Stalcup also deposed several government witnesses regarding the TWA 800 disaster. Id. at ¶ 88; see also n.4, supra. One of these witnesses, Steven Habeger, the Executive Director of an East Coast Navy land-based test site, testified that within minutes of the TWA 800 disaster, he was ordered to allow the FBI to remove all Navy radar tapes from his facility that might have recorded the TWA 800 incident. Id. at ¶ 89. This event was supported by Mr. Habeger's commanding officer Rear Admiral George Huchting and by FBI custody records obtained during the FOIA litigation. Id. at ¶ 90. Admiral Huchting testified that the only time in history that he is aware of, when Navy radar tapes were so handled was eight years

---

Force Steven Whitehead, id. at ¶ 21; and former Captain of the U.S. guided missile cruiser the U.S.S. Normandy Frank DeMasi, id. at ¶ 22.

13

prior to the TWA 800 crash, when the USS Vincennes accidentally shot down an Iranian commercial airliner over the Persian Gulf.

Dr. Stalcup also discovered that five days after the TWA 800 disaster, the Joint Terrorism Task Force directed the FBI to obtain another "original [Navy] radar tape" showing an object "heading straight for TWA 800" and to "prepare FD-302 reprocurement of this original tape." Id. at ¶ 91.

These radar tapes were confiscated by the FBI immediately after the crash of TWA 800. According to records obtained in the FOIA Litigation, they indicate an object "impact[ed]" TWA 800, which directly contradicts the FBI's, CIAs, and NTSB's public conclusions that what caused the incident was "NOT A MISSILE." Id. at ¶ 92. See also NTSB Final Report on TWA 800, ECF 45-1 at 89 ("The Safety Board's examination of all of the available radar data revealed no sequence of primary or secondary radar returns that intersected TWA flight 800's position at any time, nor did it reveal any radar returns consistent with a missile or other projectile traveling toward the accident airplane.")

Plaintiffs only learned of the evidence Dr. Stalcup compiled on April 15, 2021, when they attended a Zoom meeting he hosted. At that meeting, Dr. Stalcup informed Plaintiffs for the first time of the key facts he learned in his FOIA litigation. Id. ¶ 97. This evidence reveals that TWA 800 was brought down by a missile and the government hid this truth from Plaintiffs and the public at large for nearly 30 years.[13]

Less than six months later after Dr. Stalcup's April 15, 2021 presentation, on October 4, 2021, Plaintiffs filed administrative claims as required by the Federal Tort Claims Act. These claims were denied on December 28, 2021, and Plaintiffs filed their original complaint on June 28, 2022.[14]

---

13 Plaintiffs anticipate that additional evidence of a missile explosion will be uncovered through this litigation. Plaintiffs' experts, including specialists in explosives and metallurgy, inspected the remaining wreckage of TWA 800 on January 26, 2023. Declaration of John Roddy ("Roddy Decl.", ECF 75-1) at ¶ 8. The experts identified portions of the wreckage, including fractured metallic components and apparent chemical residues, which with laboratory testing may confirm that a missile caused the explosion. Id. at ¶ 8. Plaintiffs informally requested to collect samples and conduct that testing via emails sent to the NTSB and DOJ's counsel. Id. at ¶ 8.
14 ECF 1.

These pleaded facts establish a comprehensive pattern of concealment and misrepresentation that directly contradicts Defendants' characterizations they argue  support dismissal. The Massachusetts District Court found these allegations sufficient to state plausible claims and specifically noted that factual determinations regarding concealment and discovery cannot be resolved on motions to dismiss. The extensive factual disputes revealed in Defendants' motions confirm this conclusion and mandate development of the record through discovery.

## IV.  LEGAL STANDARD

### A.  <u>Rule 12(b)(1) and 12(b)(6) Standards</u>

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction. Here, where "jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits, the trial court should employ the standard applicable to a motion for summary judgment."[15] This principle, which requires proper notice and discovery, is particularly relevant in cases such as this involving fraudulent concealment and inducement, where the concealment that tolls the statute of limitations and vitiates contracts is central to the plaintiffs' substantive claims.

When considering a motion to dismiss under Rule 12(b), the court must "accept as true all of the factual allegations contained in the complaint" and draw all reasonable inferences in the plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). The complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While the complaint must contain enough facts to state a claim to relief that is plausible on its face, *Twombly*, 550 U.S. at 570, it does not need detailed factual allegations. *Id.* at 555. The plausibility standard is not akin to a 'probability requirement.' *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In applying this standard, Judge Kelley correctly recognized that the court must "credit the plaintiff's

---

15 *London v. Polishook*, 189 F. 3d 196, 198 (2nd Cir. 1999).

well-pleaded factual allegations (usually taken from the complaint…), draw all reasonable inferences from them in [plaintiffs'] favor, and dispose of the challenge accordingly."[16]

### B.  Objection to Defendants' Exhibits

Plaintiffs object to any consideration of the exhibits that Defendants have attached to their Motions to Dismiss. Consideration of such external materials would improperly convert these FRCP 12(b)(6) Motions into FRCP 56 Motions for Summary Judgment, which would require notice to Plaintiffs and an opportunity for discovery under Rule 56(d).[17]

The only exceptions to this rule are documents that are integral to the complaint or subject to judicial notice. Defendants' proposed exhibits—including newspaper articles, prior court decisions in different cases, and other external materials—do not fall within these narrow exceptions. As Judge Kelley recognized, "the Court is unwilling to take judicial notice of this volume of materials outside the four corners of the complaint at the pleading stage, and to infer facts based upon these documents prior to discovery."[18] To the extent that certain external records that challenge standing are reviewed to determine jurisdiction, opposing parties may provide new evidence in response.

### V.  THE 2ND AMENDED COMPLAINT REBUTTS DEFENDANTS' ASSERTIONS

### A.  Massachusetts Court Findings Establish Persuasive Authority for Factual Disputes

The Massachusetts District Court's comprehensive analysis of identical factual and legal issues provides valuable persuasive authority for resolving the factual disputes that permeate Defendants' motions. Judge Kelley's decision specifically found that:

- Relevant actions include "the government's efforts to conceal and delegitimize the missile theory";

---

16  Memorandum and Order on Motions to Dismiss, *Krick v. Raytheon Co.*, No. 1:22-cv-11032-AK, 2023 WL 6328494 (D. Mass. Sept. 29, 2023), p. 6 [ECF #95][hereinafter Order]
17  See Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").
18  Order on MTD, p. 13.

- Fraudulent concealment was adequately pleaded through specific allegations of government misrepresentation
- Discovery rule application was warranted based on extraordinary concealment efforts
- Factual determinations regarding concealment cannot be resolved at the motion to dismiss stage
- The message from the government regarding the missile theory was loud and clear: this is not a tenable theory and there is nothing to support the missile theory.[19]

Judge Donnelly's endorsement of this decision as "pretty good" establishes judicial recognition that these factual findings should guide resolution of Defendants' renewed arguments.[20] Each category of Defendants' assertions directly contradicts these established factual determinations.

B.   **Statute of Limitations: Government's Continuing Concealment Through 2019**

1.      *Fraudulent Concealment and the Discovery Rule*

The Massachusetts District Court unequivocally determined that "the government's concealment efforts are inextricably linked to the reasons Plaintiffs likely prevail under the discovery rule" and found the "Amended Complaint suffice to establish the 'time, place, and content' of affirmatively false or fraudulent representations made by the United States."[21] The court therefore concluded: "Plaintiffs have sufficiently demonstrated to this Court that the transfer of their claims against the United States would not be futile." *Krick v. Raytheon Co.*, 695 F. Supp. 3d 202, 219 (D. Mass. 2023).[22] Plaintiffs' reliance on government investigations and assertions falsely denying a missile strike as the cause of the crash was therefore deemed sufficiently pled for tolling purposes.

Under the discovery rule, a claim accrues when a plaintiff discovers, or with reasonable diligence should have discovered, the injury forming the basis for the claim *Gabelli v. SEC*, 568 U.S. 442, 449 (2013). Where the defendant actively conceals material facts, the limitations period is tolled until the plaintiff could reasonably discover the factual basis for the claim. In this case, the

---

19  Order on MTD.
20  Ayers Dec., Ex. A, p. 5, para. 19
21  Id.
22  Order on MTD, p. 21 [ECF #95].

government's coordinated misinformation campaign and active concealment tactics directly delayed Plaintiffs' ability to bring the claim until actionable facts emerged.

Defendants argue that Plaintiffs' claims accrued no later than 1996-1997 due to widespread media speculation about a missile strike. They assert that the FTCA two-year statute of limitations expired before Plaintiffs filed their claims in September 2023. Relying on the1996 crash of TWA Flight 800 and the NTSB's final report in 2000, Defendants claim the filing was untimely.[23] Defendants fundamentally misrepresent the claim accrual timeline by ignoring the government's active denials of military involvement, which persisted through 2019. During this period, the government systematically reinforced the false narrative that the crash resulted from mechanical failure. This ongoing campaign of disinformation included:

### 2.    *Affirmative Denials and/or Concealment:*

Key evidence confirming that a missile caused the crash of TWA 800 was hidden from the public and the victims' families for over 25 years. This evidence was only recently unearthed by Dr. Tom Stalcup in his hard-fought FOIA litigation, which has now been pending for over ten years.[24] As the SAC plead, government agencies, including the DoD, maintained a decades-long effort to suppress information; these false assurances continued to mislead Plaintiffs and the public until an independent investigation by Dr. Stalcup—beginning in 2019—uncovered critical truths.%[25]

### 3.    *FBI Radar Data:*

Plaintiffs contend that the Government/FBI withheld radar evidence showing an object "head toward" TWA Flight 800 prior to "impact" until it was disclosed through delayed FOIA responses in 2020-2022.[26]  This telling radar data contradicts government reports and statements, repeatedly and

---

23 Gov't Motion, [ECF #179, p. 25]; Raytheon Motion, [ECF #186, p. 26].
24  SAC, para. 96 [ECF #33, p. 18].
25  SAC, para. 97 [ECF #33, p. 18]
26  SAC, para. 40, 84, 89 [ECF #33].

unequivocally stating that nothing in the available radar evidence is "consistent with a missile or other projectile traveling toward the accident airplane."[27] Final Report, ECF 45-1, p. 89.

### 4.    *Drone Activity Concealment:*

Plaintiffs learned that a high-ranking FBI official  confirmed the use of Navy target drones in the crash vicinity during Dr. Stalcup's post-2019 investigation.[28] This critical omission underscores the government's suppression of key facts throughout the limitations period, including when the FBI, within November 18, 1997 press release stated that there was no "drone" exercises in the vicinity at the time of the crash.

### 5.    *Judge Kelley Acknowledged Government's Delegitimizing Efforts:*

Judge Kelley found that the government's efforts to delegitimize the missile theory are notable enough to distinguish this case and find Plaintiffs were reasonable to stop their inquires there:

> Plaintiffs argue—and the Court agrees—that the government's efforts to delegitimize the theory (through official communications and its own investigative reports) and dissuade Plaintiffs from exercising any further due diligence, is what distinguishes this case. [Dkt. 33 at ¶¶ 51-54]. After a thorough investigation by a number of agencies, the government told Plaintiffs the only possible cause of the crash was an explosion of flammable vapors in the plane's center fuel tank. [Id.]. It is reasonable that Plaintiffs trusted and believed that federal agencies and law enforcement such as the CIA, FBI, NTSB, and NTSB Office of Families were providing truthful information and competent advice.[29] *** It is reasonable for the obligation to engage in further due diligence or investigation to end there.

Thus, this matter involved facts that were "inherently unknowable" due to the government's concealment. Extraordinary investigative measures, including a decade-long FOIA battle, were necessary to uncover actionable evidence.

---

27  Raytheon Motion, Ex. A, NTSB Report, [ECF #45-1, p. 107].
28  SAC, para. 86 [ECF #33, p.16].
29  Order on MTD, p. 12 [ECF #95, p. 12].

### 6.      *Judge Kelley On The Role of the Contractors*

The discovery rule also helps the Plaintiffs with regards to the timing of their complaints

against the contractor Defendants:

> It is true that Plaintiffs have not alleged with specificity that Contractor Defendants engaged in efforts to conceal the missile strike. It is also inconsequential to Plaintiffs' success under the discovery rule. While the government's concealment efforts are inextricably linked to the reasons Plaintiffs likely prevail under the discovery rule, Defendants have failed to provide case law holding that Contractor Defendants are required to have personally engaged in those efforts for the discovery rule to apply. *See United States v. Rockland Tr. Co.*, 860 F. Supp. 895, 904 (D. Mass. 1994) (the discovery rule analysis concerns whether the cause of action was "inherently unknowable"). Accordingly, application of the discovery rule resulting in a transfer of all claims here, would not be futile.% [30]

The continuation of these denials directly impacts the statute of limitations analysis. The material

factual dispute involves when Plaintiffs reasonably could have discovered the misconduct, precluding

dismissal at the Rule 12(b)(6) stage.  These acts of concealment collectively establish a plausible basis

for tolling the limitations period and preclude resolution via dismissal at the pleading stage.

## VI.   RULE 12(B)(6) ANALYSIS: FACTUAL DISPUTE OVER DISCOVERY TIMELINE

The stark temporal contrast between broad media speculation in 1996-1997 and the specific

government denials at that time and continuing until 2019 creates genuine issues regarding when

actionable evidence became available. Defendants' reliance on public statements or earlier FOIA

responses conflates speculation with concrete evidence, ignoring:

- Plaintiffs' reasonable reliance on definitive government statements, which persisted until 2019.[31]
- The later disclosure of critical radar and physical evidence that confirmed military involvement, years after the crash itself.

The statute of limitations should be tolled due to substantial evidence of fraudulent

concealment, affirmative misrepresentations, and the coordinated suppression of material facts by

---

30  Order on MTD, p. 16 [ECF #95, p. 16].
31 Order on MTD, ECF # 95, p. 12.

government entities until 2019. As the Massachusetts court correctly determined, these circumstances establish that the limitations period may be tolled and prevent resolution at the pleading stage. These factual discrepancies, central to the limitations analysis, necessitate denial of Defendants' Motions. The deliberate spoliation of evidence, concealment of radar data, and DoD's decades-long denial campaign form a compelling basis for denying Defendants' Motions to Dismiss and allowing discovery to proceed.[32]

## VII.  PLAINTIFFS' ESTATE STATUS CONTRADICTS DEFENDANTS' ASSERTIONS

### A.  <u>There Are Factual Disputes as to the Status of the Estates</u>

The factual disputes between the parties regarding estate status demonstrate dismissal based on Plaintiffs' capacity to sue is inappropriate.  Defendants first claim that the estates of certain victims were closed years ago, and that Plaintiffs lack the capacity to bring claims on their behalf; Defendant Lockheed Martin claims "respective estates in this action were opened decades ago and have been closed for several years without being reopened."[33]  The Defendants are incorrect. One of the estates, the estate of O. Lamar Allen, has been open since the 1990s and was never closed.  Current estate documentation establishes: (1) the Estate of O. Lamar Allen has been open since the 1990s and was never closed; (2) three estates are currently open and actively administered: (a) O. Lamar Allen; (b) Oliver Krick; and (c) Charles Henry Gray, III; and (3) all remaining Estate Plaintiffs have filed petitions to reopen estates and are awaiting court dates.[34]

---

32 See discussion Infra and Ex. C, including new findings of spoliation of the fuselage obtained during a joint inspection of the TWA 800 reconstruction in 2023 by the family member Plaintiffs in this action, alongside the Defendants, where a key fuselage component was found to have been altered in a manner to conceal a feature consistent with the effects of a missile blast wave beneath the plane, precisely where the aircraft broke in half in midair.

33  Lockheed Motion, [ECF #182, pp. 1, 5-11]. Govt Motion, [ECF #179, p. 20-21; Raytheon [ECF # 186, p. 11, 14].

34  See Ayers Dec., Ex. B for estate documentation.

**B.    The Federal Rules Allow for Reasonable Time After Objection for Estate Defects To Be Cured**

Defendants also argue that Plaintiffs failed to obtain letters of administration in New York for the relevant estates and that Plaintiffs lack standing as beneficiaries, asserting that such status does not confer the right to bring claims.[35]    However, if the court were to find capacity defects, such defects are readily curable under FRCP 17(a)(3), which provides liberal amendment opportunities. Under FRCP 17(a)(3), technical defects in capacity are procedural, not jurisdictional, and can be cured during the litigation.  As FRCP 17(a)(3) provides:

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

[Emphasis added.].  As the Eastern District of New York found:

> Plaintiff's lateness in obtaining and pleading her appointment as executrix is the kind of technical mistake apparently contemplated by Rule 17(a). That impression is confirmed by the Advisory Committee Note accompanying the 1966 amendment adding the quoted sentence. The note refers to cases where "an honest mistake has been made in choosing the party in whose name the action is to be filed, and says that the rule was intended in part "to codify in broad terms the salutary principle" of *Levinson v. Deupree*, 345 U.S. 648 (1953).[36]

---

35  Raytheon Motion, [ECF # 186, p. 11-14], p. ; Lockheed Motion, [ECF # 182, p. 6-14].

36  *See also, Brohan v. Volkswagen Mfg. Corp.*, 97 F.R.D. 46, 49 (E.D.N.Y. 1983) stating:

> It provides that "no action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest." An amendment under this rule relates back to the date of initial filing of the action.

> Plaintiff's lateness in obtaining and pleading her appointment as executrix is the kind of technical mistake apparently contemplated by Rule 17(a).

*See also Eisner v. United States*, No. 21-CV-06834 (OEM) (ARL), 2025 U.S. Dist. LEXIS 34884, at

*25-26 (E.D.N.Y. Feb. 26, 2025) explaining:

> Courts in this circuit have allowed "substitution to replace invalid estate administrators" under Rule 17(a)(3).[10] See, e.g., *Fletcher v. City of New London*, 16-CV-241 (MPS), 2017 WL 690533, at *5 (D. Conn. Feb. 21, 2017); *Yien-Koo King v. Wang*, 14-CV-7694 (JFK), 2018 WL 1478044, at *4, 6 (S.D.N.Y. Mar. 26, 2018) (court allowed plaintiff, who previously lacked standing, to proceed with action after appointment as preliminary executrix because the appointment was "essentially a technical change that in no way alters the factual allegations in the amended complaint"); *Estwick v. U.S. Air Shuttle*, 950 F. Supp. 493, 498-99 (E.D.N.Y. 1996) (holding that defect in plaintiff's standing without appointment as administratrix was cured by plaintiff's subsequent appointment thereof and reasoning that ruling otherwise would be "contrary to the liberal policy underlying [Rule 17(a)]"); ***

Defendants filed their objections to the standing of the estates when they filed their April 1, 2025 Motions to Dismiss raising the issue of the Plaintiffs' standing. FRCP 17 expressly permits courts to allow time for substitution of the proper party in interest. Thus, even if issues existed with Plaintiffs' appointment as personal representatives, such deficiencies can be corrected under FRCP 17(a)(3).

Additionally, under New York law, estates may be reopened upon the discovery of new assets or causes of action (N.Y. Surr. Ct. Proc. Act § 2207). The fraudulently concealed evidence constitutes such newly discovered assets, justifying reopening. Furthermore, FRCP 17(a)(3) allows the court to permit relation back of proper appointments as personal representatives, ensuring that procedural formalities do not hinder substantive justice.

However, even if this Court were to dismiss Plaintiffs' claims for lack of a duly appointed administrator, such dismissal would be without prejudice, and the potential harshness of this rule is tempered by operation of New York Civil Practice Law and Rule § 205(a). *Joachim v. United States*, No. 22-cv-5719, 2023 WL 6292542, n.2 (E.D.N.Y. Sept. 27, 2023). This provision allows plaintiffs to recommence an action within six months of dismissal, if a prior action was timely commenced but terminated because it was filed by someone other than the appointed administrator. *Carrick v. Central Gen. Hosp.*, 51 N.Y.2d 242, 249-50 (1980) (finding that the six-month extension

23

afforded under Section 205(a) "may be applied when a prior wrongful death action has been dismissed due to the lack of an appointed administrator," as the defect is curable and not a substantive bar). Thus, any dismissal here would not permanently bar Plaintiffs' claims, as they could promptly seek reappointment and refile within the statutory window, ensuring no forfeiture of their timely asserted rights. Even so, FRCP 17's allowance for reasonable time for substitutions should be applied here for the reasons set forth above and for judicial economy.

The contradiction between Defendants' "closed estates" assertions and documented current open estate status creates genuine disputes that cannot be resolved on the pleadings without discovery into estate records. The factual disputes detailed above—including the current status of the estates and Plaintiffs' legal relationship to them—establish a plausible basis for maintaining the action that cannot be resolved at the pleading stage.  Thus there is no defect for these open estates, and if there is any defect for the others, it is curable and/or in process of being cured.

## VIII.   RELEASE: NEWLY DISCOVERED EVIDENCE DEMONSTRATES FRAUD

The fraudulent inducement surrounding settlement agreements and releases directly influences their legal validity. Under New York law, "a release, like any other contract, may be set aside on the traditional bases of fraudulent inducement, fraudulent concealment, misrepresentation, mutual mistake, or duress."[37] The newly uncovered evidence reveals systemic efforts by the Defendants to fraudulently

---

37  *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) explains:

> A release may be invalidated, however, for any of "the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake" (*id.*).

> Although a defendant has the initial burden of establishing that it has been released from any claims, a signed release "shifts the burden of going forward . . . to the [plaintiff] to show that there has been fraud, duress or some other fact which will be sufficient to void the release" (*Fleming v Ponziani*, 24 NY2d 105, 111, 247 NE2d 114, 299 NYS2d 134 [1969]). A plaintiff seeking to invalidate a release due to fraudulent inducement must "establish the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury" (*Global Minerals*, 35 AD3d at 98 [infra]).

conceal critical facts before, during, and after the settlement period, thereby invalidating the agreements. The facts set forth in the SAC demonstrate these agreements are null and void under the law.

### A. Defendants' Core Assertion and Plaintiff's Factual Rebuttal: Fraudulent Concealment of Material Evidence

Defendants assert that Plaintiffs' claims are barred by releases that explicitly contemplated the possibility of subsequently discovered facts.[38] They argue that the settlement agreements preclude liability, regardless of any subsequently uncovered evidence.

The same basic facts which establish equitable tolling of the statute of limitations apply to the fraudulent inducement of the plaintiffs to sign the respective settlement agreements. The fraudulent inducement surrounding settlement agreements and releases directly influences their legal validity. Under New York law. The newly uncovered evidence reveals systemic efforts by the Defendants to fraudulently conceal critical facts during and after the settlement period, thereby invalidating the agreements as null and void.

As a matter of black-letter law, a release may be set aside if procured by fraud. The Appellate Division of the Supreme Court of the State of New York in *Global Mins. & Metals Corp. v. Holme,* 35 A.D.3d 93, 98, 824 N.Y.S.2d 210 [1st Dept 2006] indicated that "may be set aside on the traditional bases of fraudulent inducement, fraudulent concealment, misrepresentation, mutual mistake or duress." And a party seeking to invalidate a release due to fraud "must establish the basic elements of fraud", which are: (1) a false representation of material fact, (2) knowledge of falsity by the party who made the representation, (3) justifiable reliance on the representation by the plaintiff, and (4) resulting injury. The Second Circuit in *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006), similarly indicated that even collateral misrepresentations can void a release if they were instrumental in inducing

---

38  Lockheed and Raytheon Motions, [ECF #186, p. 36; ECF # 179, p. 11].

execution. These authorities foreclose any argument that the 1990s releases, signed under the shadow of deliberate fraud, misrepresentations, and concealment that the Massachusetts District Court has already found to have existed when the releases were signed, are valid or enforceable.

Defendants' reliance on standard release language fails under well-established legal principles prohibiting fraud. Concealment of material facts during and after settlement negotiations vitiates any release, as such agreements cannot shield parties from liability for intentionally hidden misconduct. The newly discovered evidence reveals a coordinated pattern of concealment that spanned over two decades:

- **Settlement Period (1999-2001)**: During the period of settlement negotiations, Defendant Government advanced the false narrative that the crash resulted from a fuel tank explosion, while the Defendants suppressed and altered key indicators of missile involvement and/or hid their own involvement.
- **Post-Settlement Concealment (2001-2019)**: The Department of Defense continually denied that there were any missile firings or testing in the vicinity perpetuating the falsehood that no military activity occurred in the area.[39]
- **Radar Evidence Suppression**: The Government/FBI withheld radar recordings showing an object "heading straight for TWA 800" just prior to "impact", deceiving Plaintiffs into believing the government's false narrative of an exploding gas tank.[40]

### B.   <u>Fraud Vitiation Standard</u>

The pervasive and systematic concealment of material evidence by Defendants rendered the settlement process fundamentally flawed. This goes beyond the mere discovery of new information or speculation, demonstrating intentional deception aimed at misrepresenting that the crash's true cause was an exploding fuel tank.

---

39  *See infra.*
40  SAC, ECF #33, para. 84.

The Massachusetts District Court recognized Plaintiffs plead intentional deception in finding that the SAC does "suffice to establish the 'time, place, and content' of affirmatively false or fraudulent representations made by the United States."[41] Fraudulent inducement invalidates such agreements because it prevents claimants from entering settlements based on a meeting of the minds. These allegations present substantial factual disputes that cannot be resolved under Rule 12(b)(6) or 12(b)(1).

Plaintiffs argue that Defendants' concealment of critical facts and repeated disclosures of a false narrative regarding an exploding gas tank between 1996 and 2022, including the concealment of radar evidence and operational configurations, precludes enforcement of any settlement agreement.

## IX.   ADMIRALTY JURISDICTION: FACTUAL DISPUTES REQUIRE DISCOVERY

The specifics of Plaintiffs' claims significantly affect the legal analysis of admiralty jurisdiction under the Supreme Court's two-part test, which requires both locality and a maritime connection.[42] Admiralty jurisdiction is not automatically exclusive, especially where additional jurisdictional bases, such as the Federal Tort Claims Act (FTCA), apply.  Even if this Court finds the matter is subject to Admiralty jurisdiction, the proper remedy is to transfer this action to the Admiralty side of this Court, not dismissal.  As 28 U.S.C. § 1631 provides:

> the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court (or, for cases within the jurisdiction of the United States Tax Court, to that court) in which the action or appeal could have been brought at the time it was filed or noticed ***.

### A.   Defendants' Core Assertion and Plaintiffs' Factual Rebuttal: Land-Based Negligence and Jurisdiction

Defendants characterize the incident as a "transoceanic commercial flight crashing into navigable waters due to military warships testing weapons."[43] They argue that the locality test is satisfied by the crash's occurrence over the Atlantic Ocean, claiming that triggers exclusive admiralty

---

41  Order on MTD, ECF # 95, p. 14-15.
42  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 533 (1995)
43  Motions, [ECF #186, pp. 10-11].

jurisdiction.  Defendants' assertion oversimplifies the jurisdictional analysis by focusing entirely on the locality test while neglecting critical factual complexities. Key evidence from Dr. Stalcup's investigation reveals that:

- **Land-Based Negligence**: The military weapons testing implicated in the crash involves operations conducted from land-based facilities, rather than solely ship-based platforms in navigable waters.
- **Multiple Service Branch Involvement**: Defendants' negligence may stem from overlapping Army and Navy missile systems, further underscoring the land-based aspects.
- **Dual Jurisdiction Theory**: Plaintiffs invoke concurrent jurisdiction under the Suits in Admiralty Act (SIAA) and the FTCA. Claims related to the crash itself may fall under the SIAA, while the administrative cover-up constitutes negligence under the FTCA. This theory refutes any claim of exclusive admiralty jurisdiction.

Defendants' suggestion that the crash's occurrence over navigable waters automatically resolves jurisdiction ignores these land-based elements, which demand a more nuanced analysis.

### B.  Massachusetts Court's Findings and Burden Shifting on Limitations

The Massachusetts District Court implicitly acknowledged Plaintiffs' jurisdictional theories by denying Defendants' motions to dismiss and transferring the case under 28 U.S.C. § 1631. While Defendants argue that Plaintiffs failed to provide timely notice under the SIAA's two-year statute of limitations, they improperly shift the burden of establishing admiralty jurisdiction to Plaintiffs.[44] However, once Defendants assert admiralty jurisdiction, they must establish its exclusivity and demonstrate that no other jurisdictional basis applies. As set forth in the SAC, when negligence stems from both maritime and non-maritime activities—such as land-based testing with effects over water and a subsequent cover-up —jurisdiction is not limited to admiralty.

---

[44]  Govt Motion, pp. 2, 22, 25) [ECF #179]

### C.   Dual Jurisdiction Theory: Maritime and Non-Maritime Claims

Defendants claim that the crash's location over the Atlantic Ocean and the presence of navigable waters satisfy the locality test, making admiralty jurisdiction mandatory and exclusive.[45] However, while the crash occurred over navigable waters, Defendants ignore the dual nature of the case and pleadings. The two-part *Grubart* test—requiring both locality and maritime connection—does not foreclose jurisdiction under the FTCA when substantial land-based negligence is also alleged. Plaintiffs contend that:

- **Land-Based Origins**: The military testing at issue involved land-based facilities and operations, not exclusively ship-based activities. Negligence arising from land triggers FTCA jurisdiction even if the harm ultimately occurred over water.
- **Case Law on Dual Jurisdiction**: Courts have consistently indicated that claims may proceed under both maritime and non-maritime theories when the facts implicate both domains. Here, the land-based negligence that led to the crash supports FTCA jurisdiction alongside any potential SIAA claims.
- **Discovery Required**: Determining the precise military platforms involved—land-based testing or ship-based operations—requires discovery into Defendants' operational records and configurations. Dismissing the case at this stage would prematurely resolve these unresolved factual disputes.

The unresolved factual disputes regarding Defendants' testing configurations, radar evidence, and land-based negligence preclude dismissal at the pleading stage. Jurisdictional issues related to dual theories, fraudulent concealment, and the precise nature of operational negligence can only be addressed through discovery.

Admiralty jurisdiction does not automatically foreclose alternative jurisdictional bases in complex cases involving both maritime and non-maritime elements. Plaintiffs' allegations of land-

---

45  Raytheon Motion [ECF # 186, pp. 7-9]; Lockheed Motion [ECF #182, pp. 8-9].

based negligence, fraudulent concealment, and violations of both the FTCA and SIAA establish a plausible basis for concurrent jurisdiction. Defendants' attempt to resolve these factual disputes prematurely under Rule 12(b)(6) ignores the need for discovery to develop the record. Accordingly, these jurisdictional issues must proceed to the next phase of litigation.

## X.    POLITICAL QUESTION DOCTRINE

The political question doctrine limits the judiciary's authority to resolve disputes that are textually or constitutionally committed to a coordinate political branch, or where a lack of judicially discoverable and manageable standards forecloses adjudication. *Baker v. Carr*, 369 U.S. 186, 217 (1962). In this case, the doctrine does not shield Defendants from liability, as the issues presented are grounded in operational negligence, regulated by well-established legal standards.

### A.   Command-Level vs. Political-Level Distinction

Defendants argue that adjudicating these claims would require courts to evaluate military judgments, implicating decisions about whether it was necessary for the military to test the Aegis missile system when it did, how it did, and where it did, thereby touching on national defense against foreign threats (ECF #186, p. 36).  Plaintiffs provide compelling evidence differentiating operational negligence from political-level decisions. Key testimony from high-ranking officials undermines the applicability of the political question doctrine:

**Secretary Perry and Director Coyle Depositions**

- Secretary Perry denied awareness of any cover-up or missile-related decisions reaching his level or the President's desk.
- Director Coyle testified explicitly that "national security concerns were no justification for needless loss of life," signaling accountability for operational errors at lower levels.

**Operational Characterization**

- Evidence categorically attributes the negligence to command-level decision-making, rather than high-level political decisions tied to national defense or foreign policy.

**Operational vs. Political Scope**

30

- Government records confirm that the weapons testing was operational, falling under established safety protocols. Operational negligence claims, such as failure to adhere to safety standards, fall squarely within judicial competence and do not trigger political question protections.

The distinction between political decision-making and operational negligence creates a material factual dispute. The non-political, command-level nature of the conduct alleged precludes categorical dismissal at the pleading stage.

### B.   Standard Negligence Principles Apply

Defendants claim that adjudicating this case requires courts to evaluate classified military operations and decisions, rendering the claims non-justiciable (Raytheon ECF 186, pp. 32-34; Lockheed ECF 182, pp. 24-28). This objection is factually and procedurally unfounded. Plaintiffs' claims rely on evidence that is either declassified or never properly classified. Key evidence includes:

- **Declassified FBI Radar Data**: Information disclosed through FOIA requests in 2021-2022 directly counters Defendants' secrecy claims, providing radar evidence of objects approaching TWA Flight 800.
- **Misuse of Classification**: Plaintiffs allege that Defendants improperly used classification not to protect national security but to conceal operational negligence and critical evidence of their misconduct.

Courts may handle cases involving potentially sensitive information through mechanisms such as *in camera* review and protective orders. The mere existence of classified materials does not preclude adjudication, particularly where the claims center on operational negligence and declassified evidence.

Defendants contend that resolving these claims requires second-guessing military judgments about weapons testing, for which no judicially manageable standards exist (USA ECF 179, pp. 8-9, 19, 38-39; Raytheon ECF 186, pp. 39-40; Lockheed ECF 182, p. 25-28).

Contrary to Defendants' argument, Plaintiffs' claims concern routine negligence, which courts are equipped to adjudicate using well-established legal standards. The case does not question military policy or discretion but instead alleges violations of safety procedures during weapons testing over navigable airspace. Specific points include:

31

**Negligence in Execution**: Plaintiffs allege that Defendants failed to follow:

- Federal Aviation Administration regulations governing airspace usage.

- Department of Defense weapons testing protocols aimed at ensuring safety.

- Foundational negligence principles requiring adherence to reasonable care standards.

**Judicial Competence**: Courts frequently address military contractor negligence without invoking the political question doctrine. For instance, courts review compliance with operational safety protocols and statutory regulations in negligence cases, even when federal agencies or contractors are implicated.

**Judicially Manageable Standards**: The regulatory and legal frameworks governing negligence claims, including FAA and DoD standards, provide courts with manageable criteria for adjudicating this case without engaging in political or strategic military policy decisions.

The Second Amended Complaint is grounded in specific procedural violations and operational errors that fall under standard negligence law, not high-level policy debates. Determining the classification status of evidence and the applicability of negligence standards requires factual development through discovery, precluding dismissal at this stage.

The political question doctrine does not shield Defendants from liability where the conduct alleged involves command-level operational negligence rather than political decisions tied to military strategy. The distinction between operational execution and high-level policymaking is well-supported by testimony from high-ranking officials and government documents. Additionally, Plaintiffs' claims rely on established regulatory and negligence standards, with no need to second-guess military policy decisions or access legitimately classified materials. These factual disputes preclude dismissal and require resolution through discovery, ensuring that judicial review remains within boundaries set by precedent and procedural safeguards.

The extensive factual disputes identified above demonstrate that defendants seek dismissal based on factual characterizations that directly contradict the pleaded facts and established precedent. The Massachusetts District Court's comprehensive analysis of identical issues provides the legal framework for addressing defendants' arguments, while the factual rebuttals above establish that

32

genuine disputes of material fact preclude resolution on a Rule 12(b)(6) motion. These factual disputes permeate every category of Defendants' arguments and mandate denial of their dismissal motions.

## XI.   THE MASSACHUSETTS DECISION IS PERSUASIVE AUTHORITY

Judge Kelley's decision denying defendants' motions to dismiss is persuasive authority that should guide this Court's analysis. While not binding, the decision carries significant weight because it addresses identical issues, regarding the identical complaint, filed by the identical defendants, raising the identical arguments. The case was transferred to this Court solely due to venue considerations, not because of any deficiency in the pleadings.

Judge Kelley's analysis was comprehensive, addressing each of defendants' arguments in turn. After a thorough review, she concluded that plaintiffs' allegations were sufficient to survive defendants' Rule 12(b)(6) challenges. This Court should reach the same conclusion for the same reasons.

The persuasiveness of Judge Kelley's decision is particularly strong regarding the statute of limitations issue. After carefully examining plaintiffs' discovery rule and fraudulent concealment arguments, Judge Kelley concluded:

> Plaintiffs have sufficiently demonstrated to this Court that the transfer of their claims against the United States would not be futile... [I]t is reasonable for Plaintiffs to need 'something more' than a blog or article on the internet, for example, to trigger an accrual period. In contrast, the radar tapes the government produced as a result of Dr. Stalcup's FOIA litigation, display an object colliding with the plane, [which] carries more weight than a circulated story containing a presumably debunked rumor.[46]

Similarly, on the issue of fraudulent concealment, Judge Kelley found:

> Plaintiffs' Amended Complaint demonstrates that the alleged wrongful act was 'done in a way that made it difficult to discover.'... For example, the government put forth the engine malfunction explanation as the verified cause of the crash after thorough investigations by several different government agencies; it took actions to delegitimize the missile

---

46  Order on MTD, p. 15-16, 21[ECF #95]. Published at *Krick v. Raytheon Co.*, 695 F. Supp. 3d 202, 219-220 (D. Mass. 2023)

theory as a tenable cause for the crash; and it concealed evidence supporting the missile theory.[47]

These findings directly refute Defendants' current arguments and should inform this Court's analysis. As Judge Kelley recognized, the statute of limitations began to run only when Plaintiffs became aware of Dr. Stalcup's findings in April 2021, making their complaint timely filed.[48]

The factual disputes identified above confirm Judge Kelley's conclusion that these issues cannot be resolved at the motion to dismiss stage. Her finding is fully consistent with Plaintiffs' arguments that actionable facts were "inherently unknowable", which is directly supported by the evidence of continuing government denials through 2019. Her conclusion that fraudulent concealment was adequately pleaded is reinforced by the newly discovered evidence of systematic physical evidence spoliation. Judge Donnelly's endorsement provides additional judicial support for applying Judge Kelley's factual and legal analysis to deny defendants' renewed motions.

## XII.   2ND AMENDED COMPLAINT STATES VALID CLAIMS FOR RELIEF

The factual rebuttals above demonstrate that Plaintiffs' detailed allegations are not merely plausible but are supported by specific evidence that directly contradicts Defendants' counter-narrative. The systematic concealment evidence, continuing government denials, and physical evidence spoliation provide factual foundation that strengthens the plausibility analysis beyond the minimum *Twombly* and *Iqbal* plausibility standard. The SAC contains specific allegations regarding defendants' missile testing activities, the missile strike on TWA 800, and the subsequent cover-up. These include:

1. Allegations that defendants were conducting missile tests with live warheads off the coast of New York and New Jersey near commercial airline flight paths;[49]
2. Evidence from Navy radar tapes showing an object "heading straight for TWA 800" just before the explosion;[50]

---

47 *Id.* at page 20.
48 *Id.*
49 SAC ¶¶ 5, 32, 61, 70, pages 2, 6, 12, 14 [ECF #33]
50 SAC, at ¶ 84, p. 16.

3. Detailed accounts of the government's interference with the investigation, including removing radar tapes, preventing NTSB from conducting interviews, and threatening witnesses[51]

4. Specific actions taken to discredit the missile theory, including the production of a video explicitly stating "What Did The Eyewitnesses See? …NOT A MISSILE"[52]

5. Allegations that Defendants knowingly concealed the true cause of the crash for decades.[53]

These allegations go well beyond conclusory statements and provide a plausible basis for Plaintiffs' claims. As Judge Kelley observed, the SAC contains "specific details outlining fraudulent concealment efforts" that are more than sufficient at the pleading stage.[54] The Second Circuit has explained that the plausibility standard is not akin to a probability requirement. *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 324 (2d Cir. 2011) (internal quotation marks omitted). Plaintiffs need not prove their case at this stage; they need only allege sufficient facts to make their claims plausible. The SAC easily meets this standard.

### A.  Plaintiffs' Claims Are Not Time-Barred

Defendants argue that Plaintiffs' claims are barred by the applicable statute of limitations. This argument was thoroughly considered and rejected by Judge Kelley, who found that both the discovery rule and fraudulent concealment doctrine tolled the limitations period until April 2021, when Plaintiffs first learned of Dr. Stalcup's findings.

The factual evidence of concealment continuing through 2019 directly contradicts Defendants' accrual arguments and supports both discovery rule and fraudulent concealment tolling. The temporal gap between Defendants' claimed 1996 accrual and documented 2019 concealment creates genuine factual disputes that cannot be resolved on motion to dismiss.

---

51 SAC, at ¶¶ 39-41, pages 7-8.
52 *Id*. at ¶¶ 47-49, pages 9-10.
53 *Id*. at ¶¶ 6, 98-100, pages 3, 18-19.
54 Order on MTD, p. 18 [ECF #95].

### 1.      *The Discovery Rule Tolls the Statute of Limitations*

Under the discovery rule, a claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the factual basis for the cause of action. *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002). The Supreme Court established in *United States v. Kubrick*, 444 U.S. 111 (1979), that the FTCA's statute of limitations may be tolled by the discovery rule, and the Second Circuit has indicated this rule may apply to cases outside the medical malpractice context. *See A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 140 (2d Cir. 2011) (FTCA claim).

Judge Kelley correctly found that Plaintiffs' cause of action was "inherently unknowable" until Dr. Stalcup revealed his findings in April 2021.[55] As Judge Kelley explained:

> Plaintiffs argue—and the Court agrees—that the government's efforts to delegitimize the [missile] theory (through official communications and its own investigative reports) and dissuade Plaintiffs from exercising any further due diligence, is what distinguishes this case... After a thorough investigation by a number of agencies, the government told Plaintiffs the only possible cause of the crash was an explosion of flammable vapors in the plane's center fuel tank. It is reasonable that Plaintiffs trusted and believed that federal agencies and law enforcement such as the CIA, FBI, NTSB, and NTSB Office of Families were providing truthful information and competent advice.[56]

This analysis aligns with Second Circuit precedent recognizing that the discovery rule applies when the government's actions prevent plaintiffs from discovering the facts underlying their claims. *See Barrett v. United States*, 689 F.2d 324, 330 (2d Cir. 1982) (holding that the government's fraudulent concealment of facts can toll the statute of limitations). "It is illogical to require a party to sue the government for negligence at a time when the Government's responsibility in the matter is suppressed in a manner designed to prevent the party, even with reasonable effort, from finding out about it.". Id.

The Defendants' argument that Plaintiffs could have discovered the basis for their claims through reasonable diligence is particularly unconvincing. As Judge Kelley noted, "Dr. Stalcup only

---

[55] Order on MTD, p. 10 [ECF #95, p. 10].
[56] *Id*. at 12.

36

obtained the relevant information after, in the United States' own words, 'undertaking actions that were... incredibly time consuming and expensive... engaging in decades long FOIA litigation.'"[57] It would be unreasonable to expect Plaintiffs to have undertaken such extraordinary efforts, particularly when government officials were actively reassuring them that the official explanation was correct.

### 2.   *The Fraudulent Concealment Doctrine Also Tolls the Statute of Limitations*

Even if the discovery rule did not apply, the fraudulent concealment doctrine independently tolls the statute of limitations. Under this doctrine, the limitations period is tolled when a defendant conceals the existence of a cause of action through affirmative acts or representations which are calculated to, and in fact do, prevent the discovery of the cause of action. *Kronisch v. United States*, 150 F.3d 112, 121 and 126 (2d Cir. 1998). The SAC contains detailed allegations of affirmative acts of concealment, including:

1. The FBI removing all copies of Navy radar tapes showing an object heading toward TWA 800[58];
2. The FBI preventing the NTSB from conducting eyewitness interviews or reviewing FBI results;[59]
3. The FBI threatening eyewitnesses to "keep quiet" about seeing something "arcing" toward the plane;[60]
4. The CIA producing materials specifically designed to discredit the missile theory.[61]

Judge Kelley found that these allegations were sufficient to establish fraudulent concealment, stating:

> Plaintiffs include specific details outlining fraudulent concealment efforts. For example, the CIA produced materials to discredit the eyewitnesses by including a video that was displayed during a nationally broadcasted FBI press conference which stated: 'What Did The Eyewitnesses See? NOT A MISSILE.'... As alleged in the Amended Complaint, the FBI removed all copies of the radar tapes from the Navy immediately following the crash and used threats to silence eyewitnesses. It also prohibited the NTSB from following regular protocol or drafting analysis reports, and instead the FBI and CIA ran the investigation."[62]

---

57  Order on MTD, p. 14 [ECF #95, p. 14].
58  SAC ¶¶ 40, 84, pp. 8, 16 [ECF #33, pp. 8, 16].
59  SAC ¶¶ 40-41 [ECF #33, p. 8].
60  SAC ¶ 41 [ECF #33, p. 8].
61  SAC ¶¶ 47-49 [ECF #33, pp. 9-10].
62  Order on MTD, p. 18 [ECF #95, page 18].

Active concealment by government officials can toll the statute of limitations even where the concealment occurred decades ago. *See Kronisch*, 150 F.3d at 124. As Judge Kelley correctly concluded, the statute of limitations was tolled until April 15, 2021, when Plaintiffs first became aware of Dr. Stalcup's findings. Plaintiffs filed their administrative claims less than six months later, well within the applicable two-year period.

### B.    Plaintiffs Have Standing To Pursue Their Claims

Defendants argue that some Plaintiffs lack standing to bring these claims, particularly regarding estate documentation. This argument is premature and should not result in dismissal. First, many Plaintiffs are bringing claims in their individual capacities for their own injuries, including loss of companionship and emotional distress. These individual claims are not dependent on estate documentation.  Second, for Plaintiffs bringing claims on behalf of estates, courts may provide reasonable deadlines for submitting proper documentation rather than dismissing claims outright. Third, piecemeal dismissal of some Plaintiffs while allowing others to proceed would be inefficient and potentially prejudicial. All Plaintiffs' claims arise from the same incident and involve the same legal issues. Judicial economy favors keeping all claims together.  The standing issues raised by Defendants do not warrant dismissal at this stage because as explained above, FRCP 17(a)(3), does not allow for dismissal without the Cort allowing a reasonable time for the real party to ratify, join, or be substituted. Defendants objected on April 1, 2025, and since that time all estate Plaintiffs have been diligently attempting to reopen the estates. Three such estates are now open, and all others are in the process of being reopened.  If the Court finds an issue with the parties, the Court must set reasonable deadlines for Plaintiffs to provide any necessary documentation and to amend the complaint.

### C.    Plaintiffs' Claims Are Not Defeated By Fraudulent Settlements

Defendants argue that plaintiffs' claims are barred by previous settlements with Boeing, TWA, and other entities. This argument fails because the current claims involve different defendants, different theories of liability, and previously concealed facts.  As a general matter, releases obtained

38

through fraud or misrepresentation are not enforceable. See *Centro Empresarial v. América Móvil*, 17 N.Y.3d 269, 276 (2011), explaining that "a release, like any other contract, may be set aside on the traditional bases of fraudulent inducement, fraudulent concealment, misrepresentation, mutual mistake, or duress". Here, Plaintiffs allege that Defendants actively constructed a false narrative that the crash was caused by an exploding gas tank, while concealing evidence of a missile, thereby inducing Plaintiffs to settle with Boeing and TWA for a defect that did not actually cause the crash.

Plaintiffs could not have released claims against these Defendants for a missile strike which they were told by the government was a conspiracy theory. As the SAC alleges, Plaintiffs only learned in April 2021 that the crash was caused by a missile strike, not an aircraft defect.[63]

Courts have consistently indicated that releases do not bar claims based on facts that were fraudulently concealed at the time of settlement. *See* G*lobal Minerals and Metals Corp. v. Holme,* 824 N.Y.S.2d 210, 214-15 (N.Y. App. Div. 2006) (holding that releases are ineffective where procured by fraudulent inducement or misrepresentation). This principle applies with even greater force where, as here, the Defendants actively participated in concealing the true cause of the injuries.

## XIII.  THIS COURT HAS JURISDICTION OVER PLAINTIFFS' CLAIMS

### A.  <u>Admiralty Jurisdiction Would Not Bar Plaintiffs' FTCA Claims</u>

The United States argues that Plaintiffs' claims fall exclusively within admiralty jurisdiction and therefore cannot be brought under the FTCA. And even true, this case must be transferred to the Admiralty side of this Court, and not be dismissed.  28 U.S.C. § 1631. This argument misconstrues both the nature of plaintiffs' claims and the relationship between admiralty jurisdiction and the FTCA. The Second Circuit has already given some guidance as to aspects of admiralty jurisdiction in relation to the TWA 800 crash, finding that the crash site was within US territorial waters and not the high seas. See *In re Air Crash Off Long Island, N.Y.*, on July 17, 1996, 209 F.3d 200, 212 (2d Cir. 2000)

---

63  SAC ¶¶ 97-98, p. 18 [ECF #33, p. 18].

(finding Death on the High Seas Act does not apply contrary to presidential proclamation extending territorial waters, now superseded by statute). But even if admiralty jurisdiction applies, that does not preclude Plaintiffs from bringing FTCA claims or from amending to address any issues.

The Supreme Court has established that the FTCA allows claims against the United States under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b)(1). This includes circumstances where admiralty law would govern a private party's liability. *See Indian Towing Co. v. United States*, 350 U.S. 61, 68-69 (1955) (permitting FTCA claim for maritime tort). Moreover, this case involves more than just the crash itself. It includes allegations of land-based negligence in missile testing procedures and the subsequent cover-up, which extend beyond traditional admiralty jurisdiction.

### B.  All Individual Plaintiffs Have Standing

The Defendants have moved to dismiss the individual Plaintiffs for failure to state a claim. As set forth in FRCP 8(a)(2), "a pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief". As presently written, the SAC contains significant factual allegations by the individual defendants that set forth various causes of action, including but not limited to fraud, abuse of process, reckless infliction of emotional distress, and violation of civil rights. Those allegations, however, were not formulated in the SAC to state specific causes of action. Under these circumstances, the Plaintiffs are allowed by FRCP 15 to amend the SAC to state these causes of action. See Rule 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

### XIV.  THE POLITICAL QUESTION DOCTRINE DOES NOT APPLY

As a threshold matter, District Judge Kelley, acknowledged Defendants raised political question arguments and ultimately denied their motions. The political question doctrine is a "narrow exception" to the general rule that "the Judiciary has a responsibility to decide cases properly before

40

it."[64] The Supreme Court has explained that it is "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."[65] The doctrine does not apply simply because a lawsuit may implicate government actions. Rather, it bars a federal court from exercising jurisdiction only if at least one of six factors is "inextricable from the case at bar."[66] The six *Baker* factors are: [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.[67] The first two factors are the most important, and all are absent here[68].

### A.   Plaintiffs' claims do not implicate the first Baker factor

The first Baker factor asks whether the Constitution commits the challenged decision to another branch of government. Baker, 369 U.S. at 211. The Contractor Defendants contend that this factor is met because Plaintiffs' claims require evaluating military judgments about the necessity, timing, and location of Aegis missile system testing, implicating national defense and foreign policy.[69] This argument misconstrues Plaintiffs' claims.

Plaintiffs do not challenge military strategy, foreign policy, or high-level decisions regarding the Aegis missile system's development or testing. Instead, they allege operational negligence by the

---

64 *Zivotofsky ex rel. Zivotofsky v. Clinton,* 566 U.S. 189, 194–95 (2012).
65 *Baker v. Carr*, 369 U.S. 186, 211 (1962).
66 *Id*. at 217.
67 *Id*.
68 *Zivotofsky*, at 197.
69 Motions, ECF #186, pp. 36–39; ECF #182, pp. 24–27.

41

government and contractor Defendants in conducting a missile test in commercial airspace, resulting in an errant missile striking TWA 800, and manufacturing defects in the radar and missile systems.[70] Specifically, Plaintiffs assert that Raytheon and Lockheed negligently tested a defective SPY-ID(V) radar and SM-2 missile in the Sardi sector, a commercial airspace not closed for military use, and failed to warn of associated risks. Id. ¶¶ 108–110, 132–148. Testimony from high-ranking officials supports this distinction: Secretary of Defense William Perry denied awareness of any cover-up or missile-related decisions reaching his level or the President's, and Director Coyle testified that "national security concerns were no justification for needless loss of life," indicating accountability for operational errors at the command level. Government records further confirm that the testing was operational, governed by safety protocols, not political decisions tied to national defense. These facts create a material dispute, precluding dismissal at the pleading stage.

The Contractor Defendants' argument that "the Constitution commits the conduct of foreign affairs to the executive and legislative branches,", is irrelevant.[71] Plaintiffs' claims do not challenge foreign affairs but seek redress for negligent operational conduct in commercial airspace. The SAC does not allege an intentional strike on TWA 800 or a test designed to target commercial aircraft. SAC ¶ 5. Claims of operational negligence fall within judicial competence, as courts may review such conduct. See, e.g., *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1364 (11th Cir. 2007) ("McMahon II") (a negligence standard is consistent with our constitutional framework because the military does not enjoy absolute immunity from suit). In *Peterson v. U.S.*, 673 F.2d 237, 240–42 (8th Cir. 1982), the Eighth Circuit indicated the government liable for negligence when an Air Force B-52 flew too low over a farm, violating Air Force policies, FAA regulations, and state law. Similarly, in *Ward v. U.S.*, 471 F.2d 667, 669 (3d Cir. 1973), the Third Circuit rejected a national security defense,

---

70  SAC ¶¶ 5, 108–120, 132–148.
71  ECF 186, p. 36; ECF 182, p. 24.

finding negligence from sonic booms over Pittsburgh actionable. In *United Air Lines, Inc. v. Wiener*, 335 F.2d 379, 393–95 (9th Cir. 1964) applying 14 C.F.R. § 617.4), the Ninth Circuit affirmed negligence liability for a mid-air collision due to the Air Force's failure to follow FAA and internal rules. Here, Plaintiffs allege Defendants breached a duty not to negligently test missiles in commercial airspace, supported by evidence that TWA 800 was in the Sardi sector, not a closed military area. Roddy Decl. ¶ 8, Exhibit 4. These claims do not implicate the first Baker factor.

### B.  **Plaintiffs' claims do not implicate the second Baker factor**

The second Baker factor asks whether there are "judicially discoverable and manageable standards" for resolving the case.[72] *Baker*, 369 U.S. at 217. The Contractor Defendants argue that no such standards exist, claiming adjudication requires second-guessing military judgments about weapons testing and evaluating classified information.% [73]. This mischaracterizes Plaintiffs' claims and ignores established legal frameworks.

Plaintiffs' negligence claims are governed by standard tort principles, requiring proof of duty, breach, causation, and damages. SAC ¶¶ 108–110. Courts may apply these to military conduct. See *McMahon II*, 502 F.3d at 1364. Extensive regulations, including FAA rules (14 C.F.R. §§ 91.1 et seq.) and Department of Defense weapons testing protocols, provide clear standards for airspace use and safety. See FAA Order JO 7400.8. Courts have applied these in military negligence cases. See, e.g., Wiener, 335 F.2d at 393–95. Plaintiffs allege Defendants violated these standards by testing in commercial airspace, a claim supported by declassified FBI radar data obtained via FOIA in 2020–2022, showing an object approaching TWA 800.[74] Plaintiffs further allege Defendants misused classification to conceal operational negligence, not to protect national security. Courts can handle

---

72  *Baker*, at 217.
73  ECF 186, pp. 39–40; ECF 182, pp. 27–28
74  SAC ¶¶ 49, 84.

sensitive information through in camera review or protective orders, ensuring adjudication without compromising security.

Plaintiffs' product liability claims allege manufacturing defects and failure to warn, not design defects, asserting that the SPY-ID(V) radar and SM-2 missile failed to meet military specifications.[75] Such claims are justiciable, as courts have held.[76] These regulatory and tort frameworks provide manageable standards, negating the second Baker factor.

### C. The Contractor Defendants' reliance on Aktepe and Carmichael is misplaced.

The Contractor Defendants rely on *Aktepe v. U.S.*, 105 F.3d 1400 (11th Cir. 1997), and *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271 (11th Cir. 2009). ECF 186, pp. 28–31; ECF 182, pp. 25–37. These cases are distinguishable. In *Aktepe*, claims arose from foreign military operations a NATO training exercise where live missiles misfired due to miscommunication, requiring evaluation of military training protocols.[77]. Here, Plaintiffs challenge negligent testing in commercial airspace, not training procedures. In *Carmichael*, 572 F.3d at 1281–86, a wartime convoy accident in Iraq implicated military decisions on route and speed. This case involves no foreign military or wartime context, occurring in commercial airspace near a major civilian airport. Other cases distinguish *Aktepe* and *Carmichael* where claims avoid policy judgments. *See McMahon v. Presidential Airways, Inc.*, 460 F. Supp. 2d 1315 (M.D. Fla. 2006), aff'd, 502 F.3d 1331. "Claims implicating decisions made by military personnel during combat trigger the political question doctrine because those claims require courts to delve into areas unfit for judicial scrutiny." *McMahon* 460 F. Supp. 2d at 1322. Perhaps the most relevant case is *Koohi v. United States*, 976 F.2d 1328 (9th Cir.

---

75 SAC ¶¶ 132–148.
76 *See Rodriguez v. General Dynamics Armament and Technical Products, Inc.,* 696 F. Supp. 2d 1163, 1183 (D. Haw. 2010).
77 *Aktepe* , 105 F.3d at 1402–04

1992), which arose from the accidental shoot-down of a commercial aircraft eight years prior to the loss of TWA Flight 800, involving an earlier version of the same Aegis missile system.

In *Koohi,* the Ninth Circuit rejected the political question doctrine defense, even though the incident occurred in the Persian Gulf, involved an active-duty Aegis-equipped warship, and took place in the context of armed conflict. "The Supreme Court has explained that the federal courts are capable of reviewing military decisions, particularly when those decisions cause injury to civilians. The controlling case is *The Paquete Habana*, 175 U.S. 677 (1900)." *Koohi at* 1331. By contrast, TWA Flight 800 was downed off the coast of the United States, in peacetime and far from any active hostilities—circumstances that make invocation of the political question doctrine here even less appropriate.

### D.   *The three remaining Baker factors are inapplicable*

The final three Baker factors are relevant only if judicial resolution contradicts prior political branch decisions. *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995). Plaintiffs do not challenge military policy, rendering these factors inapplicable.

### E.   *The Contractor Defendants' potential defenses are not dispositive*

The Contractor Defendants argue their defenses raise political questions, citing *Amedi v. BAE Systems, Inc.,* 782 F. Supp. 2d 1350 (N.D. Ga. 2011)[78]. ECF 186, pp. 33–34; ECF 182, pp. 29–30. *Amedi*, involving a war zone incident, is distinguishable and lacks any precedential weight here. Allowing dismissal based on potential defenses would unduly immunize contractors.

---

[78] Id.

**F.   _It would be premature to dismiss Plaintiffs' case without discovery_**

Even if the Court considers the motions, dismissal is premature without discovery. Factual

disputes, including the operational nature of the conduct and evidence classification, require

development. Plaintiffs deserve the same opportunity as in *Aktepe* and *Carmichael*.[79]

## XV.   PLAINTIFF CHRISTOPHER KRICK HAS STANDING UNDER FTCA

In the context of Federal Tort Claims Act (FTCA) litigation, courts have consistently indicated

that the administrative exhaustion requirement under 28 U.S.C. § 2675(a) demands only minimal

notice to the government agency, sufficient to permit a reasonable investigation of the underlying

incident and evaluation for potential settlement, without requiring exhaustive or formalistic details.

The government simply needs enough "information to investigate the claim." *Collins v. United States*,

996 F.3d 102, 111 (2d Cir. 2021). For instance, in *Adams v. United States*, 615 F.2d 284 (5th Cir.

1980), clarified, 622 F.2d 197 (5th Cir. 1980), the Fifth Circuit emphasized that an administrative

claim need not articulate specific legal theories or all factual nuances, as long as it supplies enough

information about the injury and circumstances to enable the agency to investigate effectively and

consider settlement, aligning with Congress's intent to streamline claims processing while avoiding

undue technical barriers. "The FTCA's jurisdictional presentment prerequisite is one of notice, not

proof. While this requirement demands more than a conclusory assertion of claims, it does not

necessarily require that a claimant provide an agency with supporting evidence." <u>Collins at</u> 105.

This approach, focused on practical notice rather than rigid formality, is particularly apt in

wrongful death cases where family members' interests are interconnected. Applying this principle, the

administrative claims filed on behalf of Oliver Krick's parents—detailing the plane crash, the resulting

wrongful death, and the family's shared loss—provided the relevant agencies with ample notice to

---

[79]*See McMahon II*, 502 F.3d at 1365 (dismissal premature if political question may not arise).

explore the full extent of damages stemming from the same facts, including impacts on all statutory beneficiaries. Christopher Krick's claim as Oliver's brother, arising from these identical circumstances, is encompassed within these filings, as the government was positioned to assess the broader familial ramifications without prejudice.

Persuasive authority from various jurisdictions reinforces permitting Christopher's claim to proceed absent a separate filing, especially in family-centric wrongful death scenarios where a representative's claim notifies the agency of collective injuries. For example, in *Estate of Sullivan v. United States*, 777 F. Supp. 695, 701 (N.D. Ind. 1991), the court found that a widow's wrongful death administrative claim satisfied jurisdictional requirements for her derivative loss of consortium claim, recognizing the interconnected nature of family losses and the sufficiency of notice for investigation. The court held: "Although it is apparent that the decedent's sister and mother were not named on the claim form, the government nevertheless had notice that they were potential claimants since, depending on how the evidence unfolds at trial, the sister and mother could recover under the wrongful death statute as 'dependent next of kin.' Accordingly, the government's supplemental motion to dismiss will be denied" *Id.*.

In like manner, *Emery v. United States*, 920 F. Supp. 788, 791 (W.D. Mich. 1996), deemed a husband's single SF-95 form sufficient for his wife's loss of consortium claim due to a brief reference enabling agency review.  The court indicated that the "notice requirement set forth in 28 U.S.C. § 2675(a) does not require a spouse to file a separate administrative claim form from her spouse's when filing a loss of consortium claim." These precedents demonstrate judicial aversion to barring sibling or derivative claims when the agency's investigative ability remains unimpaired, a principle directly applicable here where the parents' claims underscored the crash's profound family-wide devastation.

Moreover, the procedural history strengthens the case for retaining Chris Krick's claims. Though FTCA exhaustion is jurisdictional and non-waivable, his inclusion in the original Massachusetts complaint—unchallenged in initial dismissal motions—signals no surprise to

47

Defendants, consistent with the notice-oriented framework in wrongful death contexts. The delayed objection after transfer to New York should not undermine the parents' filings, which prepared the agencies to handle all foreseeable beneficiary claims from Oliver's death. Dismissing Chris Krick's action would undermine the FTCA's remedial purpose.

## XVI.  CONCLUSION

The comprehensive factual disputes identified above confirm that Defendants seek dismissal based on characterizations that directly contradict both the pleaded facts and the SAC's representations of the expert investigation underlying this case. The Massachusetts District Court's thorough analysis of identical statute of limitations arguments and Judge Donnelly's endorsement provides both legal precedent and factual framework supporting denial of Defendants' Motions. These factual disputes span every category of Defendants' arguments: the temporal scope of concealment, the current status of estates, the fraudulent basis of prior settlements, the scope of admiralty jurisdiction, and the applicability of political question doctrine. Under Rule 12(b)(6) standards, these extensive factual conflicts mandate development of the record through discovery rather than resolution through dismissal.

For the reasons set forth above, and in light of the Massachusetts precedent and extensive factual disputes that preclude dismissal, this Court should deny Defendants' Motions to dismiss in their entirety. As Judge Kelley correctly determined after thorough analysis, the SAC pleads valid claims for relief that are not barred by the statute of limitations. In the alternative, if the Court finds any deficiencies in the Second Amended Complaint, Plaintiffs respectfully request leave to file a Third Amended Complaint to address those issues. Rule 15(a)(2) provides that courts should freely give leave [to amend] when justice so requires, and the Second Circuit has consistently indicated that complaints should not be dismissed with prejudice unless it is clear that no amendment could cure the defect. *Porat v. Lincoln Towers Cmty. Ass'n,* 464 F.3d 274, 276 (2d Cir. 2006).

Plaintiffs also request oral argument on these motions.

Respectfully submitted

s/Stephani L. Ayers

Stephani L. Ayers

## CERTIFICATE OF SERVICE

I hereby certify that on July , 2025, I electronically filed the foregoing **PLAINTIFFS' CORRECTED ONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** with the Clerk of Court using the CM/ECF system, which will automatically send electronic notification of such filing to all following counsel of record.

I further certify that a courtesy copy of the foregoing document has been provided to the Court via hand delivery in accordance with the Court's Individual Rules.

Dated:  July 29, 2025

/s/ Stephani L. Ayers