UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

RONALD KRICK, et al.,

      Plaintiffs,

            v.

RAYTHEON COMPANY, et al.;

      Defendants.

-----------------------------------------------------x

Civil Action No.
1:23-cv-8093-AMD-JAM

(Donnelly, D.J.)
(Marutollo, M.J.)

## UNITED STATES OF AMERICA'S REPLY
## TO PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS[1]

---

[1] For simplicity the United States refers to Plaintiffs' Second Amended Complaint generally as "Complaint," except in the sections discussing the amendments to the original Complaint.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

1.    PLAINTIFFS PREVIOUSLY RELEASED ALL CLAIMS, INCLUDING FUTURE

ACTIONS AGAINST THE UNITED STATES, IN PRIOR SETTLEMENTS. ........................... 2

    a.    The Court does not need to look to parol evidence. .......................................... 2

    b.    The clear and unambiguous language of the releases precludes these claims. .................. 5

    c.    Plaintiffs bore the burden of proof, and they have failed to carry it. ................................. 9

2.    PERSONAL REPRESENTATIVES WERE NOT TIMELY APPOINTED. ........................ 11

3.    CERTAIN PLAINTIFFS DID NOT FILE ADMINISTRATIVE CLAIMS. ........................ 14

    a.    Christopher Krick failed to exhaust his administrative remedies. .................................... 14

    b.    The Court need not consider Plaintiffs' unfounded speculation regarding the Grays'

failure to file an administrative claim. ..................................................................................... 16

4.    THE OPPOSITION FAILED TO REFUTE THAT THE CLAIMS ARE TIME BARRED. 16

    a.    Plaintiffs attempt to add new claims and incorrectly expanded the limited holding from

the District of Massachusetts. ................................................................................................. 16

    b.    Plaintiffs have demonstrated no reason to delay the accrual beyond July 17, 1996. ........ 18

    c.    There is no basis for a claim of fraudulent concealment. .................................................. 19

5.    THIS CASE MEETS THE SUPREME COURT'S JURSIDICTIONAL TEST AS AN

ADMIRALTY MATTER. ......................................................................................................... 21

CONCLUSION ....................................................................................................................... 23

# TABLE OF AUTHORITIES

<u>Cases</u>

*A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135 (2d Cir. 2011)............................................ 19

*Alleghany Corp. v. Kirby*, 333 F.2d 327 (2d Cir. 1964) ................................................................ 6

*Berman v. Parco*, 986 F. Supp. 195 (S.D.N.Y. 1997)................................................................... 5

*Burke v. Quick Lift, Inc.*, 464 F. Supp. 2d 150 (E.D.N.Y. 2006).................................................. 23

*Butler v. Am. Trawler Co., Inc.*, 887 F.2d 20 (1st Cir. 1989) ..................................................... 23

*Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.,*

    *(Centro)*, 952 N.E.2d 995 (N.Y. 2011) ........................................................... 5, 7, 9, 10

*Chiron Corp. & PerSeptive Biosystems v. Nat'l Transp. Safety Bd.*,

    198 F.3d 935 (D.C. Cir. 1999) ...................................................................... 10, 11

*Collins v. United States*, 996 F.3d 102 (2d Cir. 2021)........................................................... 14, 15

*Columbia Consultants, LLC v. Danucht Entertainment, LLC,*

    222 A.D.3d 479 (N.Y. App. Div. 2023)........................................................ 7, 10

*Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 554 F. Supp. 2d 178 (S.D.N.Y. 2008) ................. 6

*Cortlandt St. Recovery Corp. v. Hellas Tel., S.a.r.l*, 790 F.3d 411 (2d Cir. 2015)........................ 12

*Crawford v. Electric Boat Corp.*, 515 F. Supp. 2d 282 (D. Conn. 2007)...................................... 22

*Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387 (S.D.N.Y. 2023) ................................. 3, 4

*Elias v. Gettry Marcus CPA, P.C.,*

    17 Civ. 4066 (ER), 2018 WL 3117510 (S.D.N.Y. June 25, 2018)................................ 4

*Ellul v. Congregation of Christian Bros.*, 774 F.3d 791 (2d Cir. 2014) ........................................ 19

*Emery v. United States*, 920 F. Supp. 788 (W.D. Mich. 1996)................................... 14, 15, 17, 18

*Estate of Sullivan v. United States*, 777 F. Supp. 695 (N.D. Ind. 1991) ...................................... 15

*Fleming v. Ponziani*, 247 N.E.2d 114 (N.Y. 1969) ....................................................................... 9

*Garmon v. Cnty. of Rockland*, No. 10-cv-7724, 2013 WL 541380 (S.D.N.Y. Feb. 11, 2013)...... 12

*Haekal v. Refco, Inc.*, 198 F.3d 37 (2d Cir. 1999).......................................................................... 20

*Hanley v. Lark Deli Corp.*, 2 F. Supp. 2d 534 (S.D.N.Y. 1998)............................................................ 2

*Harper v. Ercole*, 648 F.3d 132 (2d Cir. 2011) ............................................................................... 20

*In re Air Crash Near Peixoto De Azeveda, Brazil*, 574 F. Supp. 2d 272 (E.D.N.Y. 2008)........... 11

*In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ........................ 14

*Indian Towing Co. v. United States*, 350 U.S. 61 (1955) ................................................................. 21

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,513 U.S. 527 (1995) .................... 21

*Knous v. United States*, 981 F. Supp. 2d 1365 (N.D. Ga. 2013) .................................................... 11

*Long v. O'Neill*, 126 A.D.3d 404 (1st Dept. 2015) ......................................................................... 4

*Marine Midland Bank-Southern v. Thurlow*, 425 N.E.2d 805 (N.Y. 1981)............................... 2, 3

*Matthias v. United States* 475 F. Supp. 3d 125 (E.D.N.Y. 2020)................................................. 13

*Miller v. Brunner*, 164 A.D.3d 1228 (N.Y. App. Div. 2018)........................................................ 9

*Salehi v. Surfside III Condominium Owners' Ass'n*,
    200 Cal. App. 4th 1146 (Cal. Ct. App. 2011)........................................................................ 7, 8

*Trump v. Trump*, 77 Misc. 3d 543 (N.Y. Sup. Ct. 2022) ............................................................ 5, 7

*Uddoh v. United Healthcare*, 254 F. Supp. 3d 424 (E.D.N.Y. 2017) ........................................... 22

*Wright v Ernst & Young, LLP*, 152 F.3d 169 (2d Cir. 1998)......................................................... 22

Statutes

28 U.S.C. § 1631............................................................................................................................ 23

28 U.S.C. § 2401(b) ...................................................................................................................... 14

28 U.S.C. § 2680(d) ...................................................................................................................... 22

46 U.S.C. § 801.............................................................................................................................. 22

46 U.S.C. § 30903 ................................................................................................................ 22

46 U.S.C. § 30904 ................................................................................................................ 22

49 U.S.C. § 1154(b) ............................................................................................................. 10

N.Y. Est. Powers & Trusts Law § 5–4.1 ............................................................................. 11

Rules

Fed. R. Civ. P. 2 .................................................................................................................. 23

Fed. R. Civ. P. 9(b) ............................................................................................................. 20

Regulations

49 C.F.R. § 831.4(c) ........................................................................................................... 10

Other Authorities

Pub. L. 86-770 ..................................................................................................................... 22

INTRODUCTION

The United States of America respectfully submits this Reply to Plaintiffs' Oppositions. ECF 196, 220. Plaintiffs have largely failed to address the case law and arguments asserted in the Motion to Dismiss that provide the Court with multiple bases for dismissing the Complaint. Rather, Plaintiffs rely almost exclusively on a nonbinding decision from Judge Angel Kelley of the District of Massachusetts. They essentially contend that this Court can dispatch with the motion based on that decision without analyzing the Complaint and arguments favoring dismissal. Plaintiffs' reliance on Judge Kelley's order misapprehends the limited nature of that decision.

The prior motion Judge Kelly considered had only two bases: statute of limitations and improper venue. It did not argue, first, that Plaintiffs had previously released all claims in settling their earlier cases because the releases were not produced at the time and Plaintiffs pleaded no facts related to this obvious and serious shortcoming. Second, it did not argue that Plaintiffs lack standing because Defendants had not yet learned that there were no open estates with appointed personal representatives when Plaintiffs filed their lawsuit. Defendants first discovered this deficiency after the case was transferred. Third, the Motion did not assert that certain Plaintiffs failed to file administrative claims and fourth, it did not argue that this case was brought under the wrong waiver of sovereign immunity. In addition, Judge Kelley's analysis regarding the futility of transfer to the Eastern District of New York did not decide when the claim accrued, and if the statute of limitations had run. Those decisions were reserved for this Court, following transfer for improper venue. The earlier decision was also based on First Circuit precedent that is not binding on this Court. This Court is free to determine when the claim accrued and when the statute of limitations ran, and to use Second Circuit case law in so doing.

1

**ARGUMENT**

1.  PLAINTIFFS PREVIOUSLY RELEASED ALL CLAIMS, INCLUDING FUTURE ACTIONS AGAINST THE UNITED STATES, IN PRIOR SETTLEMENTS.

    a.  The Court does not need to look to parol evidence.

Plaintiffs have failed to refute, per the clear and unambiguous language of the releases, that 1) the United States is a "Releasee" in the settlements they signed with The Boeing Company in 2000 and 2001 and 2) this lawsuit is foreclosed as a potential future action they surrendered in exchange for money.[2] Rather Plaintiffs contend that the Court must refer to parol evidence, and thereby permit discovery, about the intent of otherwise straightforward language. *See* ECF 220 at 3–6. The Court already ruled, on December 30, 2024, that discovery was stayed pending resolution of the motion.[3] That decision was based on a joint status report submitted by the parties, *see* ECF 166, where the issue of discovery regarding the releases was specifically addressed. No changes have occurred that would provide a reason to revisit a decided issue.

Where a settlement agreement's language is unambiguous the parol evidence rule bars consideration of external evidence "to vary, contradict, add to or explain its terms." *Hanley v. Lark Deli Corp.*, 2 F. Supp. 2d 534, 537 (S.D.N.Y. 1998) (citing *Marine Midland Bank-Southern*

---

[2] Given the centrality of the releases, it is telling that Plaintiffs' Complaint never mentioned their existence or notified the Court that they previously engaged in years of litigation with Boeing and other defendants, before settling, and waiving all future claims against anyone allegedly responsible for the crash, even claims that were unknown at the time.

[3] In their recent filing Plaintiffs, for the first time, allege that the releases attached as exhibits to the Motion are incomplete. *See* ECF 220 at 6. They even intimate that the notarized signatures of their clients could be forged, or that they were not adequately informed by former counsel in 2000 and 2001 as to the contents of the releases. *Id.* at 5. Such speculation is fanciful, and further there is no factual support for any of these late-manufactured arguments. The releases were produced by Boeing in response to a subpoena. There are no indicia of them being incomplete, and despite the intervening two years that they have had these releases, Plaintiffs have never made any of these claims.

2

*v. Thurlow*, 425 N.E.2d 805 (N.Y. 1981)). Plaintiffs demonstrate no ambiguity in the language of the releases but rather demand that the Court look to parol evidence to demonstrate that the United States is not a released party, and that any actions, such as this one, were not released. *See* ECF 220 at 3.

In their argument, Plaintiffs state legal maxims, for which they provide no citation such as "New York law and federal precedent within the Second Circuit establish that the scope and applicability of a settlement release to non-parties involve factual questions that preclude summary adjudication when genuine disputes exist regarding the parties' intent." *Id*. Plaintiffs also allege without citation that "[c]ourts have recognized that the passage of time and changed circumstances may affect the interpretation of settlement terms, particularly when the current defendants were not involved in the original negotiations." *Id*. at 6. However, the most absurd argument they attempt to make without citation is that releases from 2000 and 2001 are so ancient that they cannot be relied upon. *Id*. at 2-3, 6. Stemming from these statements is the suggestion that the language of a settlement release is fungible and that it evolves over time depending upon the subjective intent of a signatory. This purported "legal maxim" is so vastly disconnected from legal reality that this Court should not consider it.

The cases Plaintiffs actually cite provide no support for their argument but rather undercut the suggestion that the Court should look to parol evidence. *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387 (S.D.N.Y. 2023), stems from the fallout related to the Jeffrey Epstein sex-trafficking scandal and specifically whether banks that were involved in moving monies associated with him could be defendants in subsequent legal actions for facilitating the crimes. Contrary to Plaintiffs' over-arching suggestion that this Court look to parol evidence, the focus in that case was exclusively on the language of the agreement as

neither party suggested extrinsic evidence was necessary to inform the court's understanding. *Id*. at 401. Rather the court's focus was exclusively on the language contained in the agreement, and whether the banks were covered. The "intent" from the agreement that the court determined was based on just the language in the document, and clauses that referenced the limited scope of specific terms contained therein. *Id*. at 401-02. Here Plaintiffs have pointed to no language in the releases which counter any of the United States' arguments about its coverage.

Plaintiffs then turn to *Elias v. Gettry Marcus CPA, P.C.*, 17 Civ. 4066 (ER), 2018 WL 3117510 (S.D.N.Y. June 25, 2018), to suggest that a determination of coverage includes context and conduct of the parties. *See* ECF 220 at 4. Plaintiffs' citation to *Elias* is of no merit as that case interpreted the language of the agreement under Florida law, and not New York or California law which are applicable here. *Elias*, 2018 WL 3117510, at *3 n.3 (S.D.N.Y. June 25, 2018). Therefore, the Court need not consider any issues raised by this holding or Plaintiffs' arguments based thereon.

Plaintiffs' citation to *Long v. O'Neill* is equally quixotic as it runs counter to their claims. 126 A.D.3d 404 (1st Dept. 2015). In that case, a signatory to a broad release argued that it only released claims between plaintiffs and defendants and did not include claims among defendants. The appellate court disagreed, focusing exclusively on the language contained in the agreement. *Id*. at 407. The court actually rebuked a suggestion about the party's subjective intent compared to actual language in the agreement. *Id*. Moreover the court contended that releases are to be given effect "even when the releasors are subjectively unaware of the precise claims they are releasing." *Id*. at 408. This holding is far from anything Plaintiffs are suggesting and provides no support for evaluating parol evidence.

Plaintiffs' citation to *Berman v. Parco*, 986 F. Supp. 195 (S.D.N.Y. 1997), is likewise unavailing and only provides further support to the United States' position. In that case, the Southern District of New York evaluated a settlement agreement as a whole and determined that various paragraphs within it were internally inconsistent thus making it ambiguous. *Id*. at 210. However, arriving at that location the court reaffirmed that where an agreement is clear and unambiguous that the court will not look beyond the "four corners" and that parol evidence of intentions is inadmissible. *Id*. at 209 (collecting cases). Further, determining if an agreement is clear and unambiguous is a question of law resolved by the court. *Id*. (collecting cases). And importantly, the "traditional view is that the search for ambiguity must be conducted within the four corners of the writing." *Id*. (citations omitted). As Plaintiffs have not pointed to any ambiguity in the language of the releases, the entirety of their argument for the necessity to conduct discovery and evaluate the meaning of terms based on subjective extrinsic evidence is without merit.

    b.   The clear and unambiguous language of the releases precludes these claims.

"[A] release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is fairly and knowingly made." *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V. (Centro)*, 952 N.E.2d 995, 1000 (N.Y. 2011) (citation modified). Where a party releases a fraud claim, it "may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release." *Id.* (citation modified); *see also Trump v. Trump*, 77 Misc. 3d 543, 553 (N.Y. Sup. Ct. 2022). "Were this not the case, no party could ever settle a fraud claim with any finality." *Centro*, 952 N.E.2d at 1000; *see also Trump*, 77 Misc. 3d at 553.

The Second Circuit has also recognized that under New York law, all the facts and circumstances of the claim being released need not be disclosed for a release to be valid and

enforceable. *See Alleghany Corp. v. Kirby*, 333 F.2d 327, 333-34 (2d Cir. 1964) (failure to disclose all aspects of underlying fraud does not invalidate otherwise valid settlement); *see also Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 554 F. Supp. 2d 178, 190-91 (S.D.N.Y. 2008) (discussing Second Circuit and New York federal district court cases recognizing this principle).

It is beyond doubt that Plaintiffs, or their predecessors who sought recovery for the fatal injuries to their decedents, fairly and knowingly released the claims advanced in this lawsuit. The parties to the releases, represented by counsel, agreed to the following language:

- ¶ 3 "[R]eleasors release and forever discharge any and all actions, causes of action, [and] suits, . . . which against Releasees the Releasors ever had, now have or hereafter can, shall or may have . . . arising out of, or in any way related to the Event . . . ."[4]

- ¶ 3 "This Release expressly extends to and includes, but is not limited to, any and all causes of action based on any wrongful death act, survival statute, or common law.  This Release also expressly extends to and includes, but is not limited to, each and every claim or cause of action that could have been asserted . . . ."

- ¶ 5 "Releasors intend this Release to constitute a full release and discharge of any and all claims that they may have arising out of the injury to and death of Decedent.  Releasors state that they intend to release fully all individuals, entities or corporations, whether specifically named or not, that might be liable for damages arising out of the injury to or death of Decedent . . . ."

- ¶ 6 "This Release is intended to . . . dispose of all liability of Releasees to Releasors and all heirs and dependents of Decedent not otherwise identified, and their successors and assigns, that might now or in the future assert a claim, demand, action or bring suit arising out of injury to or the death of Decedent . . . ."

---

[4] "Releasees" include the United States as the term is defined as "all other persons and entities not specifically identified who are or may be liable to Releasors in whole or in part for any and/or all damages and losses to Releasors, whether known or unknown arising out of or in any way related to or resulting from the loss of TWA Flight 800." ECF 180-9 (defining "Releasees" on page 1 of each release). The Kevorkian release specifically named the United States as a Releasee. *Id.*

"Event" is defined as "On or about July 17, 1996, Decedent died in the loss of TWA Flight 800 . . . off the coast of Long Island, New York . . . ." *Id.* ¶ 1.

- ¶ 8 "Releasors enter into this Release contemplating the possibility that facts may be subsequently discovered that could support claims as yet unasserted against Releasees for compensatory, consequential and/or punitive damages . . . . Releasors intend to discharge Releasees from all liability for all losses, injuries or damages arising out of the injury to or death of Decedent, both those now known and those that may be subsequently discovered . . . . Releasors also fully understand and acknowledge that facts concerning their claims may be found hereafter to be other than or different from the facts they now believe to be true. Releasors expressly accept and assume the risk of any such possible differences in facts and agree that this Release shall remain in full effect notwithstanding any such difference in facts. Releasors waive any rights or benefits conferred by any statute or common law decision with respect to unknown or unsuspected claims . . . ."

ECF 180-9.

Language releasing "all actions" or "causes of action" that a plaintiff "can," "shall," or "may" bring for any reason indicates that a release includes unknown fraud claims. *Trump v. Trump*, 77 Misc. 3d at 554 (citing *Centro*, 952 N.E.2d at 1000) (citation modified); *see also Columbia Consultants, LLC v. Danucht Entertainment, LLC*, 222 A.D.3d 479, 479-80 (N.Y. App. Div. 2023) (language that party may discover different facts from those known at the time included fraud claims). Generalized language releasing "all manner of actions" or "future" actions, especially when stated as known or unknown, is evidence of a knowing waiver of unknown fraud claims. *Centro*, 952 N.E.2d at 1000; *see also Salehi v. Surfside III Condominium Owners' Ass'n*, 200 Cal. App. 4th 1146, 1160-61 (Cal. Ct. App. 2011) (release in prior settlement agreement of "known and unknown" claims barred later claim for fraud). This is especially true when a releasor was represented by counsel when the agreement was negotiated. *Trump*, 77 Misc. 3d at 557 (New York law); *Salehi*, 200 Cal. App. 4th at 1160 (California law). Releasors negotiated and executed releases sufficiently broad enough to preclude this lawsuit with their eyes wide open.

Plaintiffs cannot plausibly argue that the releases' language is ambiguous as to unknown, future claims against those who were not parties to the prior litigation. The language, in fact,

7

could not be plainer and simpler – Releasors released all claims against any entity that may be liable for the crash, whether known or unknown, and the releases remain valid, even if Plaintiffs learn of additional facts about the accident's cause. *E.g.*, ECF 180-9 at 5-6, 14-15, 23-24, 44-45, 53-54, 62-63, 71-72, ¶¶ 8-9. The parties were both represented by counsel and had the benefit of years of discovery when negotiations occurred. ECF 196 at 24, 39.

A finding by a court that such language, intentionally crafted, was not broad enough to include claims of fraud, would make releases ineffective as to unknown or unsuspected claims. Such a finding is contrary to public policy, judicial efficiency, and the interests of finality. *See Salehi*, 200 Cal. App. 4 at 1161. The present releases resolved a complex aviation tort action. Such actions are regularly settled, including ones where causation theories continue to swirl even after litigation has concluded. The scenario alleged in this action was specifically contemplated by the releases and should be given effect.

Releasors could have negotiated for language preserving their rights to bring a later action. Instead, they waived such rights, whereas the Releasees negotiated to maintain their own rights to sue. The parties agreed that "[i]t is the express intent . . . that any and all rights of indemnity, contribution or other derivative claims that any Releasee may have against any other Releasee or other person, corporation or entity whether known or unknown, shall be preserved . . . ." *See* ECF 180-9 ¶ 13. In other words, Boeing could have sued the United States and the other Defendants, but Plaintiffs could not. This indicates that future actions were contemplated when the releases were negotiated and that Releasors agreed to waive their rights to sue.

8

c.   Plaintiffs bore the burden of proof, and they have failed to carry it.

As the United States demonstrated that the claims were released, *see* ECF 179 at 15-18, the burden of proof shifts to Plaintiffs to demonstrate actual fraud, separate from the subject of the release, sufficient to void the releases. *Centro*, 952 N.E.2d at 1000-01 (citing *Fleming v. Ponziani*, 247 N.E.2d 114 (N.Y. 1969)); *see also Miller v. Brunner*, 164 A.D.3d 1228, 1231 (N.Y. App. Div. 2018). Further, a plaintiff seeking to invalidate a release due to that separate fraud must establish all the essential elements including justifiable reliance. *Centro*, 952 N.E.2d at 1000; *see also Miller*, 164 A.D.3d at 1231 (plaintiffs must sufficiently allege each element).

Plaintiffs failed to allege a fraud separate from the subject of the releases. Plaintiffs contend that the United States misled them as to the cause of the crash of TWA Flight 800, inducing Plaintiffs and Boeing to settle these cases. ECF 33 ¶¶ 47-48, 50-54. The subject of the releases is the cause of that crash, the litigation stemming from it, and Boeing's payment of money to the relatives and estates of the same decedents for whom this action purportedly seeks recovery, in exchange for Releasors releasing their rights to sue. The Releasors signed the releases specifically "contemplating the possibility that facts may be subsequently discovered that could support claims yet unasserted . . . [and] Releasors intend to discharge Releasees from all liability . . . for all losses, . . . both those now known and those that may subsequently be discovered." ECF 180-9, ¶ 8. Plaintiffs' failure to allege a separate fraud precludes their argument that the releases should not be given effect. *See Centro*, 952 N.E.2d at 1001-03 (holding that "[t]he fraud described in the complaint . . . falls squarely within the scope of the release").

Even if they had alleged a separate fraud, Plaintiffs' action should still be dismissed because they fail to demonstrate they reasonably relied on statements from the Government in signing the releases. *See Centro*, 952 N.E.2d at 1002. Plaintiffs cannot show the required

reasonable reliance as they contemporaneously attested that they did not rely on representations made by any "Releasee or by any attorney, agent or other person representing any Releasee concerning . . . [t]he cause or causes for the (crash of TWA Flight 800) . . . ." ECF 180-9 ¶ 9. Such an acknowledgment makes reliance on Governmental representations unreasonable "as a matter of law." *Columbia Consultants*, 222 A.D.3d at 480. Further, the Complaint contains no allegation that the United States had any involvement in settlement negotiations or writing the broad terms of the release.

Plaintiffs contend they relied on the National Transportation Safety Board's (NTSB) conclusions in its final report regarding the cause of the explosion, a conclusion which Plaintiffs claim is false. ECF 33 ¶¶ 3, 50-51, 54. This alleged reliance on the NTSB's statements is unreasonable, and in the case of the Kevorkian release, temporally impossible.[5] Reasonable reliance is foreclosed by 49 U.S.C. § 1154(b), which states that "[n]o part of a report of the Board, related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report." Further, applicable regulations provide that NTSB investigations are not conducted to determine the rights or liability of any person. 49 C.F.R. § 831.4(c).

Congress has taken great care to separate NTSB investigations from litigation to prevent the Board's resources from being diverted from its principal mission and to protect its internal decision-making from controversy. *Chiron Corp. & PerSeptive Biosystems v. Nat'l Transp. Safety Bd.*, 198 F.3d 935, 940-42 (D.C. Cir. 1999). NTSB investigations are not intended to facilitate litigation, and Congress made it clear that NTSB reports should not be used to the advantage or

---

[5] The Kevorkian release was signed in April of 2000, months before the NTSB report was issued, and in no way can be said to have relied on its probable cause finding.

disadvantage of parties in a civil lawsuit. *Id.*; *see also In re Air Crash Near Peixoto De Azeveda, Brazil*, 574 F. Supp. 2d 272, 278 (E.D.N.Y. 2008) (§ 1154(b) prohibits use of NTSB report but taking judicial notice that the NTSB issued a report). To the extent Plaintiffs relied on the NTSB report, such reliance is not reasonable. *Knous v. United States*, 981 F. Supp. 2d 1365, 1367 (N.D. Ga. 2013) (barring plaintiffs from referencing NTSB's conclusions in an FTCA complaint). This action was released and should be dismissed.

2.  PERSONAL REPRESENTATIVES WERE NOT TIMELY APPOINTED.

    a.  Plaintiffs were not personal representatives when the lawsuit was filed.

Plaintiffs do not dispute that under New York law the power to bring this action is held only by a court-appointed personal representative. N.Y. Est. Powers & Trusts Law § 5–4.1; *id.* § 1–2.13. The Complaint alleged that Ronald Krick, Douglas Kevorkian, Wanda Kemp, and Eileen Zaharioudakis were personal representatives of the estates on the day suit was filed. ECF 33 ¶¶ 15, 18, 24, 26. As established that allegation is flat wrong. All estates were closed when the original Complaint was filed, and none had an active court-appointed personal representative at that time.[6] In fact, even as of the date of this filing, two of the parties purporting to be personal representatives—Wanda Kemp[7] and Eileen Zaharioudakis—are still not appointed. ECF 215.

---

[6] Plaintiffs assert that Lamar Allen's estate remained open, despite more than two decades of inactivity. ECF 196 at 21. That is wrong. The administrator Betty Anne Allen (decedent's widow) asked that the estate be closed in 2002. Mrs. Allen still does not want the estate to be a part of the present lawsuit. *See* ECF 215-1 at 7.

[7] Plaintiffs spend considerable paragraphs alleging that Christine Grogan took a DNA test and speculating that the results of that test demonstrate that the purported daughter of Lamar Allen has a right to recover or serve as a personal representative. Further they contend that they should be permitted discovery to further that claim. However, they failed to address the fact that she was adopted by another family, and that the act of adoption terminated any rights she may have had. No discovery is necessary for her to determine that she was adopted.

Plaintiffs, also, failed to discuss the cases cited by the United States holding that a personal representative of an open estate must bring the action. Apparently admitting error, they scrambled to attempt to reopen the estates. To assist them in this endeavor they asked for numerous extensions of time, on top of the three years this case had already been open. ECF 192-1 at 7.[8] Regardless of the recent but sadly dilatory and half-hearted efforts to rectify their allegations, the proper remedy is dismissal as Plaintiffs lacked standing to sue on behalf of the estate when they filed this lawsuit. *Garmon v. Cnty. of Rockland*, No. 10-cv-7724, 2013 WL 541380 at *2 (S.D.N.Y. Feb. 11, 2013). Plaintiffs seek leniency under Rule 17(a)(3), however, as will be shown, they should not be granted any.

Given the extreme passage of time and Plaintiffs' inaction until just recently, it is impossible for them to establish that they acted timely much less in good faith. Rule 17(a)(3) was designed to avoid forfeiture and injustice when an understandable mistake was made selecting in whose name the action should be brought. *Cortlandt St. Recovery Corp. v. Hellas Tel., S.a.r.l*, 790 F.3d 411, 421 (2d Cir. 2015). Rule 17(a)(3) codifies the modern "judicial tendency to be lenient when an honest mistake has been made in selecting the proper plaintiff." *Id*. No such mistake was made here.

In certain circumstances, not present here, a court may substitute a personal representative. In this case, however, Plaintiffs cannot show an understandable mistake. To the contrary, Plaintiffs pleaded this action as personal representatives, indicating knowledge that a wrongful death action must be brought that way. The choice of individuals to serve as those representatives was deliberate. Because those allegedly representing the estates did not, in fact, represent open estates when the case was filed, the Court has no grounds for substituting any

---

[8] The Opposition wholesale fails to address Ashton Lamar Allen's estate.

12

newly appointed personal representative. One cannot claim an "understandable mistake" in wrongfully holding oneself out as a court-appointed personal representative when none of the prerequisite steps were taken.

As seen in *Matthias v. United States*, a plaintiff must demonstrate standing by proving appointment as a personal representative when the suit is commenced. 475 F. Supp. 3d 125, 136 (E.D.N.Y. 2020). Plaintiffs did not qualify as personal representatives on the day suit was filed, which they do not dispute, and therefore they must be dismissed. Plaintiffs claim they are entitled to discovery about themselves on an issue entirely of their own making. ECF 196 at 23. Evidence of their status is entirely under Plaintiffs' control and discovery is unnecessary.[9]

    b.   The Opposition fails to address each individual Plaintiff's lack of standing.

The Motion argues, with relevant case law, that the nine individual Plaintiffs lack standing to assert claims on their own behalf. ECF 179 at 30-31. Plaintiffs failed to address those arguments. Rather they baldly state that the individuals have the right to bring claims for their own unpleaded injuries. ECF 196 at 38. They further argue that the Complaint contains "significant factual allegations by the individual defendants [sic] that set forth various causes of action, including but not limited to fraud, abuse of process, reckless infliction of emotional distress, and violation of civil rights." *Id*. at 40. In the very next sentence, Plaintiffs admit there are no causes of action in the Complaint that lay out those injuries. *Id*. Plaintiffs cannot amend the Complaint through their Opposition. *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 432 (S.D.N.Y. 2001). Therefore, the Court should not consider their argument.

---

[9] Plaintiffs claim they are entitled to a New York state procedural rule to give themselves a do-over to find the right plaintiffs and refile. ECF 196 at 23. The Court should not consider the accuracy of this unripe assertion. If future court-appointed personal representatives file new actions, after dismissal, a future court will determine whether New York's procedural rules would apply in federal court to allow them to re-commence an FTCA action.

3.  CERTAIN PLAINTIFFS DID NOT FILE ADMINISTRATIVE CLAIMS.

a.   Christopher Krick failed to exhaust his administrative remedies.

Plaintiffs admit that Christopher Krick did not file an administrative claim. ECF 196 at

47. Rather than acknowledge that his failure to meet this jurisdictional prerequisite is grounds for

dismissal, Plaintiffs argue he should be permitted to proceed because somewhere buried within

the claim filed by Ronald or Margareta Krick, the Navy was put on notice that decedent Oliver

Krick's now-adult brother also intended to bring a claim. *Id*. This argument is without merit.

Plaintiffs submitted separate SF-95 forms supported by a single set of exhibits and an

"Attachment 1" supplying information for twenty claimants. *See* ECF 72-4 (Ronald Krick

claim); 180-10 (cover letter to claims). Christopher Krick's name is nowhere in those documents.

The claim made no reference to siblings or other family members of decedent Oliver Krick aside

from his parents. Plaintiffs suggest the absence of basic information like a plaintiff's name or

existence, *i.e.* that the decedent had a sibling, is justified as providing "minimal notice."

As one of Plaintiffs' cited cases states, "[t]he filing requirements are not mere

jurisdictional technicalities. Rather, they are essential to the fulfillment of the Congressional

intent underlying (28 U.S.C. § 2401(b))." *Emery v. United States*, 920 F. Supp. 788, 790 (W.D.

Mich. 1996). The claims process was designed to minimize caseloads by requiring presentment

and hopefully settlement of meritorious claims. *Id*. Asking an agency to parse lines of a claim to

discern unnamed potential distributees on the penumbra of a family is inconsistent with that

standard. *Collins v. United States*, 996 F.3d 102, 111 (2d Cir. 2021) (claim must be specific

enough to expedite settlements). The burden is on the plaintiff who "must provide the

appropriate agency with sufficient notice." *Id*. at 110. What was provided was insufficient to

evaluate any claim now raised by Christopher Krick.

Tellingly Plaintiffs could not locate a case from the last nearly thirty years, or from the Second Circuit, to support their assertions, and the cases they cite do not support their arguments. In *Estate of Sullivan v. United States*, 777 F. Supp. 695 (N.D. Ind. 1991), the district court dealt with a situation where only one person filed an administrative claim as an individual and personal representative of decedent's estate. In the ensuing FTCA lawsuit, the same person sought to recover damages on behalf of two additional survivors, named on the claim form but who did not file their own. *Id.* at 698. The United States moved to dismiss claims made on behalf of the additional survivors. *Id.* The court held that such claims could proceed because the personal representative was the only one who could prosecute a wrongful death action under applicable state law for the benefit of the two survivors. *Id.* at 699. Here, an estate is not attempting to recover damages on behalf of Christopher Krick as a statutory distributee. Rather, Christopher Krick is seeking damages for his own losses consequent to Oliver Krick's death. Therefore, this case is distinguishable.

In *Emery v. United States*, an injured individual filed an administrative claim that noted that his wife, named specifically, also had a claim for loss of consortium. 920 F. Supp. at 789. Denying a motion to dismiss the loss of consortium claim, the district court determined that there was sufficient information within the administrative claim referencing the spouse's loss of consortium to put the government on notice. *Id.* at 791. However, the district court noted that other jurisdictions had previously found that a spouse's failure to file his/her/their own administrative claim was grounds for dismissal. *Id.* (collecting cases). What saved the spouse's claim in *Emery* was the explicit reference to her by name and type of claim. Such indicia are absent from the claims filed by Ronald or Margareta Krick. Therefore, *Emery* is distinguishable.

b.  The Court need not consider Plaintiffs' unfounded speculation regarding the Grays' failure to file an administrative claim.

Plaintiffs do not dispute the accuracy of the Dronberger declaration which states that after a search of relevant files there is no evidence that Charles Henry Gray IV or Chadwick Graham Gray ever filed an administrative claim. *See* ECF 180-11 ¶¶ 3-4. Rather, Plaintiffs speculate that a claim may have been filed but not received in the correct office, and therefore they should not have their case dismissed for failure to meet their burden of proving this jurisdictional prerequisite. *See* ECF 220 at 8. They insist, through this speculation, that they need discovery of Navy logs in order to prove compliance. Such speculation is tiresome at this stage of litigation over three years since the Amended Complaint was filed adding these parties. Notably, they provide no declaration from these individuals asserting that they filed an administrative claim. The Navy performed a search for an administrative claim (not just an SF-95 form as suggested by Plaintiffs) and found no evidence of it. That is sufficient evidence in support of a Rule 12(b)(1) motion that none was filed, and this Court need not further consider this unfounded guesswork.

4.  THE OPPOSITION FAILED TO REFUTE THAT THE CLAIMS ARE TIME BARRED.

a.  Plaintiffs attempt to add new claims and incorrectly expanded the limited holding from the District of Massachusetts.

Plaintiffs failed to address the case law or arguments advanced by the United States regarding the standard for judging accrual of a claim, application of the discovery rule, or the fraudulent concealment doctrine. Rather, they attempt to mischaracterize and expand the scope of the ruling from the District of Massachusetts to confuse issues and present the Court with a *fait accompli*. Namely, Plaintiffs suggest that "the Massachusetts court correctly determined these circumstances establish that the limitations period may be tolled . . . ." ECF 196 at 21. They further suggest that "[Judge Kelley] concluded that plaintiffs' allegations were sufficient to

16

survive defendants' Rule 12(b)(6) challenge." *Id*. at 33. They continue, stating that Judge Kelley "recognized, the statute of limitations began to run only when Plaintiffs became aware of Dr. Stalcup's findings in April 2021 . . . ." *Id*. at 34. They also claim that Judge Kelley "concluded" that the statute of limitations issues could not be resolved at the motion to dismiss stage. *Id*.

The District of Massachusetts reached no such "conclusions." Rather, the Court twice emphasized that its holding was limited to whether venue was appropriate in Boston and reserved any decisions on the statute of limitations for the transferee venue, *i.e.* the Eastern District of New York. *See* ECF 95 at 9, 22 ("The Court addresses the statute of limitations challenge solely to determine whether to completely dispose of the matter or transfer it for all substantive issues to be decided by the receiving court. . . . Out of respect for the province of the receiving court, this Court does not reach a final determination on the accrual date for calculation of the statute of limitations."). As such, this Court is free to weigh the merits of these arguments on its own accord.

Plaintiffs also did not address the comprehensive timeline established by the United States, *see* ECF 179 at 12-24, which detailed the evolution of the errant missile test theory, and efforts taken by Dr. Stalcup and others, to publicly undercut the NTSB's conclusion that the accident was the result of an internal explosion in the aircraft's fuel tank. In addition, Plaintiffs have manufactured a spoliation claim without basis in their pleadings. *See* ECF 196 at 21, 34. As mentioned elsewhere, Plaintiffs are not permitted to expand the scope of their Complaint via their Opposition. More to the point, Plaintiffs' spoliation claim has no bearing over the issue of whether the statute of limitations accrued earlier than October 2019.

   b.  Plaintiffs have demonstrated no reason to delay the accrual beyond July 17, 1996.[10]

Plaintiffs' arguments contesting the timely accrual of their claims vanish at the moment in history when they retained counsel for their original wrongful death actions. The releases signed in 2000 and 2001, terminating their cases, indicate that six of the nine remaining individual Plaintiffs retained counsel after the crash: Christine Grogan, Ronald Krick, Margareta Krick, Christopher Krick, Douglas Kevorkian, and Eileen Zaharioudakis. *See* ECF 180-9. Personal representatives on behalf of all of the estates likewise retained counsel. *Id*. It is not clear whether the remaining three individual Plaintiffs (Michael Deteresa, Craig Gaetke, and Wanda Kemp) retained counsel. But that does not matter because legal representatives of their decedents did retain counsel and compromised the claims on behalf of all heirs and dependents. ECF 180-9 ¶ 6.

   It is well established in the Motion, Complaint, and Opposition, that the missile theory was circulating in public discourse at least by November 17, 1997, when the Central Intelligence Agency's (CIA) animation was played on national television. As stated in the Motion, and unrefuted by Plaintiffs, there would be no need to air such information, including an explicit statement that "it was not a missile," if that theory was not well ensconced in the public's vernacular. Further, there would be no need to include an extensive discussion in the NTSB report on the missile theory in 2000, if it had fallen out of the general conversation regarding the crash as well. During this highly relevant time, six of the nine individual Plaintiffs and the court-appointed personal representatives of the estates had the assistance of counsel and the subject matter experts that come with competent representation. This distinguishes the present case from all precedents Plaintiffs raise. At no time have Plaintiffs alleged that they or their predecessors

---

[10] Like their response to the Motion in the District of Massachusetts, Plaintiffs here failed to respond to the United States' arguments that equitable estoppel and laches are inapplicable. *See* ECF 179 at 44-45. As such, the Court should conclude that these theories were abandoned.

who sought recovery for their decedents' deaths in the prior litigation received ineffective assistance of counsel.

Further, Plaintiffs have never stated that they were anything less than completely satisfied with the counsel who successfully settled their suits against Boeing. *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 140 (2d Cir. 2011) ("Once an injured party . . . knows enough to warrant consultation with counsel . . . conscientious counsel will have ample time to protect the client's interest by investigating the case and determining whether, when, where, and against whom to bring suit."). With all the available information circulating during the time and knowing that counsel did not file suit against the United States, the obvious conclusion is not that the missile theory was suppressed; rather that competent counsel and experts found it meritless.

In addition, despite the United States' explanation about the District of Massachusetts' factual error regarding the production of radar tapes to Dr. Stalcup, *see* ECF 179 at 36, Plaintiffs continue to express factual inaccuracies. Specifically, they assert that radar evidence was produced to Dr. Stalcup showing an object heading toward TWA Flight 800 just prior to impact. *See* ECF 196 at 18. No such radar tape was produced. Rather, Dr. Stalcup received a document which purports to describe what was seen by an unknown individual on radar. *See* ECF 179 at 36.

    c.   There is no basis for a claim of fraudulent concealment.

Fraudulent concealment requires an admission that a claim already accrued but there are reasons to stop the statute of limitations clock. *Ellul v. Congregation of Christian Bros*., 774 F.3d 791, 801 (2d Cir. 2014). In this case, Plaintiffs claim a Government conspiracy led by a series of misrepresentations; however, nowhere in their Complaint or Opposition do they provide a start date for accrual beyond April 2021. At that point fraudulent concealment is inapplicable.

The Complaint fails to meet the standard for particularity under Fed. R. Civ. P. 9(b) when alleging fraud. *See* 179 at 33-34. As previously stated, and unrefuted, only two verifiable dates of any communications from the Government exist—November 17, 1997, for the CIA animation, and August 2000 for the NTSB report. Assuming an accrual date on the day of the crash, given the open and obvious nature of the incident, that would mean sixteen months out of a total twenty-four-month statute of limitations period passed before the first allegedly fraudulent statement was made.

The law in the Second Circuit, also unrefuted by Plaintiffs, is that when a limitations period is tolled, that stoppage is not perpetual; but rather only lasts as long as the cause of the tolling exists. *Haekal v. Refco, Inc*., 198 F.3d 37, 43 (2d Cir. 1999). Even then, it does not act to reset the limitations period; but rather, interrupts it. *Id*. This means once the cause of tolling is removed, "the time remaining on the (statute of limitations) clock is calculated by subtracting from the full limitations period whatever time ran before the clock was stopped." *Harper v. Ercole*, 648 F.3d 132, 139 (2d Cir. 2011).

As demonstrated, numerous events challenging the conclusion that a missile played no role in downing TWA Flight 800 occurred after November 1997 and before the release of the NTSB report—a period of 33 additional months for a total 47 months from the date of the crash. This is well beyond the two-year statute of limitations. And all along that timeline Plaintiffs were represented by counsel who prosecuted wrongful death actions in federal court with full discovery. To suggest that within that period, much less the 21 years that would pass afterwards, that the tolled clock would not have restarted and completed its additional eight-month run, strains credulity.

5.   THIS CASE MEETS THE SUPREME COURT'S JURSIDICTIONAL TEST AS AN ADMIRALTY MATTER.

The arguments in the Opposition regarding admiralty jurisdiction are breathtakingly inaccurate and belie a complete mischaracterization of the Supreme Court's test in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co*., 513 U.S. 527 (1995), and subsequent case law. Plaintiffs start with the premise that "[a]dmiralty jurisdiction is not automatically exclusive . . . ." ECF 196 at 27. This alleged legal maxim is unsupported by legal citation. Plaintiffs then state that "once Defendants assert admiralty jurisdiction, they must establish its exclusivity and demonstrate that no other jurisdictional basis applies." *Id*. at 28. Again, no citation is found. Plaintiffs continue in this vein with the statement that "Courts have consistently indicated that claims may proceed under both maritime and non-maritime theories when the facts implicate both domains." *Id*. at 29. Plaintiffs repeat the tenet again stating "[a]dmiralty jurisdiction does not automatically foreclose alternative jurisdictional bases in complex cases involving both maritime and non-maritime elements." In both instances not a single citation is presented.

Only at the end of their brief do Plaintiffs cite *Indian Towing Co. v. United States*, 350 U.S. 61 (1955), for the proposition that the Supreme Court has allowed an admiralty claim to proceed through the FTCA. The problem with the citation is that *Indian Towing* is no longer good law for that proposition as Congress subsequently amended the Suits in Admiralty Act (SIAA), changing the legal framework. *Indian Towing* was decided in 1955, before the 1960 amendment to the SIAA expanded its waiver to create a broad remedy for admiralty torts. Prior to 1960 the SIAA only applied to the narrow context where the Government engaged in purely commercial conduct as an operator of merchant vessels.[11]

---

[11] This was an outgrowth of the Shipping Act of 1916. 39 Stat. 728 (1916), 46 U.S.C. § 801 *et seq*. (1916) which harkened the Government's role in commercial shipping before World War One. The Shipping Act permitted liability for Government vessels "while employed solely as

In 1955, when *Indian Towing* was decided, the SIAA provided no remedy for admiralty torts more broadly. *Indian Towing*, however, did not involve a U.S.-owned vessel but the negligent operation of a lighthouse. The SIAA then provided no remedy, so claimants sued the United States under the FTCA. The 1960 amendment clarified that the SIAA provided a remedy for all situations where "if a private person or property were involved, a civil action in admiralty could be maintained." Pub. L. 86-770, 74 Stat. 912 (1960), 46 U.S.C. § 30903. The SIAA also now states that where it provides a remedy, that remedy is exclusive. 46 U.S.C. § 30904; *see also Crawford v. Electric Boat Corp.*, 515 F. Supp. 2d 282, 291 (D. Conn. 2007). The FTCA also excludes suits arising in admiralty from its waiver of sovereign immunity. 28 U.S.C. § 2680(d). Any implication from *Indian Towing* that a party can maintain an admiralty case through the FTCA is 66 years out of date.

Plaintiffs have also fabricated new facts and causes of action including that the missile test has connections to the U.S. Army and that there is a tort for "negligent cover-up" pleaded in the Complaint. *See* ECF 196 at 28. Plaintiffs are not permitted to interpose new factual allegations or new legal theories in an opposition. *Uddoh v. United Healthcare*, 254 F. Supp. 3d 424, 429 (E.D.N.Y. 2017) (citing *Wright v Ernst & Young, LLP*, 152 F.3d 169, 178 (2d Cir. 1998)). Nowhere within the Complaint does the word "Army" appear. Further, the Complaint lists only two causes of action against the United States: (1) Negligence and Gross Negligence, and (2) Wrongful Death and Survivorship, ECF 33 at 19, 25. There is no cause of action for

---

merchant vessels . . . ." *Id*. § 8, 39 Stat. 730-31 (1916). The consequence was that it permitted the arrest of Government vessels by private parties while the vessels were carrying critical war cargo, an untenable situation. To remedy it Congress passed the SIAA, which provided that suits against U.S.-owned cargo vessels could only be brought *in personam*, thus prohibiting marine arrests. 41 Stat. 525 (1920), 46 U.S.C. § 30903.

negligent cover-up, and the United States has found no such a cause of action under any potentially applicable law.

Plaintiffs further attempt to complicate this straightforward analysis by alleging that shore-based actions are to blame for the purported missile test. Plaintiffs do not dispute that the Complaint clearly states that TWA Flight 800 crashed into the Atlantic Ocean, and that the cause of the crash were missile(s) with live warhead(s) fired by unspecified warship(s). ECF 33 at 2. Rather, Plaintiffs throw in arguments based on land-based facilities to claim that jurisdiction could be under both the SIAA and FTCA. ECF 196 at 28. This argument misses the mark because, for purposes of determining admiralty jurisdiction, the location of the tort is where the injury is suffered, not where the negligent act occurred. *Burke v. Quick Lift, Inc*., 464 F. Supp. 2d 150, 155 (E.D.N.Y. 2006) (citing *Butler v. Am. Trawler Co., Inc.*, 887 F.2d 20, 21 (1st Cir. 1989)). Therefore, the fact that the missile(s) impacted TWA Flight 800 over the Atlantic Ocean is the relevant factor, and not whether there was land-based involvement.[12]

## CONCLUSION

For the above-stated reasons, along with those in its Motion and Supplemental Brief, the United States respectfully requests the Court dismiss Plaintiffs' Complaint.

---

[12] Plaintiffs suggest the Court could "transfer" their case "to the Admiralty side" under 28 U.S.C. § 1631. ECF 196 at 39. There is no admiralty "side." The Federal Rules of Civil Procedure were amended in 1966 to establish the core concept of "one cause of action," Fed. R. Civ. P. 2, so § 1631 does not apply.

Dated: January 20, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

ARTEMIS LEKAKIS
Assistant United States Attorney
Eastern District of New York

/s/ *Robert Kelly*
ROBERT KELLY
JILL DAHLMANN ROSA
Senior Admiralty & Aviation Counsel
EMMA HILDEBRAND
Trial Attorney
Torts Branch, Civil Division
U. S. Department of Justice
P.O. Box 14271
Washington, D.C. 20044-4271
Robert.Kelly@usdoj.gov
Jill.Rosa@usdoj.gov
Emma.Hildebrand@usdoj.gov

Attorneys for Defendant
UNITED STATES OF AMERICA

To: All attorneys of record via CM/ECF